**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                        :

In re:                       :    Chapter 11
                        :

RYCKMAN CREEK RESOURCES, LLC,  :    Case No. 16-10292 (___)
et al.,                    :
                        :    (Joint Administration Pending)
          Debtors.[1]   :
                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS UNDER
BANKRUPTCY CODE SECTIONS 105, 361, 362, 363, AND 364, BANKRUPTCY
RULES 2002 AND 4001, AND LOCAL BANKRUPTCY RULE 4001-2 (I)
AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION
FINANCING ON A SECURED, SUPERPRIORITY BASIS AND (B) USE CASH
COLLATERAL, (II) GRANTING ADEQUATE PROTECTION, (III)
<u>SCHEDULING A FINAL HEARING, AND (IV) GRANTING RELATED RELIEF</u>**

Ryckman Creek Resources, LLC ("<u>Ryckman</u>") and certain of its affiliates, the

debtors and debtors in possession in the above-captioned cases (collectively, the "<u>Debtors</u>" or the

"<u>Company</u>"), hereby move (this "<u>Motion</u>") this Court, under sections 105, 361, 362, 363, and

364 of chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), Rules 2002 and

4001 of Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and Rule 4001-2 of

the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for

the District of Delaware (the "<u>Local Bankruptcy Rules</u>"), for entry of (A) an interim order

substantially in the form annexed hereto (the "<u>Interim DIP Order</u>") (i) authorizing the Debtors to

obtain secured postpetition bridge financing (the "<u>Bridge Facility</u>") pursuant to the terms and

---

[1] The Debtors and, where applicable, the last four digits of their respective taxpayer identification numbers are as follows: Ryckman Creek Resources, LLC (4180), Ryckman Creek Resources Holding Company LLC, Peregrine Rocky Mountains LLC, and Peregrine Midstream Partners LLC (3363). The address of the Debtors' corporate headquarters is 3 Riverway, Suite 1100, Houston, TX 77056.

conditions of the Ryckman Creek Resources, LLC Terms and Conditions of Proposed Senior

Secured, Super-Priority Debtor-in-Possession Bridge Facility Term Sheet, attached hereto as

Exhibit A (as amended, modified, and/or supplemented at or before the Final Hearing (defined

below), the "Bridge Financing Term Sheet") with ING Capital LLC ("ING"), as agent and lender

(the "DIP Agent" and "Bridge DIP Lender," respectively), (ii) scheduling a final hearing (the

"Final Hearing"), and (iii) granting related relief, and (B) a final order (the "Final DIP Order",

and together with the Interim DIP Order, the "DIP Orders")[2] (i) approving the Bridge Facility on

a final basis, (ii) authorizing the Debtors to obtain additional secured postpetition financing (the

"DIP Facility," and together with the Bridge Facility, the "Postpetition Facilities") pursuant to

the terms and conditions of that certain Senior Secured, Super-Priority Debtor-In-Possession

Credit Facility Term Sheet, attached as Annex A to the Bridge Financing Term Sheet (the "DIP

Financing Term Sheet," and together with the Bridge Financing Term Sheet, the "Term Sheets")

which would be further reflected in a senior secured, super-priority debtor-in-possession credit

agreement (as amended, supplemented, restated, or otherwise modified from time to time in

accordance therewith, the "DIP Credit Agreement" and, together with the other documents,

agreements, and instruments delivered pursuant thereto or executed or filed in connection

therewith, all as may be reasonably requested by the DIP Lenders, as the same may be amended,

supplemented, restated, or otherwise modified from time to time the "DIP Loan Documents")

with the DIP Agent, as agent, the Bridge DIP Lender and the other lenders party thereto (together

with the Bridge DIP Lender, the "DIP Lenders") to be filed prior to the Final Hearing and (iii)

granting related relief.  In support of this Motion, the Debtors rely upon and incorporate by

---

[2]    A copy of the proposed Final Order shall be filed under separate cover prior to the Final Hearing (as defined below).

reference the Declaration of Robert D. Albergotti, the Vice President of Restructuring of

Ryckman Creek Resources, LLC (the "First Day Declaration"),[3] filed with this Court

concurrently herewith.  In further support of this Motion, the Debtors, by and through their

undersigned counsel, respectfully represent as follows:

## OVERVIEW

1.    By this Motion, the Debtors seek entry of the proposed DIP Orders,

which:

    (a)    authorize the Debtors to execute and deliver the Bridge Financing
Term Sheet and obtain up to $3,000,000 of secured postpetition
loans to be made available for the period commencing on the
Petition Date and ending forty-five (45) days thereafter, pursuant
to the terms of the Bridge Financing Term Sheet, to be provided by
the Bridge DIP Lender;

    (b)    authorize the Debtors to execute and deliver the DIP Loan
Documents and obtain up to $30,000,000 of secured postpetition
loans after entry of the Final DIP Order, pursuant to the terms of
the DIP Loan Documents, to be provided by the DIP Lenders;

    (c)    authorize the Debtors to use Cash Collateral;

    (d)    authorize the Debtors to execute and enter into the Bridge
Financing Term Sheet and the DIP Loan Documents, and to
perform such other and further acts as may be required in
connection with the Bridge Financing Term Sheet and the DIP
Loan Documents;

    (e)    grant allowed superpriority administrative expense claims to the
DIP Agent with respect to all amounts owed by the Debtors to the
DIP Agent pursuant to the Bridge Facility and the DIP Facility,
subject to the Carve Out (as defined below), to the extent set forth
in the Interim Order;

    (f)    grant to the DIP Agent valid, binding, continuing, enforceable,
fully-perfected liens, subject and junior only to the Carve-Out (as
defined herein) and valid, enforceable, properly perfected, and

---

[3]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Bridge
Financing Term Sheet, the DIP Financing Term Sheet, or the Interim Order, as applicable.

unavoidable prepetition liens that are senior to the liens of the Prepetition Lenders (as defined herein), upon substantially all of the Debtors' assets;

(g)    authorize the Debtors to provide adequate protection to the Prepetition Lenders;

(h)    waive (subject to the entry of the Final DIP Order) the Debtors' right to surcharge the DIP Collateral pursuant to Bankruptcy Code section 506(c) ;

(i)    modify the automatic stay imposed by Bankruptcy Code section 362 to the extent necessary to implement and effectuate the terms of the Term Sheets, the DIP Loan Documents, and the DIP Orders;

(j)    schedule a hearing (the "Final Hearing"), pursuant to Rule 4001(c)(2) of the Bankruptcy Rules, to consider entry of the Final Orders granting the relief requested in this Motion on a final basis.; and

(k)    grant related relief.

## JURISDICTION AND VENUE

2.    This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

3.    The statutory and legal predicates for the relief requested herein are Bankruptcy Code sections 105, 361, 362, 363, and 364, Bankruptcy Rules 2002 and 4001, and Local Bankruptcy Rule 4001-2.

4.    Pursuant to Rule 9013-1(f) of the Local Bankruptcy Rules, the Debtors consent to the entry of a final judgment or order with respect to this Motion if it is determined that this Court would lack Article III jurisdiction to enter such final order or judgment absent the consent of the of the parties.

## BACKGROUND

**A.    General.**

5.    On February 2, 2016 (the "Petition Date"), the Debtors each commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases").  The Debtors have requested that the Chapter 11 Cases be jointly administered.

6.    The Debtors continue to operate their business and manage their properties as debtors and debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

7.    To date, no creditors' committee has been appointed in the Chapter 11 Cases by the Office of the United States Trustee for the District of Delaware (the "United States Trustee").  No trustee or examiner has been appointed in the Chapter 11 Cases.

8.    The Company was formed to engage in the acquisition, development, marketing and operation of an underground natural gas storage facility (the "Ryckman Creek Facility"), located in Uinta County, Wyoming.  The Ryckman Creek Facility is a 50 billion cubic foot storage facility with a working gas capacity of approximately 42 billion cubic feet.  It is located approximately 25 miles from the Opal Hub, where five major interstate gas pipelines converge, allowing for distribution to several key consumer markets, including California, Nevada, the Pacific Northwest, and the Midwest.

9.    Additional factual background information regarding the Debtors, including their business operations, their corporate structure, and the events leading to the Chapter 11 Cases, is set forth in detail in the First Day Declaration.

**B.    The Debtors' Prepetition Capital Structure.**

10.    The Company's original capital structure at formation and for much of the construction phase of the project was fairly straightforward, consisting of $120,000,000 in term

loan debt, a $40,000,000 revolving credit facility, $50,000,000 in subordinated debt, and equity.[4]

The capital structure was anticipated to be sufficient to bring the project into operation.

However, as a result of various construction setbacks and other issues, as described in more

detail in the First Day Declaration, that increased the cost of the project, Ryckman worked with

its existing lenders and equity sponsor to obtain additional liquidity.  The layered capital

structure described below is the result of this additional funding.

11.    As of the Petition Date, Ryckman had approximately $333,000,000 of

prepetition bank debt which comprised of the following principal amounts plus accrued interest:[5]

- Tranche A Debt:  $55,000,000 in principal amount of Tranche A debt, which is subdivided into two tranches, the Initial Tranche A Loans (defined below) in the principal amount of $50,000,000 and the Secondary Tranche A Loans (defined below) in the principal amount of $5,000,000;

- Tranche B Debt: $95,000,000 in principal amount of Tranche B debt, which is subdivided into three tranches, the Initial Tranche B Loans (defined below) in the principal amount of $55,000,000, the Secondary Tranche B Loans (defined below) in the principal amount of $15,000,000, and the Tertiary Tranche B Loans (defined below) in the amount of $25,000,000; and

- Term Loan Debt:  $160,000,000 in principal amount of term loan debt.[6]

12.    Second Amended and Restated Credit Agreement.  Ryckman is a

borrower under that certain Second Amended and Restated Credit Agreement, dated as of

October 31, 2014 (as the same has been amended, supplemented, modified, extended, renewed,

restated and/or replaced at any time prior to the Petition Date, the "Second Amended and

---

[4]    The capital structure also included an incremental facility and an inventory management facility.

[5]    Ryckman is the only borrower under the Second Amended and Restated Credit Agreement and the Amended and Restated Credit Agreement.

[6]    In addition, there is an approximate $1,200,000 outstanding mark to market and settlement  liability related to Ryckman's  interest rate swaps with two Prepetition Lenders.

Restated Credit Facility"), with ING, as administrative agent and as collateral agent for the secured parties, the Bank of New York Mellon ("BONY"), as depository, and the tranche A lenders (the "Tranche A Lenders"), and Bear River Acquisition Company Inc., as the tranche B lender (the "Tranche B Lender" and together with the Tranche A Lenders, the "Completion Loan Lenders").

13.     The Second Amended and Restated Credit Facility is secured by (i) liens on substantially all of the assets of Ryckman, (ii) pledges of the Class A units of Ryckman by Holdings and Bear River, and (iii) pledges of the Class B units of Ryckman by the Nielson Equity Holders.

14.     Tranche A Completion Loan Commitment.  Under the Second Amended and Restated Credit Facility, the Tranche A Lenders committed to advance term loans in the aggregate principal amount of $55,000,000 to finance project costs.  The first $50,000,000 of the Tranche A Loans (the "Initial Tranche A Loans") and the remaining $5,000,000 in Tranche A Loans (the "Secondary Tranche A Loans" and together with the Initial Tranche A Loans, the "Tranche A Loans") are fully funded.  The Tranche A Loans mature on December 31, 2018.

15.     Tranche B Completion Loan Commitment.  Bear River initially committed to advance term loans to finance project costs in the aggregate principal amount of $55,000,000 (comprised of $50,000,000 of Initial Tranche B Loans and $5,000,000 of Secondary Tranche B Loans).  Subsequently, pursuant to various amendments to the Second Amended and Restated Credit Agreement, the Tranche B Lenders increased the Secondary Tranche B Loans by an additional $15,000,000 so that the aggregate Secondary Tranche B Loan commitment was $20,000,000 and the aggregate Tranche B Loan commitment was $70,000,000.  Finally, on October 13, 2015, Ryckman, the Completion Loan Lenders, ING, and the Depository entered

into the seventh amendment to the Second Amended and Restated Credit Agreement (the

"Seventh Amendment").  Under the Seventh Amendment, Bear River upsized its commitment by

another $25,000,000 to $95,000,000 in the aggregate.  The first $55,000,000 of the Tranche B

Loans (the "Initial Tranche B Loans"), the next $15,000,000 in Tranche B Loans (the

"Secondary Tranche B Loans"), and the final $25,000,000 in Tranche B Loans (the "Tertiary

Tranche B Loans" and together with the Initial Tranche B Loans and the Secondary Tranche B

Loans, the "Tranche B Loans") are all fully funded.  The Tranche B Loans mature on December

31, 2018; provided, however, under certain circumstances set forth in the Agreement Among

Lenders, the maturity date of the Tranche B Principal Debt (as defined in the Second Amended

And Restated Credit Agreement) may be extended.

16.    Term Loan Commitment.  Under the Second Amended and Restated

Credit Agreement, certain loans made under the prior Amended and Restated Credit Agreement,[7]

dated as of May 15, 2014, with ING as administrative agent and BONY as depository and the

lenders party thereto (the "Term Loan Lenders" and, together with the Completion Loan

Lenders, the "Prepetition Lenders" ), were restructured.[8]  As a result of the restructuring, as of

the Petition Date, term loans in the aggregate principal amount of approximately $160,000,000

(the "Term Loans") remain outstanding.[9]  The Term Loans mature on December 31, 2018.

---

[7]    The Amended and Restated Credit Facility is secured by the same collateral as the Second Amended and
Restated Credit Agreement.

[8]    Under the Second Amended and Restated Credit Agreement, certain Inventory Loan Commitments (as defined
in the Second Amended and Restated Credit Agreement) were terminated and none remain outstanding.  In
addition, certain Incremental Loan Commitments (as defined in the Second Amended and Restated Credit
Agreement) were terminated and the outstanding Incremental Loans were deemed to have been repaid to ING.
Finally, $40,000,000 outstanding under a revolving facility was converted to term loans.

[9]    This amount is comprised of $120,000,000 in term loans outstanding under the Amended and Restated Credit
Agreement and the  $40,000,000  in term loans converted from the revolving facility under the Amended and
Restated Credit Agreement and combined with the term loans under the Second Amended and Restated Credit
Agreement.  In addition, approximately $1,200,000 remains outstanding  as a liability under certain hedging

(Footnote continues on next page.)

17.     <u>Priority of Payment of Obligations</u>.  The Lenders are party to that certain Agreement Among Lenders (as amended, restated, or supplemented from time to time, the "<u>Agreement Among Lenders</u>").  In addition, Ryckman, ING, and BONY are party to that certain Second Amended and Restated Disbursement Agreement (as amended, restated, or supplemented from time to time, the "<u>Disbursement Agreement</u>").  The Agreement Among Lenders and the Disbursement Agreement set forth the priority of payment between and among the Completion Loan Lenders and the Term Loan Lenders.  In general, from and after a Cessation Event (as defined in the Disbursement Agreement)[10]:

- Payment of the principal and interest on the Tertiary Tranche B Loans and the Secondary Tranche A Loans is <u>pari passu</u> and senior in right of payment to the other outstanding indebtedness (collectively, the "<u>First Priority Debt</u>").

- The principal and interest on the Initial Tranche A Loans, the principal and interest on the Secondary Tranche B Loans, and the principal on the Initial Tranche B Loans are pari passu and next in priority (collectively, the "<u>Second Priority Debt</u>").

- Finally, the Term Loan principal and interest is <u>pari passu</u> with the interest on the Initial Tranche B Loans and junior to the First Priority Debt and the Second Priority Debt (collectively, the "<u>Third Priority Debt</u>").

18.     <u>Equity</u>.  Under the Second Amended and Restated Credit Agreement, all principal and interest under that certain Subordinated Advanced Note and Unit Purchase Agreement, dated as of June 2, 2014 with Bear River, pursuant to which Bear River had

_____

(Footnote continued from previous page.)

    agreements.

[10]   A Cessation Event includes a voluntary or involuntary filing for bankruptcy by Ryckman.

advanced $30,000,000 in subordinated debt was exchanged for preferred member interests in

Ryckman (the "Preferred Units"). As a result, Bear River holds 34,879.46 Preferred Units in

Ryckman. In addition, as set forth above, Holdings holds 90,000 Class A units and Bear River

holds 10,000 Class A Units of Ryckman . Individual owners of the Nielson Energy group hold

all 10,000 of Ryckman's Class B units. Peregrine Rocky Mountains LLC holds all 750,000

Class A Units of Holdings. Peregrine Midstream wholly owns Peregrine Rocky Mountains LLC.

Bear River is the majority owner of Peregrine Midstream.

### COMPLIANCE WITH LOCAL BANKRUPTCY RULE 4001-2

19.     Local Bankruptcy Rule 4001-2(a)(1) requires that certain provisions

contained in the financing documents and/or the DIP Orders be highlighted, and that the Debtors

must provide justification for the inclusion of such provisions. The Debtors believe that certain

provisions of the Postpetition Facilities discussed below may implicate Local Bankruptcy Rule

4001-2, and that such provisions are justified and necessary in the context and circumstances of

these cases. The Debtors, therefore, are identifying here the provisions that might fall within the

ambit of Local Bankruptcy Rule 4001-2.

20.     506(c) Waiver. Local Bankruptcy Rule 4001-2(a)(i)(C) requires

identification of provisions that seek to waive, without notice, the estate's rights under

Bankruptcy Code section 506(c). Subject to the entry of the Final DIP Order, the Term Sheets

make it an event of default if the Debtors (or any other party in interest) obtain an order of the

Bankruptcy Court or other judgment, and the effect of such order or judgment is to subject any of

the DIP Agent's collateral to a surcharge pursuant to Bankruptcy Code section 506(c). See

Bridge Financing Term Sheet,[11] p. 7; Interim Order ¶ 14. This provision is justified because (i)

---

[11]    The DIP Financing Term Sheet incorporates the terms of the Bridge Financing Term Sheet, except as replaced

(Footnote continues on next page.)

the Debtors need the financing provided by the Postpetition Facilities and the DIP Lenders were

not willing to provide the Postpetition Facilities without the section 506(c) waiver, (ii) such

waiver does not take effect until after the Final DIP Order is entered, and (iii) the Postpetition

Facilities provide for a Carve-Out that will fund certain administrative expenses and professional

fees following an event of default under the Postpetition Facilities.  Accordingly, the Debtors

submit that the 506(c) waiver of the Postpetition Facilities is necessary and appropriate under the

circumstances.  Moreover, because this provision will only be effective upon entry of the Final

Order and to the extent such order so provides, the Debtors respectfully submit that parties in

interest will have an opportunity to be heard with respect to this provision.

> 21.    <u>Equities of the Case under Section 552(b)</u>.  Local Rule 4001-2(a)(i)(H)

requires identification of provisions that seek to affect this Court's power to consider the equities

of the case under Bankruptcy Code section 552(b).  The Interim DIP Order provides that

"[s]ubject to the entry of the Final DIP Order, effective as of the time of commencement of the

Debtors' bankruptcy cases on the Petition Date: … the Prepetition Lenders and the Bridge

Lender shall not be subject to the "equities of the case" exception of Bankruptcy Code section

552(b), or to the equitable doctrines of "marshaling" or any similar claim or doctrine, with

respect to any DIP Collateral or the Prepetition Collateral." Interim Order ¶15(D).  In the course

of negotiations, the DIP Agent insisted upon this provision as a condition to funding.  This

provision is justified (i) in light of the Debtors' need for the Postpetition Facilities, (ii) the 552(b)

provision will not be effective until entry of the Final Order after notice and a hearing and (iii)

the fact that the  Postpetition Facilities provide for a Carve-Out that will fund certain

---

(Footnote continued from previous page.)

> or supplemented by the DIP Financing Term Sheet.  Accordingly, where indicated by the context, cites to the
> Bridge Term Sheet are applicable to the DIP Facility.

administrative expenses and professional fees following an event of default under the

Postpetition Facilities.  Moreover, because this provision will only be effective upon entry of the

Final Order and to the extent such order so provides, the Debtors respectfully submit that parties

in interest will have an opportunity to be heard with respect to this provision.

22.    The Debtors do not believe that the other provisions of Local Bankruptcy

Rule 4001-2(a)(1) are implicated.  Thus they are not mentioned herein.

## SUMMARY OF THE BRIDGE FACILITY TERMS[12]

23.    The Company and the Prepetition Lenders are presently negotiating the

terms of a potential reorganization of the Debtors, and working on the terms of a plan of

reorganization.  The Debtors contemplate that the full funding under the DIP Facility will be

available when the terms of the path to exiting bankruptcy are finalized.  In the meantime, the

Bridge Facility will provide the Company with the liquidity it needs to operate its business.

24.    In accordance with Bankruptcy Rules 4001(c) and (d), the following

summarizes the significant terms of the Bridge Financing Term Sheet and the Interim Order.

Included in this summary is a description of each of the provisions required to be highlighted by

Local Bankruptcy Rule 4001-2.  The Debtors believe that the following provisions of the Bridge

Financing Term Sheet and the Interim Order are justified and necessary in the context and

circumstances of these cases:

| **Agent and Bridge Lender**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)* | ING Capital LLC |
| --- | --- |

---

[12]    This summary of the Bridge Facility is based upon the Bridge Financing Term Sheet and is provided for the benefit of this Court and other parties in interest.  A copy of the Bridge Financing Term Sheet is attached hereto as <u>Exhibit A</u> and incorporated herein by reference.  To the extent there are any conflicts between this summary and the Bridge Financing Term Sheet, the terms of the Bridge Financing Term Sheet shall govern.  Capitalized terms used in this summary but not otherwise defined herein shall have the meanings set forth in the Bridge Financing Term Sheet.

| | |
|---|---|
| **Borrower**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)* | Ryckman Creek Resources, LLC (the "Borrower") |
| **Commitment**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)*<br>*Local Bankruptcy Rule*<br>*4001-2(a)(ii)* | The Bridge Facility will be in the aggregate principal amount not to exceed $3,000,000 (the "Commitment") pursuant to the terms of the Bridge Financing Term Sheet with advances to be made incrementally on a weekly basis in accordance with the Initial Budget or the Updated Budget, as applicable, until the Maturity Date.  An initial advance of $1,000,000 shall be made available from the Bridge Facility to the Borrower upon approval from the Bankruptcy Court. |
| **Term/Maturity**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)*<br>*Local Bankruptcy Rule*<br>*4001-2(a)(ii)* | The earliest to occur of: (a) the Maturity Date (as defined below); (b) thirty (30) days after the Petition Date if the Final DIP Order has not been entered; (c) acceleration of the obligations under the Bridge Facility (including, without limitation, in connection with any failure to make a payment under the Bridge Facility when due); and (d) the execution of the DIP Facility, as the foregoing (a) through (d) may be extended or waived in the sole discretion of the DIP Agent. The date on which the earliest of clauses (a) through (d) above occurs being referred to hereinafter as the "Termination Date." On the Termination Date, the Bridge Facility shall be deemed terminated, and neither the DIP Agent nor the Bridge Lender shall have any further obligation to provide financing pursuant to the Bridge Facility.<br><br>The Maturity Date is the date that is forty-five days after the Petition Date. |
| **Loan Payments** | All unpaid principal, interest, fees, costs, and expenses on the Bridge Facility shall be due and payable in full on the Termination Date, whether at maturity, upon acceleration, or otherwise.<br><br>In the event that the DIP Facility is made available to the Borrower, the initial draw under such DIP Facility shall be made to repay the aggregate principal amount of all advances outstanding under the Bridge Facility plus the sum of any accrued but unpaid interest and fees as of the applicable Termination Date. |
| **Interest Rates**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)*<br>*Local Bankruptcy Rule*<br>*4001-2(a)(ii)* | A per annum rate equal to (a) the Prime Rate (as defined in the Second Amended and Restated Credit Agreement), plus (b) four and one-half percent (4.5%) (the "Non-Default Interest Rate"); provided that in no event shall the Non-Default Interest Rate be less than eight percent (8%) per annum. |
| **Default Rate:**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)*<br>*Local Bankruptcy Rule*<br>*4001-2(a)(ii)* | Effective immediately upon the occurrence of an Event of Default unless waived in writing by the DIP Agent, interest on the outstanding loans under the Bridge Facility shall accrue at a rate that is 2% per annum in excess of the Non-Default Interest Rate. |
| **Expenses and Fees**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)* | The Borrower agrees to pay a fee (the "Bridge Fee"), in immediately available funds, in the amount of two percent (2%) of the Commitment. The Bridge Fee shall be payable on the Maturity Date unless the DIP Facility is consummated, in which case the Bridge Fee will be payable pursuant to the terms of such DIP Facility.<br><br>The Borrower shall promptly pay or reimburse the DIP Agent when invoiced for all reasonable costs and expenses of counsel (including, without limitation, local counsel) and financial advisors for the DIP Agent relating to the Bridge Facility and the administration and interpretation of, and the enforcement of remedies under, the Bridge Facility and including all due- |

|  | diligence, including but not limited to environmental due-diligence, duplication or printing costs, consultation, travel, and attendance at court hearings, regardless of whether the Bridge Facility is consummated, including any outstanding prepetition fees of the DIP Agent's professionals. ING shall have the right to charge the Bridge Facility for any such fees and costs. Failure to pay such fees and expenses within five business days of delivery of the applicable invoice shall be an Event of Default under the Bridge Facility. |
| --- | --- |
| **Liens and Priorities**<br>*Bankruptcy Rule 4001(c)(1)(B)(i), (xi),*<br>*Local Bankruptcy Rules 4001-2(a)(i)(A), D), (G),and 4001-2(a)(ii)* | Amounts owed by the Borrower to the DIP Agent pursuant to the Bridge Facility (including all accrued interest, fees, costs, and expenses, the "<u>Bridge Facility Obligations</u>") shall constitute, in accordance with Bankruptcy Code Section 364(c)(1), a claim having priority over any or all administrative expenses of the kind specified in, among other sections, Bankruptcy Code sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), and 726 (the "<u>Bridge Facility Superpriority Claim</u>").<br><br>The Bridge Facility (including accrued interest, fees, costs, and expenses) shall be secured by a first priority senior and priming lien, subject and junior only to (i) a carve out for accrued and unpaid professional fees and (ii) valid, enforceable, properly perfected, and unavoidable prepetition liens (including any liens that are perfected after the Petition Date with a priority that relates back to a date prior to the Petition Date as permitted under Bankruptcy Code section 546(b)) that are senior to the liens of Pre-Petition Lenders which secure all of the Pre-Petition Claims (as defined in the Bridge Financing Term Sheet) (the "<u>DIP Liens</u>") in all of the Borrower's property, including, without limitation, all of the Borrower's existing and future acquired property and interests of any nature whatsoever, real and personal, tangible and intangible, accounts receivable, general intangibles, payment intangibles, supporting obligations, investment property, commercial tort claims, inventory, rolling stock, machinery, equipment, subsidiary capital stock, chattel paper, documents, instruments, deposit accounts, contract rights, and tax refunds of the Borrower, excluding only Avoidance Actions and the proceeds thereof (collectively, the "<u>DIP Collateral</u>"). |
| **Lien Validation and Perfection**<br>Local Bankruptcy Rule 4001-2(a)(i)(B) | All liens authorized and granted pursuant to the Interim DIP Order or the Final DIP Order entered by the Bankruptcy Court approving the Bridge Facility or with respect to adequate protection shall be deemed effective and perfected as of the applicable Petition Date, and no further filing, notice or act will be required to effect such perfection.<br><br>The Borrower shall stipulate in the Interim DIP Order and the Final DIP Order that (i) the DIP Agent's liens securing the Second Amended and Restated Credit Facility are valid, perfected, encumber all assets of the Borrower, and (ii) the Borrower possesses no claims, offsets, or any other type cause of action against the DIP Agent which would impair, in any manner, the DIP Agent's liens against the Borrower's assets or the obligations of the Borrower to the DIP Agent under the Second Amended and Restated Credit Facility. The Borrower's stipulation shall be binding upon all parties in interest in the Chapter 11 Case, including any committee that is appointed, unless (i) (x) as to all parties other than a creditors' committee, an adversary proceeding is filed by any party-in-interest prior to the expiration of seventy-five (75) days after the entry of the Interim DIP |

| | |
|---|---|
| | Order or (y) as to the creditors' committee, if formed, an adversary proceeding is filed by the creditors' committee within sixty (60) days after its formation (the "Review Period") against the DIP Agent challenging the DIP Agent's liens or otherwise asserting estate claims against the DIP Agent occurs, and (ii) a final, non-appealable judgment is entered against the DIP Agent in such adversary proceeding; provided, however, any party-in-interest that fails to file an adversary proceeding within the Review Period shall be forever barred from asserting any claims against the DIP Agent on behalf of the Borrower's estate, or challenging in any manner the DIP Agent's liens and claims against the Borrower. |
| **Release of Claims** | In consideration of the furnishing of the Bridge Facility, the Borrower, subject to the rights of another party to bring a challenge action during the Review Period, and upon entry of the Final DIP Order, absolutely releases and forever discharges the administrative agent under the Second Amended and Restated Credit Agreement and its affiliates, officers, directors, employees, attorneys, and other representatives from any and all claims and causes of action of every kind and nature that the Borrower may hold against such released parties. |
| **Adequate Protection** *Bankruptcy Rule 4001(b)(1)(B)(iv), (c)(1)(B)(ii)* | As adequate protection and in consideration for being primed by the DIP Lenders' claims and liens, the Prepetition Lenders (a) shall receive a claim having priority over any and all expenses of the kind specified in, among other sections of the Bankruptcy Code, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, and 1114, subject to the super-priority administrative claims of the DIP Lender under the Bridge Facility and existing liens of the Prepetition Lenders on their respective pre-petition collateral; and (b) shall have valid, binding, enforceable, and perfected liens in all DIP Collateral, in each case equal to the sum of the aggregate diminution, if any, subsequent to the Petition Date, in the value of their respective pre-petition collateral (the "Adequate Protection Liens"). |
| **Carve-Out** *Local Bankruptcy Rule 4001-2(a)(ii)* | Set forth in the Interim DIP Order.  Interim DIP Order ¶ 13. |
| **Events of Default** *Bankruptcy Rule 4001(c)(1)(B) Local Bankruptcy Rule 4001-2(a)(ii)* | Defaults and Events of Default shall mean the occurrence of any of the following:<br>• The Chapter 11 Case of the Borrower shall be converted to a case under Chapter 7 of the Bankruptcy Code or be dismissed or a motion requesting such relief shall have been filed.<br>• Filing or support of a proposed plan of reorganization by the Borrower that does not provide for the indefeasible payment in full and in cash of the Borrower's obligations outstanding under the Bridge Facility, unless otherwise agreed in writing by the DIP Agent in its sole discretion.<br>• Entry of an order confirming (or the filing of any motion or pleading requesting confirmation of) a plan of reorganization that does not require the indefeasible repayment in full, in cash of the Bridge Facility as of the effective date of the plan, unless otherwise agreed in writing by the DIP Agent in its sole discretion.<br>• Appointment of a trustee under Section 1104 of the Bankruptcy Code without the express written consent of the DIP Agent, or the filing of any motion or other pleading requesting such relief which the Borrower fails to timely oppose.<br>• Appointment of an examiner with enlarged powers (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under |

| | |
|---|---|
| | Section 1106(b) of the Bankruptcy Code without the prior written consent of the DIP Agent, or the filing of a motion or other pleading requesting such relief which the Borrower fails to timely oppose. |
| | • Entry of an order by the Bankruptcy Court amending, supplementing, staying, vacating or otherwise modifying the Bridge Facility, the Interim DIP Order, or the Final DIP Order approving the Bridge Facility, without the prior written consent of the DIP Agent or the filing of a motion or other pleading requesting such relief which the Borrower fails to timely oppose. |
| | • Any attempt by the Borrower to obtain, or if any other party in interest obtains, an order of the Bankruptcy Court or other judgment, and the effect of such order or judgment is to, invalidate, reduce or otherwise impair Agent's claims, or to subject any of the DIP Agent's collateral to a surcharge pursuant to Section 506(c) of the Bankruptcy Code. |
| | • The Borrower shall apply for an order substituting any assets for all or any portion of the DIP Collateral. |
| | • Any payment on, or application for authority to pay, any pre-petition claim owing to terminated employees, or lease rejection damages, without prior written consent of the DIP Agent or as otherwise set forth in the Initial Budget or the Updated Budget, as applicable, each as approved by the DIP Agent in its sole discretion. |
| | • A final order is entered granting any creditor with a claim in excess of $100,000 relief from the automatic stay. |
| | • Failure to make all payments under the Bridge Facility when due. |
| | • Failure to pay any post-petition material indebtedness. |
| | • Any representation or warranty by the Borrower is incorrect or misleading in any material respect when made. |
| | • Exclusivity shall have been terminated or the Borrower shall have agreed to any such termination. |
| | • If any Sale (as defined in the Bridge Financing Term Sheet) is conducted by the Borrower and the Borrower shall take (or support any other person in taking) any action in order to restrict or prohibit the DIP Agent or any DIP Lender from submitting a "credit bid" for any assets of the Borrower. |
| | • After the consummation of any Sale, the Borrower fails to disburse the sale proceeds to the DIP Lender contemporaneously with the closing thereof. |
| | • The Plan Support Agreement (as defined in the Bridge Financing Term Sheet) shall have been terminated in accordance with its terms or, following its approval by the Bankruptcy Court any material provision thereof shall cease to be in full force or effect. |
| | • Failure to meet any of the Milestones (as defined in the Bridge Financing Term Sheet) within the timeframes provided for in the Bridge Financing Term Sheet. |
| **Affirmative and Negative Covenants** | The Borrower shall comply with the following affirmative and negative covenants and: (a) compliance with the Initial Budget and Updated Budget covenants and (b) compliance with each of the Milestones set forth in the Bridge Financing Term Sheet. |
| **Cash Management Collections and Remittances:** | The Borrower shall use a cash management system that is the same as or substantially similar to its prepetition cash management system. Any material changes from such pre-petition cash management system must be |

| | |
|---|---|
| | acceptable to the DIP Agent. The Interim DIP Order and the Final DIP Order shall provide the Bridge Lender with a valid and enforceable lien and security interest on the cash held in the Borrower's bank accounts.<br><br>For the purpose of crediting the Borrower's loan account and calculating interest, all items of payment shall be deemed applied by the DIP Agent one (1) business day following the business day of the DIP Agent's receipt thereof. |
| **Use of Cash Collateral**<br>*Bankruptcy Rule*<br>*4001(b)(1)(B)(ii)*<br>*Local Bankruptcy Rule*<br>*4001-2(a)(ii)* | Set forth in the Interim DIP Order.  Interim DIP Order ¶ 9. |
| **Use of Loans**<br>*Bankruptcy Rules*<br>*4001(b)(1)(B), (c)(1)(B)*<br>*Local Bankruptcy Rule*<br>*4001-2(a)(ii)* | Proceeds of the Bridge Facility shall be used solely for the following purposes: (a) to fund, after application of all other available cash, post-petition working capital needs of the Debtors, including, but not limited to, those activities required to remain in, or return to, compliance with laws in accordance with 28 U.S.C. § 1930; (b) to pay interest, fees, and expenses to the DIP Agent in accordance with the terms hereof (whether or not such amounts are reflected in the Initial Budget or Updated Budget); (c) to pay permitted pre-petition claim payments and adequate protection payments, if any; and (d) to pay certain other costs and expenses of administration of the Chapter 11 Cases, in each case, subject to and to the extent identified in the Initial Budget and the Updated Budget, as applicable, each as approved by the DIP Agent in its sole discretion; provided that professional fees paid in accordance with compensation procedures approved by the bankruptcy court may be paid up to the total cumulative amount shown in the Initial Budget.<br><br>Proceeds of the Bridge Facility or, until entry into the Final DIP Order, cash collateral shall not be used (a) to permit the Borrower, or any other party-in-interest or their representatives to challenge or otherwise contest or institute any proceeding to determine (i) the validity, perfection or priority of security interests in favor of the Prepetition Lenders or the DIP Lender, or (ii) the enforceability of the obligations of the Borrower under the Second Amended and Restated Credit Agreement, any other Loan Documents or the Bridge Facility, (b) to investigate, commence, prosecute, or defend any claim, motion, proceeding, or cause of action against the Prepetition Lenders or the DIP Lender and their agents, attorneys, advisors, or representatives including, without limitation, any lender liability claims or subordination claims, (c) to investigate, commence, prosecute, or defend any claim or proceeding or cause of action to disallow or challenge the obligations of the Borrower under the Second Amended and Restated Credit Agreement, any other Loan Documents or the DIP Loan Documents, or (d) to fund acquisitions, capital expenditures, capital leases, or any other similar expenditure other than capital expenditures specifically set forth in the Initial Budget or Updated Budget, as applicable, and approved by the DIP Agent. |
| **Borrowing Conditions**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)*<br>*Local Bankruptcy Rule*<br>*4001-2(a)(ii)* | The closing of the Bridge Facility shall be subject to (a) approval of the Initial Budget (as defined in the Bridge Financing Term Sheet), together with all financial information and projections regarding the Borrower requested by the DIP Agent, all in form and substance satisfactory to the DIP Agent in its sole discretion, (b) entry of an Interim DIP Order approving the Bridge Facility, its superpriority administrative claims, and all first priority and other liens securing the Bridge Facility, and containing such other orders and findings as the DIP Agent may require, including automatic modification of the automatic |

|  | stay upon the occurrence of an Event of Default enabling the DIP Agent to exercise certain rights and remedies against the DIP Collateral, which Interim DIP Order or Final DIP Order, as applicable, shall not have been modified or amended without reasonable approval of the DIP Agent, and shall not have been reversed, vacated, or stayed pending appeal, in form and substance satisfactory to the DIP Agent in its sole discretion, (c) the satisfaction of the DIP Agent with all adequate protection payments, critical vendor payments, and all other material motions and orders filed in the Chapter 11 Cases requiring the expenditure of cash, and (d) continuation of the Borrower's present cash management system.<br><br>There shall exist no Event of Default (or event that would constitute an Event of Default with the giving of notice or lapse of time) under the Bridge Financing Term Sheet, and the representations and warranties therein shall be true and correct in all material respects.<br><br>There shall have occurred no material adverse change in the Borrower's condition (financial, environmental, or otherwise), operations, performance, or properties (other than the commencement of the Chapter 11 Cases), since the date of the Bridge Financing Term Sheet, that in the reasonable judgment of the DIP Agent, has or can reasonably be expected to have a material adverse effect on the rights and remedies of the DIP Agent or on the ability of the Borrower to perform its obligations to them under the Bridge Facility. |
|---|---|
| **Milestones**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)* | A "plan support agreement" approved by the DIP Agent in consultation with the DIP Lenders (the "Plan Support Agreement") shall be executed by the Borrower, the DIP Agent, and the other Prepetition Lenders (including the Tranche B Lender), within fifteen (15) days of the Petition Date.<br><br>A plan, the terms of which conform to the Plan Support Agreement (the "Plan") shall be filed within forty (40) days of the Petition Date. |
| **Indemnification**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)(ix)* | The Borrower shall indemnify and hold the DIP Agent, the DIP Lender and its officers, directors, employees and agents (including all of their professionals) (each an "Indemnified Party") harmless from and against any and all claims, damages, losses, liabilities, and expenses (including, without limitation, all fees and disbursements of attorneys and other professionals) to which any Indemnified Party may become liable or which may be incurred by or asserted against any Indemnified Party, in each case in connection with or arising out of or by reason of any investigation, litigation or proceeding arising out of or relating to or in connection with the Bridge Facility, the DIP Loan Documents, any obligation, or any act, event, or transaction related or attendant thereto or any use or intended use of the proceeds of the Bridge Facility, except to the extent the same is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct.  The terms and conditions of Section 13.03(b) of the Second Amended and Restated Credit Agreement are  incorporated in the Bridge Financing Term Sheet mutatis mutandis. |

| Section 506(c) Waiver *Bankruptcy Rule 4001(c)(1)(B)(x)* *Local Bankruptcy Rule 4001-2(a)(i)(C)* | Defaults and Events of Default shall mean the occurrence of any of the following…Any attempt by the Borrower to obtain, or if any other party in interest obtains, an order of the Bankruptcy Court or other judgment, and the effect of such order or judgment is to, invalidate, reduce or otherwise impair the DIP Agent's claims, or to subject any of the DIP Agent's collateral to a surcharge pursuant to Section 506(c) of the Bankruptcy Code. |
|---|---|
| No Liens on Avoidance Actions | The Bridge Lender and the DIP Agent are not being granted a lien on Avoidance Actions or the proceeds thereof. |
| Modification of the Automatic Stay | See Interim Order ¶18. |

## SUMMARY OF THE DIP FACILITY TERMS[13]

25.     As noted above, the Debtors are negotiating with the DIP Agent in an attempt to secure the full $30,000,000 of funding.  A summary of the proposed terms of such funding as set forth in an annex to the Bridge Financing Term Sheet are summarized below.  The terms may change and the final terms will reflected in the DIP Credit Agreement.

26.     In accordance with Bankruptcy Rules 4001(c) and (d), the following summarizes the significant terms of the contemplated DIP Facility, as set forth in the DIP Financing Term Sheet and the Interim Order, and as will be incorporated in the DIP Loan Documents once agreed upon.[14]  Included in this summary is a description of each of the provisions required to be highlighted by Local Bankruptcy Rule 4001-2.  The Debtors believe that the following provisions of the DIP Facility and the Interim Order are justified and necessary in the context and circumstances of these cases:

---

[13]     This summary of the DIP Facility is based upon the DIP Financing Term Sheet and is provided for the benefit of this Court and other parties in interest.  A copy of the DIP Financing Term Sheet is attached as Annex A to the Bridge Financing Term Sheet, which is attached hereto as <u>Exhibit A</u> and incorporated herein by reference. To the extent there are any conflicts between this summary and the DIP Financing Term Sheet or the DIP Loan Documents, the terms of the DIP Financing Term Sheet  or the DIP Loan Documents shall govern.  To the extent there are any conflicts between the DIP Financing Term Sheet and the DIP Loan Documents, the terms of the DIP Loan Documents shall govern.  Capitalized terms used in this summary but not otherwise defined herein shall have the meanings set forth in the Bridge Financing Term Sheet.

[14]     The Debtors will file the agreed DIP Credit Agreement with this Court in advance of the Final Hearing.  To the extent that the terms of the DIP Credit Agreement differ in any material respect from the terms set forth in the DIP Financing Term Sheet or herein, the Debtors will so notify this Court and parties in interest.

| | |
|---|---|
| **Agent and DIP Lenders**<br>*Bankruptcy Rule 4001(c)(1)(B)* | ING Capital LLC, as administrative agent and DIP Lender, and the other lenders party to the DIP Credit Agreement. |
| **Borrower**<br>*Bankruptcy Rule 4001(c)(1)(B)* | Ryckman Creek Resources, LLC (the "Borrower") |
| **Commitment**<br>*Bankruptcy Rule 4001(c)(1)(B)*<br>*Local Bankruptcy Rule 4001-2(a)(ii)* | The DIP Facility will be a consolidated term loan in the aggregate principal amount of $30 million (the "Commitment") pursuant to the terms of the DIP Loan Documents.   Upon the entry of the Final DIP Order, the Borrower shall be permitted to borrow in accordance with the DIP Loan Documents. |
| **Term/Maturity**<br>*Bankruptcy Rule 4001(c)(1)(B)*<br>*Local Bankruptcy Rule 4001-2(a)(ii)* | The earliest to occur of: (a) the Maturity Date (as defined below); and (b) acceleration of the obligations under the DIP Facility (including, without limitation, in connection with any failure to make a payment under the DIP Facility when due). The date on which the earliest of clauses (a) through (b) above occurs being referred to hereinafter as the "Termination Date." On the Termination Date, the DIP Facility shall be deemed terminated, and neither the DIP Agent nor any other DIP Lender shall have any further obligation to provide financing pursuant to the DIP Facility or DIP Loan Documents.<br><br>"Maturity Date" means the date that is 120 days after the Petition Date. |
| **Interest Rates**<br>*Bankruptcy Rule 4001(c)(1)(B)*<br>*Local Bankruptcy Rule 4001-2(a)(ii)* | Interest shall be paid, in kind, on the last business day of each month on all outstanding advances under the DIP Facility, accruing at a per annum floating rate equal to (a) the LIBOR Rate, plus (b) seven and one-half percent (7.5%) (the "Non-Default Interest Rate").  Any accrued but unpaid interest shall be capitalized and added as of the applicable interest payment date to the principal amount of the DIP Facility.<br><br>Interest with respect to any outstanding obligations under the Second Amended and Restated Credit Agreement shall accrue from and after the Petition Date at the Non-Default Interest Rate and be due and payable by the Borrower on the date that the full amount of the DIP Facility is immediately due and payable. |
| **Default Rate:**<br>*Bankruptcy Rule 4001(c)(1)(B)*<br>*Local Bankruptcy Rule 4001-2(a)(ii)* | Effective immediately upon the occurrence of an Event of Default unless waived in writing by the DIP Agent, interest on the outstanding loans under the DIP Facility shall accrue at a rate that is 2% per annum in excess of the Non-Default Interest Rate. |
| **Expenses and Fees**<br>*Bankruptcy Rule 4001(c)(1)(B)* | The Borrower shall pay all fees and other charges payable in the amounts and at the times as set forth in the DIP Facility in relation to the full amount of the Commitment. |
| **Liens and Priorities**<br>*Bankruptcy Rule 4001(c)(1)(B)(i), (xi),*<br>*Local Bankruptcy Rules 4001-2(a)(i)(A), D), (G),and 4001-2(a)(ii)* | Amounts owed by the Borrower to the DIP Agent pursuant to the DIP Facility (including all accrued interest, fees, costs, and expenses, the "DIP Obligations" and together with the Bridge DIP Obligations, the "Postpetition Financing Obligations") shall constitute, in accordance with Section 364(c)(1) of the Bankruptcy Code (as defined below), a claim having priority over any or all administrative expenses of the kind specified in, among other sections, Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), and 726 of the Bankruptcy Code (the "DIP Superpriority Claim" and together with the Bridge Facility Superpriority Claim, the "Postpetition Financing Superpriority Claims").<br><br>The DIP Facility (including accrued interest, fees, costs, and expenses) shall be secured by the DIP |

|  | Liens on the DIP Collateral. |
|---|---|
| **Lien Validation and Perfection**<br>Local Bankruptcy Rule 4001-2(a)(i)(B) | The Borrower shall stipulate in the Interim DIP Order and the Final DIP Order that (i) the DIP Agent's liens securing the Second Amended and Restated Credit Facility are valid, perfected, encumber all assets of the Borrower, and (ii) the Borrower possesses no claims, offsets or any other type cause of action against the DIP Agent which would impair, in any manner, the DIP Agent's liens against the Borrower's assets or the Obligations (as defined in the Second Amended and Restated Credit Agreement) of the Borrower to the DIP Agent under the Second Amended and Restated Credit Facility.  The Borrower's stipulation shall be binding upon all parties in interest in the Chapter 11 Cases, including any committee that is appointed, unless (i) (x) as to all parties other than a creditors' committee, an adversary proceeding is filed by any party-in-interest prior to the expiration of 75 days after the entry of the Interim DIP Order or (y) as to the creditors' committee, if formed, an adversary proceeding is filed by the creditors' committee within sixty (60) days after its formation (the "<u>Review Period</u>") against the DIP Agent challenging the DIP Agent's liens or otherwise asserting estate claims against the DIP Agent occurs, and (ii) a final, non-appealable judgment is entered against the DIP Agent in such adversary proceeding; <u>provided</u>, <u>however</u>, any party-in-interest that fails to file an adversary proceeding within the Review Period shall be forever barred from asserting any claims against the DIP Agent on behalf of the Borrower's estate, or challenging in any manner the DIP Agent's liens and claims against the Borrower. |
| **Release of Claims** | In consideration of the furnishing of the DIP Facility, the Borrower, subject to the rights of another party to bring a Challenge Action during the Review Period, and upon entry of the Final DIP Order, will absolutely release and forever discharge the administrative agent under the Second Amended and Restated Credit Agreement, the Prepetition and each of their affiliates, officers, directors, employees, attorneys, and other representatives from any and all claims and causes of action of every kind and nature that the Borrower may hold against such released parties. |
| **Adequate Protection**<br>*Bankruptcy Rule 4001(b)(1)(B)(iv), (c)(1)(B)(ii)* | As adequate protection and in consideration for being primed by the DIP Lender's claims and liens, the Prepetition Lenders (a) shall receive a claim having priority over any and all expenses of the kind specified in, among other sections of the Bankruptcy Code, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, and 1114, subject to payment of a customary carve out and subject to the super-priority administrative claims of the DIP Lender under the DIP Facility and existing liens of the Prepetition Lenders on their respective pre-petition collateral (the "<u>Prepetition Adequate Protection Superpriority Claim</u>"); and (b) shall have valid, binding, enforceable and perfected liens in all DIP Collateral, subject to payment of a customary carve out and the DIP Liens, in each case equal to the sum of the aggregate diminution, if any, subsequent to the applicable Petition Date, in the value of their respective pre-petition collateral (the "<u>Adequate Protection Liens</u>"). |
| **Carve Out**<br>*Local Bankruptcy Rule 4001-2(a)(ii)* | Customary carve-out, to be included in the DIP Credit Agreement. |
| **Events of Default**<br>*Bankruptcy Rule 4001(c)(1)(B)*<br>*Local Bankruptcy Rule 4001-2(a)(ii)* | Defaults and Events of Default shall mean the occurrence of any of the following:<br><br>•       The Borrower's Chapter 11 Case shall be converted to a case under Chapter 7 of the Bankruptcy Code or be dismissed or a motion requesting such relief shall have been filed.<br><br>•       Filing or support of a proposed plan of reorganization by the Borrower that does not provide for the indefeasible payment in full and in cash of Borrower's obligations outstanding under the Bridge Facility, unless otherwise agreed in writing by the DIP Agent in its sole discretion.<br><br>•       Entry of an order confirming (or the filing of any motion or pleading requesting confirmation of) a plan of reorganization that does not require the indefeasible repayment in full, in cash of the Bridge Facility as of the effective date of the plan, unless otherwise agreed in writing by the DIP Agent in its sole discretion.<br><br>•       Appointment of a trustee under Section 1104 of the Bankruptcy Code without the express written consent of the DIP Agent, or the filing of any motion or other pleading requesting such |

|  | relief which the Borrower fails to timely oppose. |
|  | •     Appointment of an examiner with enlarged powers (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code without the prior written consent of Agent, or the filing of a motion or other pleading requesting such relief which the Borrower fails to timely oppose. |
|  | •     Entry of an order by the Bankruptcy Court amending, supplementing, staying, vacating or otherwise modifying the Bridge Facility, the Interim DIP Order or the Final DIP Order approving the Bridge Facility, without the prior written consent of the DIP Agent or the filing of a motion or other pleading requesting such relief which the Borrower fails to timely oppose. |
|  | •     Any attempt by the Borrower to obtain, or if any other party in interest obtains, an order of the Bankruptcy Court or other judgment, and the effect of such order or judgment is to, invalidate, reduce or otherwise impair the DIP Agent's claims, or to subject any of the DIP Agent's collateral to a surcharge pursuant to Section 506(c) of the Bankruptcy Code. |
|  | •     The Borrower shall apply for an order substituting any assets for all or any portion of the DIP Collateral. |
|  | •     Any payment on, or application for authority to pay, any pre-petition claim owing to terminated employees, or lease rejection damages, without prior written consent of the DIP Agent or as otherwise set forth in the Initial Budget |
|  | •     A final order is entered granting any creditor with a claim in excess of $100,000 relief from the automatic stay. |
|  | •     Failure to make all payments under the Bridge Facility when due. |
|  | •     Failure to pay any post-petition material indebtedness. |
|  | •     Any representation or warranty by the Borrower is incorrect or misleading in any material respect when made. |
|  | •     Exclusivity shall have been terminated or the Borrower shall have agreed to any such termination. |
|  | •     If any Sale (as defined in the Term Sheets) is conducted by the Borrower and the Borrower shall take (or support any other person in taking) any action in order to restrict or prohibit the DIP Agent or any DIP Lender from submitting a "credit bid" for any assets of the Borrower. |
|  | •     After the consummation of any Sale, the Borrower fails to disburse the sale proceeds to the DIP Lender contemporaneously with the closing thereof. |
|  | •     The Plan Support Agreement shall have been terminated in accordance with its terms or, following its approval by the Bankruptcy Court any material provision thereof shall cease to be in full force or effect. |
|  | •     Failure to meet any of the Milestones within the timeframes provided for herein. |
|  | •     Breach of any covenant set forth in any DIP Loan Documents. |
| **Affirmative and Negative Covenants** | Usual and customary covenants for facilities of this nature. |

| | |
|---|---|
| **Budget Compliance** | Subject to customary and typical budget variances and budget testing to be agreed upon by the parties (the "<u>Budget Variance</u>"). the Borrower's actual total cash receipts and cash disbursements from operations shall be adhered to on a cumulative basis for the Budget (as defined in the DIP Financing Term Sheet) period then ending as described below.<br><br>On or before the third business day of each week, commencing with the first week following the Petition Date, the Borrower shall deliver to the DIP Agent an Approved Budget Variance Report (as defined in the DIP Financing Term Sheet). |
| **Use of Cash Collateral**<br>*Bankruptcy Rule 4001(b)(1)(B)(ii) Local Bankruptcy Rule 4001-2(a)(ii)* | Set forth in the Interim DIP Order.  Interim DIP Order ¶ 9. |

| | |
|---|---|
| **Use of Loans**<br>*Bankruptcy Rules 4001(b)(1)(B), (c)(1)(B)*<br>*Local Bankruptcy Rule*<br>*4001-2(a)(ii)* | Proceeds of the DIP Facility shall be used solely for the following purposes (and, except as set forth in clause (d) below, to the extent identified in the Budget): (a) to finance remaining Project Costs (as defined in the Second Amended and Restated Credit Agreement) and Operating Expenses (as defined in the Second Amended and Restated Credit Agreement) (b) to fund, after application of all other available cash, post-petition working capital needs of the Debtors, including, but not limited to, those activities required to remain in, or return to, compliance with laws in accordance with 28 U.S.C. § 1930; (b) to pay interest, fees and expenses to the DIP Agent in accordance with the DIP Facility (whether or not such amounts are reflected in the Budget); (c) to pay permitted pre-petition claim payments and adequate protection payments, if any; (d) to pay Professional Fees in accordance with court-approved compensation procedures and not to exceed the cumulative amount set forth in the Budget (as may be amended); and (e) to pay certain other costs and expenses of administration of the Chapter 11 Cases.<br><br>Proceeds of the DIP Loan Documents or cash collateral shall not be used (a) to permit the Borrower, or any other party-in-interest or their representatives to challenge or otherwise contest or institute any proceeding to determine (i) the validity, perfection or priority of security interests in favor of the Prepetition Lenders or the DIP Lenders, or (ii) the enforceability of the obligations of the Borrower under the Second Amended and Restated Credit Agreement, any other Loan Documents (as defined in the Second Amended and Restated Credit Agreement) or the DIP Facility, (b) to investigate, commence, prosecute or defend any claim, motion, proceeding or cause of action against the Prepetition Lenders or the DIP Lender and their agents, attorneys, advisors or representatives including, without limitation, any lender liability claims or subordination claims, (c) to investigate, commence, prosecute or defend any claim or proceeding or cause of action to disallow or challenge the obligations of the Borrower under the Second Amended and Restated Credit Agreement, any other Loan Documents or the DIP Loan Documents, or (d) to fund acquisitions, capital expenditures, capital leases, or any other similar expenditure other than capital expenditures specifically set forth in the Budget and approved by the DIP Agent; provided that a committee and its professionals shall be permitted to investigate the liens, claims, and potential causes of action against the Prepetition Lenders in connection with the Second Amended and Restated Credit Agreement in an amount not to exceed $10,000. |
| **Borrowing Conditions**<br>*Bankruptcy Rule 4001(c)(1)(B)*<br>*Local Bankruptcy Rule*<br>*4001-2(a)(ii)* | Advances under the DIP Facility shall be requested and made as set forth below:<br>•        Disbursement of funds shall be made incrementally in such amounts and on such dates as determined by the DIP Agent in its sole discretion and shall be subject to Borrower's achievement and maintenance of certain customary contractual requirements, thresholds and other specified events, as determined by the DIP Agent in its sole and absolute discretion (the "Draw Schedule").<br><br>•        The Draw Schedule may be further modified and amended from time to time only with the consent of the DIP Agent and the Borrower.<br><br>•        The initial draw under the DIP Facility shall be made to repay the aggregate principal amount of all advances outstanding under the Bridge Facility as of the applicable Termination Date. |
| **Milestones**<br>*Bankruptcy Rule 4001(c)(1)(B)* | The disclosure statement consistent with the Plan Support Agreement and otherwise acceptable to the DIP Agent and the DIP Lenders, shall be filed within forty (40) days of the Petition Date.<br>The disclosure statement, consistent with the Plan Support Agreement and otherwise acceptable to the DIP Agent and the DIP Lenders, shall be approved within 78 days of the Petition Date.<br>The Plan, consistent with the Plan Support Agreement and otherwise acceptable to the DIP  Agent and the DIP Lenders, shall be confirmed and become effective within one hundred and ten (110) days of the Petition Date. |
| **Indemnification**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)(ix)* | The Borrower shall indemnify and hold the DIP Agent, the DIP Lenders and their officers, directors, employees and agents (including all of their professionals) (each an "Indemnified Party") harmless from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, all fees and disbursements of attorneys and other professionals) to which any Indemnified Party may become liable or which may be incurred by or asserted against any Indemnified Party, in each case in connection with or arising out of or by reason of any |

|  | investigation, litigation or proceeding arising out of or relating to or in connection with the DIP Facility, the DIP Loan Documents, any obligation, or any act, event or transaction related or attendant thereto or any use or intended use of the proceeds of the DIP Facility, except to the extent the same is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct. The terms and conditions of Section 13.03(b) of the Second Amended and Restated Credit Agreement are incorporated in the DIP Financing Term Sheet mutatis mutandis. |
|---|---|
| **Section 506(c) Waiver** *Bankruptcy Rule 4001(c)(1)(B)(x) Local Bankruptcy Rule 4001-2(a)(i)(C)* | Defaults and Events of Default shall mean the occurrence of any of the following…Any attempt by Borrower to obtain, or if any other party in interest obtains, an order of the Bankruptcy Court or other judgment, and the effect of such order or judgment is to, invalidate, reduce or otherwise impair the DIP Agent's claims, or to subject any of the DIP Agent's collateral to a surcharge pursuant to Section 506(c) of the Bankruptcy Code. |
| **No Liens on Avoidance Actions** | The DIP Agent and the  DIP Lenders are not being granted a lien on Avoidance Actions or the proceeds thereof. |
| **Modification of the Automatic Stay** | See Interim Order ¶18. |

## BASIS FOR RELIEF

## C.    The Debtors' Need For Liquidity.

27.    As further described in the First Day Declaration, the Debtors require immediate use of proceeds from the Postpetition Facilities and access to their limited Cash Collateral to fund the costs of working capital obligations, operating expenses, and expenses relating to administration of the Chapter 11 Cases to preserve and maintain the going concern value of the Debtors' estates.  The Debtors' forecasted liquidity needs during the period until entry of a Final DIP Order are set forth in detail in the budget attached hereto as <u>Exhibit B</u>.  As of the Petition Date, the Debtors have less than $200,000 in cash and absent immediate access to the Bridge Facility, would not be able to pay their employees or operate their business and, thus, would likely be required to cease operations and liquidate their assets.  Moreover, the further liquidity to be provided by the DIP Facility will enable the Debtors to continue to fund certain key construction projects to allow them to successfully and profitably operate the Ryckman Creek Facility during and after the Chapter 11 Cases and continue negotiations with the

Prepetition Lenders toward a consensual restructuring that materially deleverages their balance sheet and gives them the runway to operate and potentially, in the future, market the Ryckman Creek Facility, for the benefit of all creditors.

**D.    The Debtors' Negotiation of the Postpetition Facilities**

28.    Recognizing the Debtors' immediate need for capital and that a chapter 11 filing might be required, the Debtors and their advisors initiated a marketing process to obtain debtor-in-possession financing.  In connection therewith, the Debtors' advisors prepared a presentation describing the Debtors' capital structure, asset base, and financing needs. Simultaneously, the Debtors' advisors began identifying potential financing sources, with a focus on institutions with the ability to provide financing on an expedited bases.  In total, the Debtors' advisors contacted 25 potential third-party lending sources.

29.    Of the 25 contacted, seven of the third-party institutions accepted the Debtors' invitation to receive due diligence materials and entered into nondisclosure agreements to allow for due diligence and other exchanges of information.  The Debtors' advisors held follow-up diligence calls with a number of these institutions.

30.    Ultimately, only ING was willing to provide the Debtors with any postpetition financing, in the form of the Bridge Facility.  ING further proposed the terms of the DIP Facility, which the Debtors, ING, and the Prepetition Lenders will continue to negotiate and finalize postpetition.  Once completed, the Debtors will file the DIP Credit Agreement, in advance of the Final Hearing. Throughout the process, the Debtors negotiated with ING, and believe that they were ultimately able to materially improve the terms of the Postpetition Facilities, including, among other things, modifying the Milestones to be more workable, while still providing for an efficient restructuring process, and providing for the concept of an updated budget under the Bridge Facility.

31.    The Prepetition Lenders have been supportive of the Company and cooperative in their restructuring efforts throughout its prior difficulties.  Currently, the Company and the Prepetition Lenders are making substantial progress toward agreement on the terms of a plan of reorganization that they hope will result in a deleveraged balance sheet and sufficient liquidity to operate their business as a reorganized company, and expect to have a plan support agreement signed while the Bridge Facility is still outstanding.  Through the bridge financing, ING will provide the liquidity to support the Debtors' operational needs for the next 30 to 45 days while these negotiations are ongoing.  This proposed structure balances the Prepetition Lenders' concerns with providing a full $30,000,000 of funding before the Debtors have a clear path to exit while providing the Debtors with liquidity to fund the Chapter 11 Cases during the interim period.

32.    Taken as a whole, the Debtors believe that the Postpetition Facilities proposed by ING offer the Debtors an acceptable cost of financing, after taking into consideration the expected length of the cases and the costs, time, and distraction, that would be associated with obtaining financing which required a non-consensual priming of the Prepetition Lenders' liens, as well as the likelihood of prevailing in a priming dispute.  By priming only the Prepetition Lenders (and not liens, if any, that are senior to the Prepetition Lenders pursuant to the terms of the Second Amended and Restated Credit Agreement), the Debtors are able to obtain the required financing while avoiding unnecessary litigation with primed creditors.  Pursuant to section 6 of the Agreement Among Lenders between the Tranche A Lenders and the Tranche B Lender, because the Tranche A Lenders consent to the Postpetition Facilities (as well as use of the Cash Collateral), the Tranche B Lender also is deemed to consent and has agreed to subordinate its liens to the Postpetition Facilities on the same terms as the Tranche A Lenders.

33.     Accordingly, after careful consideration and extensive discussion with the Debtors' financial and legal advisors, the Debtors determined that the Postpetition Facilities were the Debtors' best available financing option under the circumstances.  The Debtors believe that the Postpetition Facilities offer them the best chance for a cost-efficient, quick, and, hopefully, largely consensual restructuring.  By this Motion, the Debtors seek authority to enter into the Postpetition Facilities and approval of the use of Cash Collateral.

## APPLICABLE AUTHORITY

34.     For the reasons set forth herein, the Debtors have an immediate need for adequate postpetition financing to continue operating their business in the ordinary course and preserve the value of their assets.

35.     The Debtors were unable to obtain adequate unsecured credit allowable as an unsecured claim or superpriority administrative expense because nearly all of the Debtors' assets remain subject to prepetition liens.  The Debtors were also unable to obtain postpetition financing on a junior secured basis.  The Postpetition Facilities reflect the most favorable terms on which lenders were willing to offer financing.  The Debtors believe that the proceeds from the Postpetition Facilities will allow them to continue their operations in the ordinary course, maintain prudent cash balances, satisfy working capital requirements, fund restructuring costs, and otherwise meet their liquidity needs through the Chapter 11 Cases.  The Debtors believe that the terms of the Term Sheets are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties.

I.      **THE POSTPETITION FACILITIES SHOULD BE APPROVED**

A.      **The Postpetition Facilities are Necessary to Preserve the Value of the Debtors'**
        **Estates and are in the Best Interests of Creditors.**

        36.     Without the Postpetition Facilities, the Debtors will not be able to fund the

day-to-day operating expenses of their business necessary to maintain the value of the Debtors'

assets, including payment of wages to employees necessary to sustain the going concern value of

the Debtors' assets and funds required to satisfy other general corporate and working capital

requirements and fund the administrative costs of the Chapter 11 Cases.  Indeed, absent

sufficient funds to support the Debtors' operations, the value of the Debtors' assets and

operations will quickly erode, to the detriment of the Debtors' estates and stakeholders.  See In re

Farmland Indus., Inc., 294 B.R. 855, 885 (Bankr. W.D. Mo. 2003) (approving postpetition

financing and noting that "[w]ithout the continued financing, the Debtors would likely be forced

into a Chapter 7 or 11 liquidation, to the detriment of all creditors").

        37.     As a result of ongoing expenses, including those related to the Debtors'

restructuring efforts, the Debtors' liquidity position has become precariously low. Shortfalls in

liquidity can cause irreparable damage to the Debtors' relationships with customers and vendors,

thus jeopardizing the health of the entire business.  Upon entry of the Interim DIP Order, the

Bridge Facility will provide access to $3,000,000 in liquidity (and an aggregate amount of

$30,000,000 in liquidity will be available upon entry of the Final DIP Order), which the Debtors

and their advisors have determined is sufficient and necessary to allow the Debtors to maintain

their operations in the Chapter 11 Cases.  Thus, the Debtors submit that the Postpetition

Facilities are in the best interest of the Debtors' estates, creditors, and all other stakeholders, and

therefore the Debtors should be granted the relief requested herein.

B.      **The Debtors Should Be Authorized to Obtain Postpetition Financing on a Senior Secured Priming and Superpriority Basis Pursuant to Bankruptcy Code Sections 364(c) and 364(d).**

        38.      Bankruptcy Code section 364 allows a debtor to obtain (a) unsecured credit in the ordinary course of business, (b) unsecured credit outside the ordinary course of business, (c) credit with specialized priority or with certain security interests, and (d) secured credit by granting a senior or <u>pari passu</u> lien on already encumbered property.  In other words, section 364 is "structured with an escalating series of inducements . . .." that may be offered to attract postpetition financing.  <u>Sapir v. CPQ Colorchrome Corp. (In re Photo Promotion Assocs., Inc.)</u>, 87 B.R. 835, 839 (Bankr. S.D.N.Y. 1988), <u>aff'd</u>, 881 F.2d 6 (2d Cir. 1989).  Here, the Debtors assert that the DIP Lenders should be entitled to assert the Postpetition Financing Superpriority Claims on account of the Postpetition Financing Obligations under section 364(c) and to prime the Prepetition Lenders by means of the DIP Liens on the DIP Collateral under section 364(d).

        39.      <u>Section 364(c) Superpriority Claims</u>.  With respect to the Postpetition Financing Superpriority Claims, courts consider various factors in determining whether a debtor may obtain postpetition financing under Bankruptcy Code section 364(c), including whether (i) the debtor is unable to obtain secured credit under section 364(b), (ii) the credit transaction is necessary to preserve the assets of the estate, (iii) the terms of the transaction are fair, reasonable, and adequate given the circumstances of the debtor-borrower and the proposed lender, (iv) entry into the financing constitutes an exercise of the debtor's sound and reasonable business judgment, and (v) the financing was negotiated in good faith and at arm's-length between the debtor and the lender. <u>In re Farmland Indus., Inc.</u>, 294 B.R. at 879-81; <u>See also</u> <u>In re Aqua Assocs.</u>, 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991) (applying factors 1-3).

40.     In addition, if the incentives available under Bankruptcy Code section 364(c) are insufficient to attract post-petition financing, a bankruptcy court may authorize post-petition credit under Section 364(d) secured by a senior or pari passu lien on encumbered property (i.e., a "priming" lien) without consent from the affected lienholders if (i) the debtor cannot otherwise obtain credit and (ii) the interests of the existing lienholders are adequately protected.  See 11 U.S.C. § 364(d)(1); In re 495 Cent. Park Ave. Corp., 136 B.R. at 630-31; In re Aqua Assocs., 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991).

41.     To satisfy the requirements of Bankruptcy Code section 364(c), a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis.  Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986). "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." Id.  When few lenders are likely to be able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom., Anchor Savs. Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 120 n. 4 (N.D. Ga. 1989); see also In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (approving financing facility and holding that the debtor made reasonable efforts to satisfy the standards of section 364(c) where it approached four lending institutions, was rejected by two, and selected the most favorable of the two offers it received).

42.     For the reasons discussed below, the Debtors satisfy the standards required to obtain postpetition financing on a secured superpriority lien basis under Bankruptcy Code section 364(c).

43.    <u>Section 364(d) Priming DIP Liens</u>.  If a debtor is unable to obtain credit under the provisions of Bankruptcy Code section 364(c), the debtor may obtain credit secured by a senior or equal lien on the property of the estate that is already subject to a lien, commonly referred to as a "priming lien."  11 U.S.C. § 364(d).  Bankruptcy Code section 364(d)(1), which governs the incurrence of postpetition debt secured by senior or "priming" liens, provides that the court may, after notice and a hearing, authorize the obtaining of credit or the incurring of debt by a senior or equal lien on property of the estate that is subject a lien only if (i) the debtor cannot otherwise obtain credit and (ii) the interests of the existing lienholders are adequately protected.  See 11 U.S.C. § 364(d)(1); <u>In re 495 Cent. Park Ave. Corp.</u>, 136 B.R. at 630-31; <u>In re Aqua Assocs.</u>, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991).  As set forth herein, the Postpetition Facilities satisfy both factors.

**(a)    The Debtors are Unable to Obtain Credit on More Favorable Terms**

44.    Whether debtors were unable to obtain unsecured credit is determined by application of a good faith effort standard, and debtors must make a good faith effort to demonstrate that credit was not available without granting a security interest.  <u>See</u> <u>In re YL West 87th Holdings I LLC</u>, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) ("Courts have generally deferred to a debtor's business judgment in granting section 364 financing."); <u>In re Gen. Growth Props., Inc.</u>, 412 B.R. 122, 125 (Bankr. S.D.N.Y. 2009). The required showing under section 364 of the Bankruptcy Code that unsecured credit was not available is not rigorous. <u>See</u>, <u>e.g.</u>, <u>Bray v. Shenandoah Fed. Say. & Loan Ass'n (In re Snowshoe Co.)</u>, 789 F.2d 1085, 1088 (4th Cir. 1986) (stating that section 364(d) of the Bankruptcy Code imposes no duty to seek credit from every possible lender, particularly when "time is of the essence in an effort to preserve a vulnerable seasonal enterprise").

45.     Due, in part, to the existing prepetition liens and security interests on the

Debtors' assets, including under the Second Amended and Restated Credit Agreement and the

Amended and Restated Credit Agreement, the Debtors were unable to procure sufficient debtor

in possession financing in the form of either unsecured credit under Bankruptcy Code sections

364(a) or (b).

> **(b)     The Priming Liens are Consensual and the Prepetition
> Lenders are Adequately Protected**

46.     Second, consent by a secured creditor to priming obviates the need to

show adequate protection.  See In re Sky Valley, Inc., 99 B.R. at 122 ("by tacitly consenting to

the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate

that they were adequately protected.").  As noted above, the Debtors submit that priming liens

provided for in the Postpetition Facilities are consensual because the priming liens apply only to

liens of the Prepetition Lenders who have consented or are deemed to have consented to such

treatment.

47.     In any event, to the extent that the Tranche A Lenders or the Tranche B

Lender suffer any harm as a result of the DIP Lenders' priming liens, they are adequately

protected.  Adequate protection is evaluated on a case-by-case basis and may be provided in

various forms, including payment of adequate protection fees, payment of interest, or granting of

replacement liens or administrative claims. See In re Mosello, 195 B.R. 277, 289 (Bankr.

S.D.N.Y. 1996) ("the determination of adequate protection is a fact specific inquiry . . . left to the

vagaries of each case…") (citation and quotation omitted).

48.     The adequate protection package here takes many of these forms, as the

Pre-Petition Lenders would receive superpriority claims and liens junior only to the DIP Lenders

and reimbursement of professional fees and expenses, as set forth in the Term Sheets and the

Interim DIP Order. The Debtors, therefore, believe that the adequate protection proposed herein

and in the DIP Orders is fair and reasonable and is sufficient to satisfy the requirements of both

Bankruptcy Code sections 363(c) and 364(d) and support granting priming liens to the DIP

Lenders.

> **(c)      The Postpetition Facilities are Necessary to Preserve the Assets of the Debtors' Estates.**

49.      Here, as detailed in the First Day Declaration, and as further set forth

above, the Debtors face severe liquidity constraints. The Debtors do not have sufficient funds on

hand or generated from their business to fund operations. The Debtors were forced to file the

Chapter 11 Cases to preserve the value of their assets and reorganize.

50.      Cash is necessary for working capital, operating costs and expenses

incurred during the Chapter 11 Cases, including payment to certain vendors. The Debtors do not

have sufficient sources of working capital, financing or cash collateral to carry on the operation

of their business without additional financing.

51.      The alternative in this case is "to force the debtors to close down their

operations and thus doom any effort at reorganization which will hopefully extract the maximum

value of the assets involved to the benefit of all classes of creditors and other constituencies

involved in this case." In re Dynaco Corp., 162 B.R. 389, 396 (Bankr. D. N.H. 1993).  Because

this result would be fundamentally at odds to the rehabilitative purposes of chapter 11, approval

of this Motion is warranted.  Id. at 394 (noting that "'it is apparent that the Congress intended

business under reorganization to proceed in as normal a fashion as possible' (quoting In re

Prime, Inc., 15 B.R. 216, 219 (Bankr. W.D. Mo. 1981))).

52.      As debtors in possession, the Debtors have a fiduciary duty to protect and

maximize their estates' assets. See Burtch v. Ganz (In re Mushroom Transp. Co.), 382 F.3d 325,

339 (3d Cir. 2004). As noted above, the Debtors require postpetition financing and the use of

cash collateral to continue their operations pending their reorganization through confirmation of

a plan.

**(d)      The Terms of the Postpetition Facilities Are Fair, Reasonable, and Appropriate**

53.      The terms and conditions of the Postpetition Facilities are fair, reasonable,

and appropriate in the circumstances presented, and were negotiated by the parties in good faith

and at arm's length.

54.      ING required that the Debtors grant the DIP Liens and Postpetition

Financing Superpriority Claims upon the terms and conditions set forth the Term Sheets and the

Interim Order.  The DIP Liens and Postpetition Financing Superpriority Claims will be subject to

the Carve Out, which includes professional fees that are accrued and unpaid through the time of

any event of default for the Bridge Facility and, for the DIP Facility, professional fees accruing

after an event of default and amounts payable to the United States Trustee up to a cap to be

determined and set forth in in the DIP Credit Agreement.  Such carve outs generally "preserve

the adversary system" by ensuring that the committees and the debtor's estate are adequately

assisted by counsel.  See In re Ames Dep't Stores, Inc., 115 B.R. at 38 (noting that courts

generally "insist on a carve out" for professional fees, and that "[a]bsent such protection, the

collective rights and expectations of all parties-in-interest are sorely prejudiced.").  Additionally,

the Carve Out protects against administrative insolvency during the course of the cases by

ensuring that assets remain for the payment of United States Trustee fees and professional fees of

the Debtors and the official committee of unsecured creditors, notwithstanding the grant of

superpriority and administrative liens and claims under the Postpetition Facilities.  The

Postpetition Facilities provide the Debtors with the liquidity they need to operate their businesses

35

during the Chapter 11 Cases.  After thorough analysis by the Debtors and their advisors, they

have concluded that the terms of the Postpetition Facilities are reasonable and appropriate under

the circumstances.

**(e)      Entry into the Postpetition Facilities Reflects the Debtors'
Sound Business Judgment**

55.      Bankruptcy courts routinely defer to a debtor's business judgment in

considering whether to approve the debtor's request to obtain postpetition financing.  See e.g.,

Trans World Airlines, Inc. v. Travellers Int'l AG (In re Trans World Airlines, Inc.), 163 B.R.

964, 974 (Bankr. D. Del. 1994) (approving post-petition loan and receivables facility because

such facility "reflect[ed] sound and prudent business judgment"); In re Ames Dep't Stores, Inc.,

115 B.R. at 40 (The court should defer to debtor's "reasonable business judgment . . . so long as

the financing agreement does not . . . leverage the bankruptcy process . . ." and its purpose is to

benefit the estate rather than another party-in-interest.).

56.      The Debtors exercised their reasonable business judgment in determining

that the Postpetition Facilities are the best financing options available under the present

circumstances, and the Debtors have satisfied the legal requirements to incur the DIP Obligations

on the terms and conditions set forth in the Term Sheets.  The Debtors believe that the Term

Sheets contain terms that are fair, reasonable, and in the best interests of the Debtors and their

estates.  Accordingly, the Debtors respectfully submit that they should be authorized to enter into

the Bridge Financing Term Sheet and the DIP Credit Agreement and obtain access to the

Postpetition Facilities from the DIP Lender on the terms described herein.

## II.      THE DEBTORS SHOULD BE AUTHORIZED TO PAY THE FEES REQUIRED BY THE DIP LENDERS

57.      As described above, the Debtors have agreed, subject to Court approval, to

pay certain fees described in the Term Sheets and reasonable costs and expenses to the DIP

36

Agent, including without limitation, fees and expenses of the professionals retained by the DIP

Agent and the DIP Lenders, without the necessity of filing retention applications or fee

applications.

58.     These fees and other obligations under the Term Sheets were negotiated in

good faith and at arms' length and represent the most favorable terms to the Debtors on which

the DIP Lenders would agree to make the Postpetition Facilities available. The Debtors

considered the fees described above when determining in their sound business judgment that the

Postpetition Facilities constituted the best terms on which the Debtors could obtain the

postpetition financing necessary to continue their operations during the Chapter 11 Cases, and

that paying these fees in order to obtain the Postpetition Facilities is in the best interests of the

Debtors' estates, creditors, and other parties in interest.

59.     Accordingly, this Court should authorize the Debtors to pay the fees

provided under the Bridge Financing Term Sheet and the DIP Credit Agreement in connection

with entering into those agreements.

## III.    SUPPORT FOR MODIFICATION OF AUTOMATIC STAY

60.     As set forth more fully in the proposed Interim Order, the Bridge

Financing Term Sheet contemplates a modification of the automatic stay established pursuant to

Bankruptcy Code section 362 upon the occurrence of an Event of Default to permit the DIP

Agent to exercise certain rights and remedies against the DIP Collateral without having to obtain

any further order of this Court.  The Term Sheets provide that, prior to the exercise of certain

enforcement or liquidation remedies against the DIP Collateral, the DIP Lenders shall be

required to give five business days' written notice to each of the Debtors and counsel for any

creditors' committee and the United States Trustee.

61.     The Debtors submit that stay modification provisions such as these are ordinary and usual features of postpetition financing facilities and, in the Debtors' business judgment, are reasonable under the present circumstances.  Accordingly, the Debtors respectfully request that this Court authorize the modification of the automatic stay in accordance with the terms set forth in the DIP Orders and the Term Sheets.

## IV.    THE DIP LENDERS ARE ENTITLED TO THE PROTECTIONS UNDER BANKRUPTCY CODE SECTION 364(e)

62.     Bankruptcy Code section 364(e), which protects a good faith lender's right to collect on loans extended to a debtor and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal, was designed to "encourage lenders to extend credit to debtors by eliminating the risk that any lien securing the loan will be modified on appeal."  Keltic Fin. Partners, LP v. Foreside Mgmt. Co. (In re Foreside Mgmt. Co.), 402 B.R. 446, 451 (B.A.P. 1st Cir. 2009) (citing Shapiro v. Saybrook Mfg. Co. (In re Saybrook Mfg. Co.), 963 F.2d 1490, 1493 (11th Cir. 1992)).  See also White Rose Food v. General Trading (In re Clinton St. Food Corp.), 170 B.R. 216, 220 (S.D.N.Y. 1994) (Section 364(e) "overcome[s] parties' reluctance to lend to a bankrupt firm . . ."); Fleet Nat'l Bank v. Doorcrafters (In re N. Atl. Millwork Corp.), 155 B.R. 271, 279 (Bankr. D. Mass. 1993) ("The purpose of Section 364(e) is to allow good-faith lenders to rely upon conditions at the time they extend credit and to encourage lenders to lend to bankruptcy entities.").

63.     The Debtors believe that the terms and conditions of the Postpetition Facilities are fair and reasonable and are the best possible terms on which the Debtors could obtain postpetition financing.  Further, the terms and conditions of the Term Sheets were negotiated in good faith and at arm's length with all parties represented by experienced counsel.

Accordingly, the DIP Lenders should be provided with the benefit and protection of Bankruptcy Code section 364(e), such that if any of the provisions of the Postpetition Facilities are later modified, vacated, stayed, or terminated by subsequent order of this or any other Court, the DIP Lender will be fully protected with respect to any amounts previously disbursed.

## V.    USE OF CASH COLLATERAL SHOULD BE AUTHORIZED UNDER BANKRUPTCY CODE SECTION 363 AND THE PROPOSED ADEQUATE PROTECTION BEING PROVIDED IS APPROPRIATE

64.    Bankruptcy Code section 363(c)(2) provides that the Debtors may not use, sell, or lease cash collateral unless "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."  11 U.S.C. § 363(c)(2).  Here, the use of Cash Collateral is consensual.  Certain cash held by the Debtors may include proceeds from collateral subject to liens under the Prepetition Facilities.  Nevertheless, in connection with negotiations relating to the Postpetition Facilities, the Prepetition Lenders have consented to the Debtors' use of Cash Collateral on the terms and conditions set forth in the Interim Order.  Moreover, the Debtors intend to preserve value by maintaining operations pending their reorganization pursuant to a plan.  Accordingly, based upon the foregoing, the Debtors respectfully request that this Court authorize the Debtors to use the Cash Collateral in accordance with the terms set forth in the Interim Order.

65.    Bankruptcy Code section 363(e)  provides that, "on request of an entity that has an interest in property used . . . or proposed to be used . . . by the [debtor in possession], the court . . . shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).

66.    Bankruptcy Code section 361 provides that:

When adequate protection is required under section 362, 363, or 364 of this title of an interest of an entity in property, such adequate protection may be provided by

(1) requiring the [debtor in possession] to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;

(2)  providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or

(3)  granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

11 U.S.C. § 361. "The determination of adequate protection is a fact-specific inquiry" to be decided on a case-by-case basis. In re Mosello, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("Its application is left to the vagaries of each case . . . but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process." (internal quotation marks omitted) (citation omitted)).

67.    The Debtors request that this Court approve and authorize the Debtors' proposed adequate protection of the Prepetition Lenders' interest, in respect of and as consideration for, (a) the use of Cash Collateral, (b) the granting of the priming liens and the Postpetition Superpriority Claims, (c) any other diminution in the value of the Prepetition Lenders' collateral, and (d) the imposition of the automatic stay under Bankruptcy Code section 362.

68.    In exchange for the consideration provided by the Prepetition Lenders, the Interim DIP Order and the Term Sheets provide adequate protection of the interests of such

parties in their prepetition collateral in the form of valid, binding, enforceable and perfected liens in all DIP Collateral, equal to the sum of the aggregate diminution, if any, subsequent to the Petition Date, in the value of their respective pre-petition collateral (the "Adequate Protection Liens").

69.     Bankruptcy Code section 361(2) provides that adequate protection may be provided by granting a replacement lien in postpetition assets to protect the secured creditor from diminution of its collateral during the bankruptcy case.  Courts have used that provision in fashioning adequate protection and permitting a debtor to use cash collateral under similar circumstances.  See In re Mt. Olive Hospitality, LLC, Civil No. 13-3395 (RBK), 2014 WL 1309953, at *3, n.6 (D.N.J. March 31, 2014); see also In re Airport Inn Assocs., Ltd., 132 B.R. 951, 960 (Bankr. D. Col. 1990) ("The court could order a lien in postpetition accounts receivable as adequate protection if that relief was requested.").

70.     As set forth in the Term Sheets and the Interim DIP Order, the Debtors also will grant the Prepetition Lenders a superpriority adequate protection claim to the extent equal to the sum of the aggregate diminution, if any, subsequent to the Petition Date, in the value of their respective pre-petition collateral, which shall be junior in all respects to the Postpetition Superpriority Claims.

71.     The Debtors believe that such adequate protection is fair and reasonable. Accordingly, based upon the foregoing, the Debtors respectfully request that this Court authorize the Debtors to provide the above-described adequate protection to the Prepetition Lenders in accordance with the terms set forth in the Bridge Financing Term Sheet, the DIP Credit Agreement, and the DIP Orders.

## VI.    INTERIM APPROVAL SHOULD BE GRANTED AND THE FINAL HEARING SCHEDULED

72.    Bankruptcy Rule 4001(c) provides that:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than 14 days after service of the motion. If the motion so requests, the court may conduct a hearing before such 14-day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

Fed. R. Bankr. P. 4001(c)(2).  Similarly, to the extent the Debtors are seeking authority to sell,

use or otherwise incur an obligation regarding property of their estates, Bankruptcy Rule 6003

provides that the Court may only grant immediate relief to the extent it is necessary to avoid

immediate and irreparable harm.  Fed. R. Bankr. P. 6003(b).

73.    Generally, courts find "immediate and irreparable harm" exists where loss

of the business threatens ability to reorganize.  See In re Ames Dep't Stores, Inc., 115 B.R. at 36

n.2.  Approval of the Bridge Facility on an interim basis under Rule 4001(c)(2) is left to the

discretion of the court as informed by the facts of each case.  In examining requests for interim

relief under this rule, courts apply the same business judgment standard applicable to other

business decisions, and a debtor should be entitled to borrow those amounts that it believes

prudent in the operation of its business.  See In re Trans World Airlines, Inc., 163 B.R. at 974; In

re Ames Dep't Stores, Inc., 115 B.R. at 40.  After the 14-day period, the request for financing is

not limited to those amounts necessary to prevent the destruction of the debtor's business, and

the debtor is entitled to borrow those amounts that it believes are prudent to the operation of its

business.  In re Ames Dep't Stores, Inc., 115 B.R. at 36.

74.    The Debtors seek expedited approval of the relief requested in this Motion

in light of the immediate and irreparable harm that the Debtors' estates will incur unless they

obtain the financing necessary to sustain their business.  Absent sufficient funds to support the

Debtors' operating business, the Debtors' business and assets will quickly erode to the detriment

of the Debtors' estates and creditors.  For the reasons set forth above, the Debtors submit that

immediate access to $3,000,000 under the Bridge Facility is necessary to preserve the value of

the Debtors' estates for the benefit of their creditors and other parties-in-interest.

75.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors

request that this Court set a date for the Final Hearing that is as soon as practicable, and fix the

time and date prior to the final hearing for parties to file objections to the Motion.

76.     The urgent need to preserve the Debtors' business, and avoid immediate

and irreparable harm to the Debtors' estates, makes it imperative that the Debtors be authorized

to obtain the liquidity provided by the Bridge Facility and use Cash Collateral as of the Petition

Date, pending the Final Hearing, in order to continue their operations and administer the Chapter

11 Cases.  Accordingly, the Debtors respectfully request that, pending the hearing on the Final

Order, the Interim Order be approved in all respects and that the terms and provisions of the

Interim Order be implemented and be deemed binding and that, after the Final Hearing, the Final

Orders be approved in all respects and the terms and provisions of the Final Orders be

implemented and be deemed binding.

**WAIVER OF STAY UNDER BANKRUPTCY RULES 4001(a)(3) AND 6004(h)**

77.     The Debtors also request that the Court waive the stay imposed by

Bankruptcy Rule 4001(a)(3), which provides that "[a]n order granting a motion for relief from an

automatic stay made in accordance with Rule 4001(a)(1) is stayed until the expiration of 14 days

after the entry of the order, unless the court orders otherwise," Fed. R. Bankr. P. 4001(a)(1), and

Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of

property other than cash collateral is stayed until the expiration of 14 days after entry of the

order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  As described above, the relief that the Debtors seek in the Motion is necessary for the Debtors to operate without interruption and to preserve value for their estates.  Accordingly, the Debtors respectfully request that this Court waive the 14-day stays imposed by Bankruptcy Rules 4001(a)(3) and 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

## NOTICE

78.    Notice of this Motion shall be given to (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to the agent for the Debtors' prepetition secured lenders; (c) counsel to the agent for the Debtors' postpetition secured lenders; (d) the parties listed in the consolidated list of thirty (30) largest unsecured creditors filed by the Debtors in the Chapter 11 Cases; and (e) any such other party entitled to notice pursuant to Local Bankruptcy Rule 9013-1(m).  The Debtors submit that no other or further notice need be provided.

## NO PRIOR REQUEST

79.    No previous request for the relief sought herein has been made to this Court or any other court.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter the DIP

Orders granting (a) the relief requested herein and (b) such other relief as is appropriate under the

circumstances.

Dated:          Wilmington, Delaware
                February 2, 2016

                                        SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

                                        */s/ Sarah E. Pierce*
                                        Sarah E. Pierce (I.D. No. 4648)
                                        One Rodney Square
                                        P.O. Box 636
                                        Wilmington, Delaware 19899-0636
                                        Telephone: (302) 651-3000
                                        Fax: (302) 651-3001

                                        - and -

                                        George N. Panagakis
                                        Jessica S. Kumar
                                        155 N. Wacker Dr.
                                        Chicago, Illinois 60606
                                        Telephone: (312) 407-0700
                                        Fax: (312) 407-0411

                                        Proposed Counsel for Debtors and Debtors in Possession

# EXHIBIT A

## BRIDGE FINANCING TERM SHEET

**Ryckman Creek Resources, LLC**
**Terms and Conditions**
**Proposed Senior Secured, Super-Priority**
**Debtor-in-Possession Bridge Facility**

---

*The terms outlined below in this Terms and Conditions (this "**DIP Term Sheet**") are the terms and conditions for a senior secured, super-priority debtor-in-possession bridge facility (hereinafter referred to as the "**Bridge Facility**") to be made available to the Debtor (as defined below). This DIP Term Sheet, the Interim Order and the Final Order (as defined below) shall collectively constitute the exclusive and definitive documentation and agreement among the parties for the Bridge Facility (the "**DIP Financing Documents**"). Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in that certain Second Amended and Restated Credit Agreement by and among Agent, the financial institutions from time to time party thereto and Debtor, dated as of October 31, 2014 (as heretofore and as it may be further modified, amended or restated from time to time, the "**Pre-Petition Credit Agreement**".)*

---

| | |
|---|---|
| **Borrower:** | Ryckman Creek Resources, LLC (the "**Debtor**") |
| **Amount and Type of Facility:** | After entry of the Interim Order (as defined below), a loan to be made available to Debtor, for the period commencing on the Petition Date and ending thirty (30) days thereafter, pursuant to the terms of this Term Sheet, in an amount not to exceed $3,000,000.00 (the "**Commitment**"). |
| **Agent:** | ING CAPITAL LLC ("**Agent**" or "**DIP Lender**"). |
| **Borrowing Availability:** | Advances under the Bridge Facility shall be made incrementally, on a weekly basis, to service Debtor's working capital needs as itemized in the Initial Budget or the Updated Budget, as applicable, each as approved by Agent in its sole discretion. An initial advance of $1 million shall be made available from the Bridge Facility to the Debtor upon approval from the Bankruptcy court. No later than the last Business Day of each calendar week, the Debtor will provide to Agent a proposed Updated Budget for the next calendar week, which will itemize the borrowing needs of Debtor for such calendar week. These working capital needs will be funded from the Bridge Facility to the Debtor within the first two Business Days of the following week. |
| **Budget:** | All funds disbursed pursuant to the Bridge Facility shall be applied in accordance with the Initial Budget or the Updated Budget, as applicable, each as approved by Agent in its sole discretion. |
| **Fees:** | Debtor also agrees to pay the costs and expenses of Agent as set forth in the Section titled "Fees and Expenses" below. |
| | Debtor agrees to pay a fee (the "**DIP Fee**"), in immediately |

available funds, in the amount of two percent (2%) of the Commitment. The DIP Fee shall be payable on the Maturity Date unless a Final DIP Facility (as defined below) is consummated, in which case the DIP Fee will be payable pursuant to the terms of such Final DIP Facility.

**Termination Date:**

The earliest to occur of: (a) the Maturity Date (as defined below); (b) thirty  (30) days after the Petition Date (as defined below) if the Final Order has not been entered; (c) acceleration of the obligations under the Bridge Facility (including, without limitation, in connection with any failure to make a payment under the Bridge Facility when due); and (d) the effectiveness of a Final DIP Facility, as the foregoing (a) through (d) may be extended or waived in the sole discretion of the Agent. The date on which the earliest of clauses (a) through (d) above occurs being referred to hereinafter as the "**Termination Date**." On the Termination Date, the Bridge Facility shall be deemed terminated, and neither Agent nor any other DIP Lender shall have any further obligation to provide financing pursuant to the Bridge Facility or DIP Financing Documents.

**Non-Default Interest Rate and Payment Terms:**

A per annum rate equal to (a) the Prime Rate (as defined in the Pre-Petition Credit Agreement), plus (b) four and one-half percent (4.5%) (the "**Non-Default Interest Rate**"); provided that in no event shall the Non-Default Interest Rate be less than eight percent (8%) per annum.

**Default Interest Rate And Letter of Credit Fees:**

Effective immediately upon the occurrence of an Event of Default unless waived in writing by Agent, interest on the outstanding loans under the Bridge Facility shall accrue at a rate that is 2% per annum in excess of the Non-Default Interest Rate.

**Loan Payments:**

All unpaid principal, interest, fees, costs and expenses on the Bridge Facility shall be due and payable in full on the Termination Date, whether at maturity, upon acceleration or otherwise.

In the event that a Final DIP Facility is made available to Debtor, the initial draw under such Final DIP Facility shall be made to repay the aggregate principal amount of all advances outstanding under the Bridge Facility plus the sum of any accrued but unpaid interest and fees as of the applicable Termination                                                              Date.

**Use Of Proceeds:**

Proceeds of the Bridge Facility shall be used solely for the following purposes: (a) to fund, after application of all other available cash, post-petition working capital needs of the Debtor, including, but not limited to, those activities required to remain in, or return to, compliance with laws in accordance with 28 U.S.C. § 1930; (b) to pay interest, fees and expenses to

2

Agent in accordance with the terms hereof (whether or not such amounts are reflected in the Initial Budget or Updated Budget); (c) to pay permitted pre-petition claim payments and adequate protection payments, if any; and (d) to pay certain other costs and expenses of administration of the Chapter 11 Case, in each case, subject to and to the extent identified in the Initial Budget and the Updated Budget, as applicable, each as approved by Agent in its sole discretion;  provided that professional fees paid in accordance with compensation procedures approved by the bankruptcy court may be paid up to the total cumulative amount shown in the Initial Budget.

Proceeds of the Bridge Facility or, until effectiveness of the Final DIP Facility, cash collateral shall not be used (a) to permit the Debtor, or any other party-in-interest or their representatives to challenge or otherwise contest or institute any proceeding to determine (i) the validity, perfection or priority of security interests in favor of the Pre-Petition Lenders or the DIP Lender, or (ii) the enforceability of the obligations of the Debtor under the Pre-Petition Credit Agreement, any other Loan Documents or the Bridge Facility, (b) to investigate, commence, prosecute or defend any claim, motion, proceeding or cause of action against the Pre-Petition Lenders or the DIP Lender and their agents, attorneys, advisors or representatives including, without limitation, any lender liability claims or subordination claims, (c) to investigate, commence, prosecute or defend any claim or proceeding or cause of action to disallow or challenge the obligations of Debtor under the Pre-Petition Credit Agreement, any other Loan Documents or the DIP Financing Documents, or (d) to fund acquisitions, capital expenditures, capital leases, or any other similar expenditure other than capital expenditures specifically set forth in the Initial Budget or Updated Budget, as applicable, and approved by Agent.

**Cash Management Collections and Remittances:**

Debtor shall use a cash management system that is the same as or substantially similar to its pre-petition cash management system. Any material changes from such pre-petition cash management system must be acceptable to Agent. The Interim Order and Final Order shall provide the DIP Lender with a valid and enforceable lien and security interest on the cash held in the Debtor's bank accounts.

For the purpose of crediting the Debtor's loan account and calculating interest, all items of payment shall be deemed applied by Agent one (1) Business Day following the Business Day of Agent's receipt thereof.

**Pre-Petition Obligations:**

As of the date of this DIP Term Sheet, the Debtor  owe(s) certain obligations (the "**Pre-Petition Claims**") under the Pre-Petition Credit Agreement and other Loan Documents. The Lenders party to the Pre-Petition Credit Agreement are herein referred to collectively as the "**Pre-Petition Lenders**" and each

individually a "**Pre-Petition Lender**") and Agent, in its role as Agent for the Pre-Petition Lenders, is hereinafter referred to as the Pre-Petition Agent.

|  |  |
|---|---|
| **Super-Priority Administrative Claim:** | Amounts owed by Debtor to Agent pursuant to the Bridge Facility (including all accrued interest, fees, costs and expenses) shall constitute, in accordance with Section 364(c)(1) of the Bankruptcy Code (as defined below), a claim having priority over any or all administrative expenses of the kind specified in, among other sections, Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b) and 726 of the Bankruptcy Code. |
| **Collateral Security:** | The Bridge Facility (including accrued interest, fees, costs and expenses) shall be secured by a first priority senior and priming lien, subject and junior only to (i) a carve out for accrued and unpaid professional fees and (ii) valid, enforceable, properly perfected, and unavoidable prepetition liens (including any liens that are perfected after the Petition Date with a priority that relates back to a date prior to the Petition Date as permitted under section 546(b) of the Bankruptcy Code) that are senior to the liens of Pre-Petition Lenders which secure all of the Pre-Petition Claims, (the "**DIP Liens**") in all of the Debtor's property, including, without limitation, all of Debtor's existing and future acquired property and interests of any nature whatsoever, real and personal, tangible and intangible, accounts receivable, general intangibles, payment intangibles, supporting obligations, investment property, commercial tort claims, inventory, rolling stock, machinery, equipment, subsidiary capital stock, chattel paper, documents, instruments, deposit accounts, contract rights, and tax refunds of the Debtor, excluding only Avoidance Actions and the proceeds thereof (collectively, the "**DIP Collateral**"). |
| **Lien Validation and Perfection:** | All liens authorized and granted pursuant to the Interim Order or the Final Order entered by the Bankruptcy Court approving the Bridge Facility or with respect to adequate protection shall be deemed effective and perfected as of the applicable Petition Dates, and no further filing, notice or act will be required to effect such perfection.

The Debtor shall stipulate in the Interim Order and Final Order that (i) Agent's liens securing the Pre-Petition Credit Facility are valid, perfected, and encumber all assets of the Debtor, and (ii) the Debtor possesses no claims, offsets or any other type of cause of action against Agent which would impair, in any manner, Agent's liens against the Debtor's assets or the Obligations of the Debtor to Agent under the Pre-Petition Credit Facility. The Debtor's stipulation shall be binding upon all parties in interest in the Chapter 11 Case, including any committee that is appointed, unless (i) (x) as to all parties other than a creditors' committee, an adversary proceeding is filed by |

4

any party-in-interest prior to the expiration of seventy-five (75) days after the entry of the Interim Order or (y) as to the creditors' committee, if formed, an adversary proceeding is filed by the creditors' committee within sixty (60) days after its formation (the "**Review Period**") against Agent challenging Agent's liens or otherwise asserting estate claims against Agent occurs, and (ii) a final, non-appealable judgment is entered against Agent in such adversary proceeding; provided, however, any party-in-interest that fails to file an adversary proceeding within the Review Period shall be forever barred from asserting any claims against Agent on behalf of the Debtor's estate, or challenging in any manner Agent's liens and claims against the Debtor.

**Release of Claims**

In consideration of the furnishing of the Bridge Facility, the Debtor, subject to the rights of another party to bring a Challenge Action during the Review Period, and upon entry of the Final Order, hereby absolutely releases and forever discharges the Pre-Petition Agent and its affiliates, officers, directors, employees, attorneys, and other representatives from any and all claims and causes of action of every kind and nature that the Debtor may hold against such released parties.

**Adequate Protection/ DIP Lender Liquidation Preference:**

As adequate protection and in consideration for being primed by the DIP Lender's claims and liens, the Pre-Petition Lenders (a) shall receive a claim having priority over any and all expenses of the kind specified in, among other sections of the Bankruptcy Code, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, and   1114, subject to the super-priority administrative claims of the DIP Lender under the Bridge Facility and existing liens of the Pre-Petition Lenders on their respective pre-petition collateral; and (b) shall have valid, binding, enforceable and perfected liens in all DIP Collateral, in each case equal to the sum of the aggregate diminution, if any, subsequent to the applicable Petition Dates, in the value of their respective pre-petition collateral (the "**Adequate Protection Liens**").

**Fees and Expenses:**

Debtor shall promptly pay or reimburse Agent when invoiced for all reasonable costs and expenses of counsel (including, without limitation, local counsel) and financial advisors for Agent relating to the Bridge Facility and the administration and interpretation of, and the enforcement of remedies under, the Bridge Facility and including all due-diligence, including but not limited to environmental due-diligence, duplication or printing costs, consultation, travel, and attendance at court hearings, regardless of whether the Bridge Facility is consummated, including any outstanding prepetition fees of the Agent's professionals. ING shall have the right to charge the Bridge Facility for any such fees and costs. Failure to pay such

fees and expenses within five Business Days of delivery of the applicable invoice shall be an Event of Default under the Bridge Facility.

**Conditions Precedent:**

The closing of the Bridge Facility shall be subject to (a) approval of the Initial Budget (as defined below), together with all financial information and projections regarding the Debtor requested by Agent, all in form and substance satisfactory to Agent in its sole discretion, (b) entry of an Interim Order approving the Bridge Facility, its superpriority administrative claims and all first priority   and other liens securing the Bridge Facility, and containing such other orders and findings as Agent may require, including automatic modification of the automatic stay upon the occurrence of an Event of Default enabling Agent to exercise certain rights and remedies against the DIP Collateral, which Interim Order or Final Order, as applicable, shall not have been modified or amended without reasonable approval of Agent, and shall not have been reversed, vacated or stayed pending appeal, in form and substance satisfactory to Agent in its sole discretion, (c) the satisfaction of Agent with all adequate protection payments, critical vendor payments, and all other material motions and orders filed in the Chapter 11 Case requiring the expenditure of cash, and (d) continuation of Debtor's present cash management system.

**Milestones:**

- A "plan support agreement" approved by Agent in consultation with DIP Lenders (as defined on Annex A) (the "**Plan Support Agreement**") shall be executed by Debtor, Agent and the other Pre-Petition Lenders (including the Tranche B Lender (as defined in the Pre-Petition Credit Agreement),within fifteen (15) days of the Petition Date.

- A plan, the terms of which conform to the Plan Support Agreement (the "**Plan**"), shall be filed within forty (40) days of the Petition Date.

**Affirmative and Negative Covenants:**

Debtor shall comply with the following affirmative and negative covenants: (a) compliance with Initial Budget and Updated Budget covenants and (b) compliance with each of the Milestones set forth herein.

**Bankruptcy Court Filings:**

As soon as practicable in advance of filing with the Bankruptcy Court, Debtor shall furnish to Agent (i) the motion seeking approval of and proposed forms of the Interim Order and the Final Order, which motion shall be in form and substance satisfactory to Agent in its sole discretion, (ii) all other proposed orders and pleadings related to the Bridge Facility,

6

which orders and pleadings shall be in form and substance satisfactory to Agent in its sole discretion, (iii) any plan of reorganization or liquidation, and/or any disclosure statement related to such plan (which plan or disclosure statement shall comply with the requirements set forth herein) and (iv) any other pleading, motion or filing that could have an impact upon the Bridge Facility.

**Representations and Warranties:**

The representations and warranties of Debtor set forth in the Pre-Petition Credit Agreement are hereby incorporated into this DIP Term Sheet as if made on the date hereof *mutatis mutandis*.

**Additional Conditions to Each Borrowing Under the Facility:**

There shall exist no Event of Default (or event that would constitute an Event of Default with the giving of notice or lapse of time) under any of the DIP Financing Documents, and the representations and warranties therein shall be true and correct in all material respects.

There shall have occurred no material adverse change in the Debtor's condition (financial, environmental, or otherwise), operations, performance, or properties (other than the commencement of the Chapter 11 Case), since the date of this DIP Term Sheet, that in the reasonable judgment of Agent, has or can reasonably be expected to have a material adverse effect on the rights and remedies of Agent or on the ability of the Debtor to perform its obligations to them under the Bridge Facility.

**Remedies:**

Upon the Termination Date, Agent's remedies, shall include, without limitation, the right to payment of all amounts due under the Bridge Facility, the right to realize on all DIP Collateral, the right to institute judicial proceedings, the right to file actions for specific enforcement, the right to foreclose on and sell DIP Collateral, any and all rights under the Uniform Commercial Code and the right to exercise any other legal or equitable remedy available under applicable law in each case, without the necessity of obtaining any further relief or order from the Bankruptcy Court; provided that the Agent shall provide the Debtor with not less than five business days written notice (with a copy to counsel for any creditors' committee and the United States Trustee for the District of Delaware) prior to exercising any of the foregoing remedies. Section 362 relief from the stay in favor of Agent shall be embodied in any order approving the Bridge Facility and the use of cash collateral.

**Additional Conditions To Financing:**

Compliance with Bankruptcy Rule 4001 and any applicable Local Bankruptcy Rules, the entry of the Interim Order and the Final Order, together with any other order requested by Agent authorizing and approving the Bridge Facility in form, substance and amount and providing for the DIP Collateral, all

acceptable to Agent in its sole discretion.

Payment of all fees and expenses owing to Agent in connection with the Bridge Facility and any prepetition fees of professionals to the Agent from the initial draw.

The Interim and Final Orders shall include such waivers, indemnities, and other provisions as are acceptable to Agent in its sole discretion.

**Events of Default:**

Defaults and Events of Default shall mean the occurrence of any of the following:

- The Chapter 11 Case shall be converted to a case under Chapter 7 of the Bankruptcy Code or be dismissed or a motion requesting such relief shall have been filed.

- Filing or support of a proposed plan of reorganization by Debtor that does not provide for the indefeasible payment in full and in cash of Debtor's obligations outstanding under the Bridge Facility, unless otherwise agreed in writing by Agent in its sole discretion.

- Entry of an order confirming (or the filing of any motion or pleading requesting confirmation of) a plan of reorganization that does not require the indefeasible repayment in full, in cash of the Bridge Facility as of the effective date of the plan, unless otherwise agreed in writing by Agent in its sole discretion.

- Appointment of a trustee under Section 1104 of the Bankruptcy Code without the express written consent of Agent, or the filing of any motion or other pleading requesting such relief which the Debtor fails to timely oppose.

- Appointment of an examiner with enlarged powers (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code without the prior written consent of Agent, or the filing of a motion or other pleading requesting such relief which the Debtor fails to timely oppose.

- Entry of an order by the Bankruptcy Court amending, supplementing, staying, vacating or otherwise modifying the Bridge Facility, the Interim Order or Final Order approving the Bridge Facility, without the prior written consent of Agent or the filing of a motion or other pleading requesting such relief which the Debtor fails to timely oppose.

- Any attempt by Debtor to obtain, or if any other party in

interest obtains, an order of the Bankruptcy Court or other judgment, and the effect of such order or judgment is to, invalidate, reduce or otherwise impair Agent's claims, or to subject any of Agent's collateral to a surcharge pursuant to Section 506(c) of the Bankruptcy Code.

- Debtor shall apply for an order substituting any assets for all or any portion of the DIP Collateral.

- Any payment on, or application for authority to pay, any pre-petition claim owing to terminated employees, or lease rejection damages, without prior written consent of Agent or as otherwise set forth in the Initial Budget or Updated Budget, as applicable, each as approved by Agent in its sole discretion.

- A final order is entered granting any creditor with a claim in excess of $100,000 relief from the automatic stay.

- Failure to make all payments under the Bridge Facility when due.

- Failure to pay any post-petition material indebtedness.

- Any representation or warranty by Debtor is incorrect or misleading in any material respect when made.

- Exclusivity shall have been terminated or the Debtor shall have agreed to any such termination.

- If any Sale (as defined below) is conducted by Debtor and Debtor shall take (or support any other Person in taking) any action in order to restrict or prohibit Agent or any DIP Lender from submitting a "credit bid" for any assets of the Debtor.

- After the consummation of any Sale, the Debtor fails to disburse the sale proceeds to the DIP Lender contemporaneously with the closing thereof.

- The Plan Support Agreement shall have been terminated in accordance with its terms or, following its approval by the Bankruptcy Court or any material provision thereof shall cease to be in full force or effect.

- Failure to meet any of the Milestones within the timeframes provided for herein.

**Indemnification:**    The Debtor shall indemnify and hold Agent, the DIP Lender and its officers, directors, employees and agents (including all of their professionals) (each an "**Indemnified Party**") harmless from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, all fees and disbursements of attorneys and other professionals) to which any Indemnified Party may become liable or which may be incurred

9

by or asserted against any Indemnified Party, in each case in connection with or arising out of or by reason of any investigation, litigation or proceeding arising out of or relating to or in connection with the Bridge Facility, the DIP Financing Documents, any obligation, or any act, event or transaction related or attendant thereto or any use or intended use of the proceeds of the Bridge Facility, except to the extent the same is found in a final, nonappealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct. The terms and conditions of Section 13.03(b) of the Pre-Petition Credit Agreement are hereby incorporated in the DIP Term Sheet *mutatis mutandis*.

**Governing Law:**

All documentation in connection with the Bridge Facility shall be governed by the laws of the state of New York, subject to applicable federal bankruptcy laws.

**No Commitment to Enter Into Final DIP Facility**

The parties hereto acknowledge that Debtor, Agent and certain of the Pre-Petition Lenders have contemplated and are currently discussing the supplemental terms and conditions set forth on Annex A attached hereto which, together with the terms and conditions set forth herein would form the basis for a proposed Final DIP Facility for purposes of financing remaining Project Costs (as defined in the Pre-Petition Credit Agreement) and Operating Expenses (as defined in the Pre-Petition Credit Agreement) and, subject to conditions precedent set forth therein may be made available to Debtor, in replacement of the financing provided for herein. For the avoidance of doubt, neither Agent nor any Pre-Petition Lender has committed, and nothing contained herein shall be construed as a commitment by Agent or any Pre-Petition Lender, to enter into or fund any loans under any such Final DIP Facility.

**Other Definitions:**

"**Bankruptcy Code**" means Title 11 of the United States Code (11 U.S.C. § 101 et seq.), as amended.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware presiding over the Chapter 11 Case.

"**Budget**" means a budget of Debtor relative to the operations of the Debtor in the Chapter 11 Case for any fiscal period, as delivered to Agent in form and substance satisfactory to Agent.

"**Chapter 11 Case**" means the voluntary Chapter 11 case commenced by the Debtor, case no. _____, in the Bankruptcy Court.

"**Committee**" means any statutory committee appointed in the Chapter 11 Case.

"**Final DIP Facility**" means a final senior secured, super-priority debtor-in-possession credit facility to be made available to the Debtor on terms and conditions similar to those set forth in this DIP Term Sheet as modified by Annex A hereto together with appropriate conforming changes and any other changes agreed to by Debtor and Agent. Any Final DIP Facility shall (a) be reflected by a full length senior secured, super-priority debtor-in-possession credit agreement in form and substance satisfactory to Agent in its discretion and (b) contain representations, warranties and covenants (including, without limitation, the obligation to maintain Budgets) that are usual and customary for transactions of its kind.

"**Final Order**" means a final, non-appealable order of the Bankruptcy Court, that, without limitation, approves the applicable facility and grants the liens and security interests contained therein, on terms satisfactory to Agent.

"**Initial Budget**" means a Budget covering the period from the Petition Date through the Maturity Date, approved by Agent at least 2 Business Days before any hearing related to final approval of the Bridge Facility and attached to the Final Order.

"**Interim Order**" means an interim order of the Bankruptcy Court authorizing Debtor, among other things, to obtain interim financing and incur post-petition indebtedness on terms satisfactory to Agent.

"**Maturity Date**" means the date that is forty-five (45) days after the Petition Date.

"**Petition Date**" means the date on which the Chapter 11 Case for such Debtor was filed with the Bankruptcy Court.

"**Sale**" means a sale of all or substantially all of the Debtor's assets.

"**Termination Event**" means the occurrence of the earlier of:

(i) an Event of Default under the Bridge Facility;

(ii) the Debtor's failure to comply with the terms of the Interim Order or Final Order (including, without limitation, their failure to comply with the Initial Budget or the Updated Budget, as applicable); or

(iii) the Debtor's failure to comply with any of the Milestones.

"**Updated Budget**" means  a proposed Budget to be delivered by the Debtors to the Agent no later than the last Business Day of each calendar week, which itemizes the borrowing needs for the next calendar week and is subsequently approved by Agent in its sole discretion.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their duly authorized officers as of the date first set forth above.

**BORROWER:**

**RYCKMAN CREEK RESOURCES, LLC**,
a Delaware limited liability company

By: _____

Name:   Robert Foss

Title:    Chief Executive Officer

**AGENT:**

**ING CAPITAL  LLC**

By: _____

Name:

Title:

By: _____

Name:

Title:

13

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their duly authorized officers as of the date first set forth above.

**BORROWER**:

**RYCKMAN CREEK RESOURCES, LLC,**
a Delaware limited liability company

By: _____
Name:
Title:

**AGENT**:

**ING CAPITAL LLC**

By: _____
Name: CHERYL LABELLE
Title: MANAGING DIRECTOR

By: _____
Name:
Title: Hans Beekmans
Director

[Signature Page to DIP Term Sheet]

DISCUSSION DRAFT 2/1/2016
NOT A COMMITMENT TO LEND

ANNEX A

**Ryckman Creek Resources, LLC**
**Supplemental Terms and Conditions**
**Proposed Senior Secured, Super-Priority**
**Debtor-in-Possession Credit Facility**

*The supplemental terms outlined below in this Annex (this "**Annex**") reflect proposed modifications to the terms and conditions set forth in the senior secured, super-priority debtor-in-possession bridge facility term sheet set forth above (the "**Term Sheet**") in contemplation of establishing a Final DIP Facility to be made available to the Debtor. The Term Sheet if modified hereby would merely reflect proposed terms and conditions of a Final DIP Facility, which would be reflected in a full length senior secured, super-priority debtor-in-possession credit agreement, containing customary representations, warranties and covenants for transactions of its kind. Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Term Sheet.*

The Sections listed in the first column below which correspond to Sections included in the Term Sheet shall be modified (in whole or in part) as set forth in the second column below. If any Section listed below does not correspond to a Section in the Term Sheet, such section shall be incorporated therein where appropriate.

| Applicable Term Sheet Section | Modified Text | Replacement ("R") or Supplement ("S")? |
|---|---|---|
| **Amount and Type of Facility:** | After entry of the Final DIP Order, the DIP Facility will consist of a consolidated term loan (the "**DIP Facility**") in the aggregate principal amount of $30,000,000 (the "**Commitment**"). | R |
| **DIP Lenders:** | ING CAPITAL LLC, [_____], [_____], and [_____]. | R |
| **Borrowing Availability:** | Advances under the DIP Facility shall be requested and made as set forth below:<br><br>• Disbursement of funds shall be made incrementally in such amounts and on such dates as determined by Agent in its sole discretion and shall be subject to Borrower's achievement and maintenance of certain customary contractual requirements, thresholds | R |

|  |  |  |
|---|---|---|
|  | and other specified events, as determined by Agent in its sole and absolute discretion (the "**Draw Schedule**"). <br><br> • The Draw Schedule may be further modified and amended from time to time only with the consent of Agent and the Debtor. <br> • The initial draw under the DIP Facility shall be made to repay the aggregate principal amount of all advances outstanding under the Bridge Facility as of the applicable Termination Date. |  |
| **Budget:** | Subject to customary and typical budget variances and budget testing to be agreed upon by the parties (the "**Budget Variance**"), the Debtor's actual total cash receipts and cash disbursements from operations shall be adhered to on a cumulative basis for the Budget (as defined below) period then ending as described below. <br><br> On or before the third business day of each week, commencing with the first week following the Petition Date, the Debtor shall deliver to Agent an Approved Budget Variance Report. | R |
| **Fees:** | Debtor shall pay all fees and other charges payable in the amounts and at the times as set forth in the DIP Facility in relation to the full amount of the Commitment. | S |
| **Termination:** | The earliest to occur of: (a) the Maturity Date (as defined below); and (b) acceleration of the obligations under the DIP Facility (including, without limitation, in connection with | R |

| | | |
|---|---|---|
| | any failure to make a payment under the DIP Facility when due). The date on which the earliest of clauses (a) through (b) above occurs being referred to hereinafter as the "**Termination Date**." On the Termination Date, the DIP Facility shall be deemed terminated, and neither Agent nor any other DIP Lender shall have any further obligation to provide financing pursuant to the DIP Facility or DIP Financing Documents. | |
| **Interest:** | Interest shall be paid, in kind, on the last Business Day of each month on all outstanding advances under the DIP Facility, accruing at a per annum floating rate equal to (a) the LIBOR Rate, plus (b) seven and one-half percent (7.5%) (the "**Non-Default Interest Rate**"). Any accrued but unpaid interest shall be capitalized and added as of the applicable interest payment date to the principal amount of the DIP Facility.<br><br>Interest with respect to any outstanding obligations under the Pre-Petition Credit Agreement shall accrue from and after the Petition Date at the Non-Default Interest Rate and be due and payable by the Debtor on the date that the full amount of the DIP Facility is immediately due and payable. | R |
| **Use of Proceeds:** | Proceeds of the DIP Facility shall be used solely for the following purposes (and, except as set forth in clause (d) below, to the extent identified in the Budget): (a) to finance remaining Project Costs (as defined in the Pre-Petition Credit Agreement) and Operating Expenses (as defined in the Pre-Petition Credit Agreement) (b) to fund, after application of all other available cash, post-petition working capital needs of the Debtor, | R |

including, but not limited to, those activities required to remain in, or return to, compliance with laws in accordance with 28 U.S.C. § 1930; (b) to pay interest, fees and expenses to Agent in accordance with the DIP Facility (whether or not such amounts are reflected in the Budget); (c) to pay permitted pre-petition claim payments and adequate protection payments, if any; (d) to pay Professional Fees in accordance with court-approved compensation procedures and not to exceed the cumulative amount set forth in the Budget (as may be amended); and (e) to pay certain other costs and expenses of administration of the Chapter 11 Case.

Proceeds of the DIP Financing Documents or cash collateral shall not be used (a) to permit the Debtor, or any other party-in-interest or their representatives to challenge or otherwise contest or institute any proceeding to determine (i) the validity, perfection or priority of security interests in favor of the Pre-Petition Lenders or the DIP Lender, or (ii) the enforceability of the obligations of the Debtor under the Pre-Petition Credit Agreement, any other Loan Documents or the DIP Facility, (b) to investigate, commence, prosecute or defend any claim, motion, proceeding or cause of action against the Pre-Petition Lenders or the DIP Lender and their agents, attorneys, advisors or representatives including, without limitation, any lender liability claims or subordination claims, (c) to investigate, commence, prosecute or defend any claim or proceeding or cause of action to disallow or challenge the obligations of Debtor under the Pre-Petition Credit Agreement, any other Loan Documents or the DIP Financing Documents, or (d) to fund

| | | |
|---|---|---|
| | acquisitions, capital expenditures, capital leases, or any other similar expenditure other than capital expenditures specifically set forth in the Budget and approved by Agent; provided that a Committee and its professionals shall be permitted to investigate the liens, claims, and potential causes of action against the Pre-Petition Lenders in connection with the Pre-Petition Credit Agreement in an amount not to exceed $10,000. | |
| **Release of Claims:** | In consideration of the furnishing of the DIP Facility, the Debtor, subject to the rights of another party to bring a Challenge Action during the Review Period, and upon entry of the Final Order, will absolutely release and forever discharge the Pre-Petition Agent, the Pre-Petition Lenders and each of their affiliates, officers, directors, employees, attorneys, and other representatives from any and all claims and causes of action of every kind and nature that the Debtor may hold against such released parties. | R |
| **Adequate Protection:** | As adequate protection and in consideration for being primed by the DIP Lender's claims and liens, the Pre-Petition Lenders (a) shall receive a claim having priority over any and all expenses of the kind specified in, among other sections of the Bankruptcy Code, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, and 1114, subject to payment of a customary carve out and subject to the super-priority administrative claims of the DIP Lender under the DIP Facility and existing liens of the Pre-Petition Lenders on their respective pre-petition collateral; and (b) shall have valid, binding, enforceable and perfected liens in all DIP Collateral, subject to payment of a customary carve out and the DIP Liens, in each case equal to the sum of the aggregate diminution, if any, | R |

| | | |
|---|---|---|
| | subsequent to the applicable Petition Dates, in the value of their respective pre-petition collateral (the "**Adequate Protection Liens**"). | |
| **Exit Facility/Preferred Equity:** | Subject to entry of an order confirming a plan of reorganization that is acceptable to the Agent and the DIP Lenders, on or prior to the effective date of any such plan, the DIP Facility shall convert into an exit credit facility (the "**Exit Facility**") secured by first-priority liens on and security interests in the Debtor's assets and the DIP Lenders will become lenders under the Exit Facility, each holding their respective pro rata share of the loans thereunder, in full and final satisfaction of the DIP Facility. The Exit Facility shall be in form and substance acceptable to Agent and DIP Lenders. <br><br> Upon entry of an order confirming a plan of reorganization, in consideration of the DIP Lenders' agreement to allow the DIP Facility to convert into the Exit Facility, DIP Lenders shall receive preferred equity in reorganized debtor, with a liquidation preference of $30,000,000 | S |
| **Milestones:** | • The disclosure statement, consistent with the Plan Support Agreement and otherwise acceptable to Agent and DIP Lenders, shall be filed within forty (40) days of the Petition Date. <br><br> • The disclosure statement, consistent with the Plan Support Agreement and otherwise acceptable to Agent and DIP Lenders, shall be approved within seventy-eight (78) days of the Petition Date. <br><br> • The Plan, consistent with the | S |

| | | |
|---|---|---|
| | Plan Support Agreement and otherwise acceptable to Agent and DIP Lenders, shall be confirmed and become effective within one hundred and ten (110) days of the Petition Date. | |
| **Affirmative and Negative Covenants:** | Usual and customary covenants for facilities of this nature. | R |
| **Bankruptcy Court Filings:** | As soon as practicable in advance of filing with the Bankruptcy Court, Debtor shall furnish to Agent (i) the motion seeking approval of the Final DIP Order, which motion shall be in form and substance satisfactory to Agent in its sole discretion, (ii) all other proposed orders and pleadings related to the DIP Facility, which orders and pleadings shall be in form and substance satisfactory to Agent in its sole discretion, (iii) any plan of reorganization or liquidation, and/or any disclosure statement related to such plan (which plan or disclosure statement shall comply with the requirements set forth herein), (iv) any motion and proposed form of order seeking to extend or otherwise modify the Debtor's exclusive periods set forth in section 1121 of the Bankruptcy Code, and (v) any other pleading, motion or filing that could have an impact upon the DIP Facility. | R |
| **Representations and Warranties:** | Usual and customary for facilities and transactions of this type. | R |
| **Additional Events of Default:** | Breach of any covenant set forth in any DIP Financing Document. | S |
| **Additional/Revised Definitions:** | "**Approved Budget Variance Report**" means a current report that: (i) details the actual amount of cash receipts and disbursements for the prior week for each line item included in the Budget (on a weekly and cumulative basis), (ii) compares such actual cash receipts and disbursements (on a line item by | S |

line item basis) with the weekly and cumulative budgeted amounts for each such line item set forth in the Budget for such period, and (iii) provides an explanation for all variances between budgeted and actual amounts.    Each Approved Budget Variance Report will be certified as true and correct by the Debtor's chief financial officer, chief executive officer, or chief restructuring officer.

"**Budget**" means the budget of Debtor relative to the operations of the Debtor in the Chapter 11 Case for any fiscal period, as delivered to Agent in form and substance satisfactory to Agent.    A Budget covering the period from the date of entry of the Final DIP Order through the Maturity Date must be delivered by the Debtor to Agent. Within 5 Business Days before the end of each consecutive two week period included in the applicable Budget, Debtor shall deliver to Agent an updated Budget for the remaining period covered by such Budget, which updated Budget must be approved by Agent at least one Business Day before the end of such two week Budget period.

"**Final DIP Order**" means a Final Order approving the Final DIP Facility.

"**Maturity Date**" means the date that is one hundred twenty (120) days after the Petition Date.

# **EXHIBIT B**

# **INITIAL BUDGET**

**Peregrine Consolidated**
**Cash Flow Forecast**
**2/1/2016**

| | | POST | | | | 4 Week Projected |
| --- | --- | --- | --- | --- | --- | --- |
| Act / Proj | | Proj | Proj | Proj | Proj | |
| Week Number | | 1 | 2 | 3 | 4 | |
| Date / Week | | 2/5/2016 | 2/12/2016 | 2/19/2016 | 2/26/2016 | 2/5/2016 – 2/26/2016 |
| Total Receipts | | - | - | - | - | - |
| Total Field Operating Disbursements | | (120,000) | (90,000) | (617,372) | (50,000) | (877,372) |
| Total Natural Gas Purchases | | - | - | - | (50,000) | (50,000) |
| Total Capex: | | - | (600,000) | (250,000) | (100,000) | (950,000) |
| Total SG&A Costs | | (33,500) | (68,100) | (63,500) | (166,000) | (331,100) |
| Cash Flow before Financings | | (153,500) | (758,100) | (930,872) | (366,000) | (2,208,472) |
| Total Financing | | 1,000,000 | 300,000 | 1,400,000 | 300,000 | 3,000,000 |
| Total Filing Related Costs | | (318,065) | (458,100) | (235,240) | (287,360) | (840,666) |
| Net Cash Flow | | 528,435 | (458,100) | 233,887 | (353,360) | (49,138) |
| Opening Availability | | 64,048 | 592,482 | 134,382 | 368,270 | 64,048 |
| Net Cash Flow | | 528,435 | (458,100) | 233,887 | (353,360) | (49,138) |
| Other | | - | - | - | - | - |
| Minimum Cash Balance | | - | - | - | - | - |
| Closing Availability | | 592,482 | 134,382 | 368,270 | 14,910 | 14,910 |

(1) Professional fees forecasted for the Debtor and Unsecured Creditors Committee are to be paid in accordance with interim compensation orders. The Debtors estimate that Professional Fees for this forecast period will be approximately $550,000 excluding professionals serving the secured lenders.

Page 1 of 1

Peregrine Consolidated

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                              :
In re:                                                        :    Chapter 11
                                                              :
RYCKMAN CREEK RESOURCES, LLC,                                 :    Case No. 16-10292 (___)
et al.,                                                       :
                                                              :    (Joint Administration Pending)
                           Debtors.[1]                        :
                                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## INTERIM ORDER (I) AUTHORIZING DEBTOR RYCKMAN CREEK RESOURCES, LLC TO (A) OBTAIN POSTPETITION FINANCING ON A SECURED, SUPERPRIORITY BASIS AND (B) USE CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION, (III) SCHEDULING A FINAL HEARING, AND (IV) GRANTING RELATED RELIEF

Upon the motion (the "Motion") of the Debtors for interim and final orders, under sections 105, 361, 362, 363, and 364, of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002 and 4001 of Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules") seeking, among other things:

(1) authority pursuant to Bankruptcy Code sections 363 and 364(c) and (d) to obtain an interim debtor-in-possession secured financing (the "Bridge Facility") pursuant to the following terms and agreements (collectively, the "Bridge Facility Documents"):  (a) this Order, and any final order entered by this Court approving the Bridge Facility (the "Final Order"), and (b) the Ryckman Creek Resources, LLC Terms and Conditions of Proposed Senior Secured, Super-Priority Debtor-in-Possession Bridge Facility Term Sheet, attached to the Motion as Exhibit A, as amended, modified, and/or supplemented at or before the Final Hearing (as such term is defined below) and there presented to this Court (the "Bridge Financing Term Sheet"),[2] with

---

[1]    The Debtors and, where applicable, the last four digits of their respective taxpayer identification numbers are as follows: Ryckman Creek Resources, LLC (4180), Ryckman Creek Resources Holding Company LLC, Peregrine Rocky Mountains LLC, and Peregrine Midstream Partners LLC (3363).  The address of the Debtors' corporate headquarters  is 3 Riverway, Suite 1100, Houston, TX 77056.

[2]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Bridge Financing Term Sheet or the Motion, as applicable.

ING Capital LLC ("ING"), as agent and lender (the "DIP Agent" and the "Bridge Lender," respectively);

(2) the grant to the DIP Agent, for the benefit of itself and DIP Lender, of superpriority administrative claim status pursuant to Bankruptcy Code sections 364(c)(1) and 507(b) in accordance with the terms of this Order;

(3) authorization for the Debtors' use of cash collateral whenever or wherever acquired, and the proceeds of all collateral pledged to the Prepetition Lenders (defined below), as contemplated by Bankruptcy Code section 363 in accordance with the terms set forth herein;

(4) a grant of adequate protection to the Prepetition Lenders under and in connection with the Prepetition Loan Documents (as defined below) in accordance with the terms set forth herein;

(5) modification of the automatic stay to the extent hereinafter set forth and waiving the 14-day stay provisions of Bankruptcy Rules 4001(a)(3) and 6004(h); and

(6) a Final Hearing on the Motion for entry of an order authorizing the Bridge Facility and use of cash collateral on a final basis.

Notice of the Motion, the relief requested therein, and the Interim Hearing (as defined below) (the "Notice") having been served by the Debtors in accordance with Rule 4001(c) on: (i) the counsel for the DIP Agent and the DIP Lender and counsel for the Prepetition Lenders; (ii) the United States Trustee for the District of Delaware (the "U.S. Trustee"); (iii) the holders of the thirty (30) largest unsecured claims against the Debtors' estates; (iv) all parties known to the Debtors who hold any liens or security interest in the Debtors' assets who have filed UCC-1 financing statements against any of the Debtors, or who, to such Debtor's knowledge, have asserted any liens on any of such Debtor's assets; (vi) the Internal Revenue Service and all taxing authorities of states in which the Debtors are doing business; (vii) certain other parties identified in the certificates of service filed with this Court.

Pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2, this Court held an interim hearing with respect to the Motion on _____ [__], 2016 (the "Interim Hearing").

After the Motion and the proceedings before this Court at the Interim Hearing; and all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved, or overruled by this Court as reflected on the record established by the Debtors at the Interim Hearing;

**THIS COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW**:[3]

A.     On February 2, 2016 (the "Petition Date"), the Debtors each commenced a case by filing voluntary petitions for relief under Chapter 11 of the Bankruptcy Code;[4]

B.     The Debtors continue to operate their business and manage their properties as debtors and debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108, and no trustee or examiner has been appointed;

C.     The Debtors gave notice of the Motion pursuant to Local Bankruptcy Rule 9013-1(m);

D.     This Court has core jurisdiction over the Debtors' bankruptcy cases, the Motion, and the parties and property affected by this Order pursuant to 28 U.S.C. §§ 157(b) and 1334, and venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409;

E.     As of the date hereof, the United States Trustee has not yet appointed an official committee of unsecured creditors in this matter pursuant to Bankruptcy Code section 1102 (a "Statutory Committee");

F.     The Debtors have admitted, represented and stipulated, without prejudice to the rights of third parties or any Statutory Committee set forth in this Order, the following (collectively, the "Stipulations"):

---

[3]     To the extent, any findings of fact constitute conclusions of law, they are adopted as such, and vice versa, pursuant to Fed. R. Bankr. P. 7052.
[4]     Unless otherwise noted, all statutory references are to the Bankruptcy Code.

3

(1)    as of the Petition Date, Ryckman was party to that certain Second Amended and Restated Credit Agreement dated as of October 31, 2014 (such agreement, as amended and existing immediately prior to the Petition Date, the "Second Amended and Restated Credit Agreement", and together with all other documents, instruments, and agreements delivered in connection with the Second Amended and Restated Credit Agreement, the "Prepetition Loan Documents") with ING as agent (in such capacity, the "Prepetition Agent") and ING and the other lenders party thereto, as lenders (in such capacity, the "Prepetition Lenders"),[5] pursuant to which (a) Ryckman was indebted to the Prepetition Lenders, without defense, counterclaim, recoupment, or offset of any kind, in the approximate non-contingent liquidated amount of no less than $310,000,000 as of February 1, 2016, plus prepetition interest, fees, expenses, and other amounts arising in respect of such obligations existing immediately prior to the Petition Date (such obligations, the "Prepetition Obligations"), and (b) such Prepetition Obligations were secured by valid, enforceable, properly perfected, first priority, and unavoidable liens on and security interests (the "Prepetition Liens") encumbering substantially all assets of Ryckman, as set forth in the Second Amended and Restated Credit Agreement and Prepetition Loan Documents (the "Prepetition Collateral");

(2)    the Bridge Lender is willing to provide postpetition financing to Ryckman through the Bridge Facility as set forth in the Bridge Financing Term Sheet;

(3)    the Prepetition Lenders consent to Ryckman's use of the Prepetition Collateral and cash collateral (as such term is defined in Bankruptcy Code section 363(a)) only upon the conditions contained in this Order and the Bridge Financing Term Sheet;

(4)    the Debtors possess no claims, offsets, or other rights, or causes of action against the Prepetition Lenders that would in any manner impair, reduce, or otherwise modify the Prepetition Obligations or the validly perfected Prepetition Liens upon the Prepetition Collateral;

(5)    the Prepetition Obligations constitute valid, binding obligations of the Debtors, enforceable in accordance with their terms, and the Debtors will not assert any claims, counterclaims, setoffs, or defenses of any kind or nature, which in any way would affect the validity and enforceability of any of the Prepetition Obligations and/or the Prepetition Liens of the Prepetition Lenders upon the Prepetition Collateral, or which would in any way reduce the obligation of the Debtors to pay in full all of the Prepetition Obligations;  and

(6)    each Debtor is a duly organized, validly existing limited liability company or corporation and has the requisite power and authority to own, lease, and operate its property, including, without limitation, the DIP Collateral.  Ryckman has the requisite power and authority to enter into, execute, deliver, and perform its obligations under the Bridge Financing Term Sheet and this Order and to incur the obligations provided for thereon.  Except as may be explicitly required in the Bridge Financing Term Sheet, no

---

[5]    The Prepetition Lenders include the Completion Loan Lenders and the Term Loan Lenders, each as defined in the Motion.

consent or waiver of, filing with, authorization, approval or other action by any shareholder, any federal, state, or other governmental authority or regulatory body or any other person (other than the DIP Agent), which has not already been obtained or done, is required in connection with the execution, delivery, and performance by Ryckman of any of the documents required as a condition to the validity or enforceability of the Bridge Financing Term Sheet, other than entry by this Court of this Order;

G.      The Debtors are unable to obtain sufficient levels of unsecured credit allowable under Bankruptcy Code section 503(b)(1) as an administrative expense necessary to maintain and conduct its business;

H.      The Debtors are unable to obtain secured credit on more favorable terms than under the terms and conditions provided in this Order;

I.      All cash of Ryckman, wherever located on the Petition Date, represents (i) proceeds of loans or other financial accommodations provided to Ryckman by the Prepetition Lenders under Prepetition Loan Documents; or (ii) proceeds of Prepetition Collateral.  Such funds (the "Cash Collateral") constitute cash collateral within the meaning of Bankruptcy Code section 363;

J.      It is in the best interest of Debtors' estates that Ryckman be allowed to enter into the Bridge Facility in order to obtain postpetition secured financing from the Bridge Lender, and use the Prepetition Collateral and Cash Collateral subject to and in accordance with the terms of this Order and the Bridge Financing Term Sheet, and to grant adequate protection to the Prepetition Lenders on account of the Prepetition Obligations, on an interim basis under the terms and conditions set forth herein and in the Bridge Financing Term Sheet, as such is necessary to avoid immediate and irreparable harm to the Debtors' estates pending the Final Hearing;

K.      The extension of credit and financial accommodations under the Bridge Financing Term Sheet are fair, reasonable, in good faith, negotiated at arm's length, reflect the Debtors'

exercise of prudent business judgment, and are supported by reasonably equivalent value and fair consideration and the DIP Lender is entitled to the protections of Bankruptcy Code section 364(e);

L.      Ryckman requires access to the funding available under the Bridge Facility and the Bridge Financing Term Sheet in order to satisfy administrative expenses associated with the operation of its business as a going concern and other costs relating to the administration of the Chapter 11 Cases, and in order to avoid immediate and irreparable harm to the Debtors estates pending the Final Hearing;

M.      The Prepetition Lenders are unwilling to consent to use of the Prepetition Collateral by Ryckman, except as provided under the terms of the Bridge Financing Term Sheet and this Order assuring that the liens and the various claims, superpriority claims, and other protections granted in this Order will not be affected by any subsequent reversal or modification of this Order or any other order, as provided in Bankruptcy Code section 364(e), which is applicable to the postpetition financing arrangement contemplated in the Bridge Financing Term Sheet and the use of Cash Collateral contemplated by this Order; and

N.      Good and sufficient cause has been shown for immediate entry of this Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the Local Bankruptcy Rules. Absent granting the relief set forth in this Order, the Debtors and their estates will be immediately and irreparably harmed.  Entry of this Order, consummation of the financing under the Bridge Facility and the use of Prepetition Collateral, including Cash Collateral, in accordance with this Order and the Bridge Financing Term Sheet are in the best interests of the Debtors, their estates and their creditors.

Based upon the foregoing, and after due consideration and good cause appearing therefor;

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that:**

1.       The Motion is granted on an interim basis effective as of the Petition Date. Ryckman is authorized, pursuant to Bankruptcy Code sections 363 and 364, to enter into the Bridge Facility and the Bridge Financing Term Sheet, to execute such other and additional documents necessary or desired to implement the Bridge Facility or the Bridge Financing Term Sheet, to obtain postpetition secured financing from the Bridge Lender, and to use the Prepetition Collateral, Cash Collateral, and the proceeds and products thereof, pursuant to the terms and conditions of the Bridge Financing Term Sheet and this Order (with such changes, if any, as were made prior to or as a result of the Interim Hearing or are otherwise authorized to be made as amendments to the Bridge Financing Term Sheet in accordance with this Order) to avoid immediate and irreparable harm to the Debtors' estates pending the Final Hearing.  Ryckman shall use the advances obtained under the Bridge Facility and the DIP Collateral (including Cash Collateral) only for the purposes and in the amounts set forth in the Bridge Financing Term Sheet attached to the Motion as Exhibit A, the Initial Budget attached to the Motion as Exhibit B, and any Updated Budget.  The Bridge Lender shall have no obligation to make Bridge Facility advances in excess of the amounts and times set forth in the Bridge Financing Term Sheet.

2.       In furtherance of the foregoing and without further approval of this Court, the Debtors are authorized to perform all acts, to make, execute, and deliver all instruments, documents, and agreements (including, without limitation, the execution or recordation of security agreements, mortgages, deeds of trust, and financing statements), and to pay all fees that may reasonably be required or necessary for Ryckman to implement the terms of, perform its obligations under or effectuate the purposes of and transactions contemplated by this Order or the Bridge Financing Term Sheet.

7

3.    Advances under the Bridge Facility shall be made incrementally, on a weekly basis, to service Ryckman's working capital needs as itemized in the Initial Budget or the Updated Budget, as applicable.

4.    No proceeds of the Bridge Facility or Cash Collateral shall be used to (a) permit the Debtors, or any other party-in-interest or their representatives to challenge or otherwise contest or institute any proceeding to determine (i) the validity, perfection, or priority of any security interests in favor of the Prepetition Lenders or the Bridge Lender, or (ii) the enforceability of the obligations of Ryckman or any other Debtor under the Second Amended and Restated Credit Agreement, any other Prepetition Loan Documents, or the Bridge Financing Term Sheet, (b) investigate, commence, prosecute, or defend any claim, motion, proceeding, or cause of action against the Prepetition Lenders or the Bridge Lender and their agents, attorneys, advisors, or representatives including, without limitation, any lender liability claims or subordination claims, (c) investigate, commence, prosecute, or defend any claim or proceeding or cause of action to disallow or challenge the obligations of Ryckman under the Second Amended and Restated Credit Agreement, any other Prepetition Loan Documents, or the Bridge Financing Term Sheet, or (d) fund acquisitions, capital expenditures, capital leases, or any other similar expenditure other than capital expenditures specifically set forth in the Initial Budget and approved by the DIP Agent.

5.    Pursuant to Bankruptcy Code sections 363 and 364(c) and (d), the Bridge Facility funds advanced pursuant to the terms of this Order and the Bridge Financing Term Sheet (collectively, the "Bridge Facility Advances") shall be allowed administrative expenses of the Debtors' estates, which shall have priority in payment over any other indebtedness and/or obligations now in existence or incurred hereafter by the Debtors and over all administrative

8

expenses or charges against property arising in the Chapter 11 Cases and any superseding Chapter 7 cases including, without limitation, those specified in Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 506(c) (subject to the entry of the Final Order), 507(a), 507(b), 726, 1113, or 1114, (such claim, the "Bridge Superpriority Claim").  Notwithstanding the foregoing, the Bridge Superpriority Claim shall not be payable from the proceeds of or recoveries upon Avoidance Actions (as such term is defined below).  The time of payment of the Bridge Facility Advances shall not be altered, extended, or impaired by any plan or plans of reorganization that may hereafter be accepted or confirmed or any further orders of this Court which hereafter may be entered.

6.     To the extent fully secured, interest on the Prepetition Obligations shall accrue from and after the Petition Date at the rate set forth in the Prepetition Loan Documents.  The reasonable fees and expenses of the Bridge Lender shall be payable as set forth in the Bridge Financing Term Sheet without further notice, motion, or application to, order of, or hearing before this Court (except such notice as may be required in the Bridge Financing Term Sheet).

7.     Pursuant to Bankruptcy Code sections 363, 364(c), and 364(d), as security for the Bridge Facility Advances and other postpetition costs payable under the Bridge Financing Term Sheet, Ryckman is hereby authorized to and is hereby deemed to grant to the DIP Agent a valid, binding, and enforceable lien, mortgage and/or security interest (a "Lien," and as so granted to the DIP Agent, the "DIP Lien") in all of Ryckman's presently owned or hereafter acquired property and assets, whether such property and assets were acquired before or after the Petition Date, of any kind or nature, whether real or personal, tangible or intangible, wherever located, and the proceeds and products thereof (collectively, the "DIP Collateral"), but excluding any causes of action that could be brought pursuant to sections 544, 545, 547, 548, 550, and 553, or

any applicable state fraudulent transfer statutes, and all proceeds of or recoveries thereon (the "Avoidance Actions").

8.     Pursuant to Bankruptcy Code sections 364(c) and (d), the DIP Lien shall be a first priority senior and priming lien, subject and junior only to (i) the Carve-Out (defined below) and (ii) valid, enforceable, properly perfected, and unavoidable prepetition liens (including any liens that are perfected after the Petition Date with a priority that relates back to a date prior to the Petition Date as permitted under Bankruptcy Code section 546(b)) that are senior to the liens granted to Prepetition Lenders concurrently with the initial closing of the Second Amended and Restated Credit Agreement. The DIP Credit Lien shall not be subject or subordinate to any Lien which is avoided and which would otherwise be preserved for the benefit of Ryckman's estate under Bankruptcy Code section 551, and in no event shall any person or entity who pays (or causes to be paid) any of the obligations under the Prepetition Loan Documents be subrogated, in whole or in part, to any rights, remedies, claims, privileges, liens, or security interests granted to or in favor of, or conferred upon, the Bridge Lender by the terms of the Bridge Financing Term Sheet until such time as the obligations under the Bridge Financing Term Sheet and this Order are indefeasibly paid in full, in cash.  The DIP Liens shall not be subject or subordinate to liens arising after the Petition Date, other than liens granted pursuant to this Order to the extent set forth in this Order.

9.     All rents, income, profits, cash in accounts and deposits derived from the Prepetition Collateral constitute Cash Collateral.  Provided that each of the conditions set forth in this Paragraph are satisfied, Ryckman shall be authorized to use the Cash Collateral only in accordance with the terms of the Initial Budget (or the Updated Budget, as applicable), this Order, and the other Bridge Financing Term Sheet.  The satisfaction of each of the following

conditions shall constitute a condition to Ryckman's authorization to use any Cash Collateral: (i) no Event of Default under (and as defined in the Bridge Financing Term Sheet) shall exist or be continuing; and (ii) the Termination Date (as defined in the Bridge Financing Term Sheet) shall not have occurred. If, on any date, any of such conditions is not satisfied, then Ryckman shall not be authorized to use any Cash Collateral unless and until such use is consented to by DIP Agent in its sole and absolute discretion. Absent further order of this Court, if the Termination Date occurs and after five (5) business days following delivery of the Default Notice (as hereinafter defined), Ryckman shall (a) remit to the DIP Agent, any Cash Collateral then in any Debtor's possession for application to the Bridge Facility obligations and Prepetition Obligations consistent with any applicable waterfall set forth in the Prepetition Loan Documents (as such waterfall may be modified by agreement among ING and the Prepetition Lenders) and (b) repay the aggregate principal amount of all advances outstanding under the Bridge Facility plus the sum of any accrued but unpaid interest and fees as of such Termination Date .

10.     Until the indefeasible payment in full of the Prepetition Obligations, the Prepetition Lenders are entitled to adequate protection of their interests in the Prepetition Collateral (including Cash Collateral) as a result of (a) the provisions of this Order granting first priority and/or priming liens on such Prepetition Collateral to the DIP Agent for the benefit of the Bridge Lender, (b) Ryckman's use of the Prepetition Collateral (including Cash Collateral), (c) the imposition of the automatic stay pursuant to Bankruptcy Code section 362, or (d) otherwise, pursuant to Bankruptcy Code sections 361(a), 363(c), and 364(d)(1). The Prepetition Agent, on behalf of and for the benefit of the Prepetition Lenders, is hereby granted, solely to the extent of diminution in value of the Prepetition Liens in the Prepetition Collateral from and after the Petition Date, the following:

11

A.       a Lien in all DIP Collateral (the "Adequate Protection Lien") junior only to the DIP Lien and the Carve-Out; and

B.       a postpetition superpriority administrative expense claim (the "Prepetition Adequate Protection Superpriority Claim") against the Debtors with recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof under Bankruptcy Code sections 503 and 507 against the Debtors' estates, in each case to the extent the Adequate Protection Lien does not adequately protect against the diminution in value of the Prepetition Liens, which shall have priority in payment over any other indebtedness and/or obligations now in existence or incurred hereafter by the Debtors' or any of their respective estates and over all other administrative expenses of any kind, including, without limitation, those specified in Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 726, or 1114, or otherwise and including those resulting from the conversion of a Chapter 11 Case pursuant to Bankruptcy Code section 1112; subject and junior only to the Bridge Facility Advances, provided, however, that no Prepetition Adequate Protection Superpriority Claims shall be paid from Avoidance Actions or the proceeds thereof.

11.       Nothing herein shall be deemed to be a waiver by any Prepetition Lender of its right to request additional or further protection of its interests in any property of the Debtors, to move for relief from the automatic stay (if such relief is required), to seek the appointment of a trustee or examiner or the dismissal of any of the Debtors' bankruptcy cases, or to request any other relief.

12.       The automatic stay provisions of Bankruptcy Code section 362 are hereby modified to permit (a) Ryckman and the DIP Agent to implement and perform the Bridge

12

Facility and the Bridge Financing Term Sheet, including without limitation the provisions thereof with respect to the collection of Proceeds, and the maintenance and implementation of the Collection Accounts and the Collection Procedures (as such terms are defined below), and (b) the creation and perfection of all liens granted or permitted by this Order.  Ryckman and the holders of any DIP Lien or Adequate Protection Lien shall not be required to enter into any additional security agreements to create, memorialize, and/or perfect any such Liens, or to file UCC financing statements, mortgages, or other instruments with any other filing authority or take any other action to perfect any such Liens, which shall be and are deemed valid, binding, enforceable, and automatically perfected by the docket entry of this Order by the Clerk of the Court.  If, however, the holder of any DIP Lien or Adequate Protection Lien in its sole and absolute discretion shall elect for any reason to enter into, file, record, or serve any such financing statements or other documents with respect to any such Lien, then Ryckman shall execute same upon request and the filing, recording, or service thereof (as the case may be) shall be deemed to have been made at the time and on the date of the docket entry of this Order by the Clerk of the Court.  The holders of any DIP Lien, Prepetition Lien, or Adequate Protection Lien are hereby relieved of any requirement to file proofs of claim in the Debtors' bankruptcy cases with respect to any such Liens and the claims secured thereby, but any such holder may in its sole and absolute discretion file any such proof of claim.

13.    The DIP Liens, Bridge Facility Superpriority Claims, Adequate Protection Liens and Prepetition Adequate Protection Superpriority Claims shall be subject to right of payment of the following expenses (the following subparagraphs, collectively, the "Carve-Out," and all amounts payable in connection therewith, the "Carve-Out Amounts"):

A.    unpaid postpetition fees and expenses of the Clerk of the Court and the U.S. Trustee pursuant to 28 U.S.C. § 1930 in such amount, with respect to the U.S. Trustee, as agreed to by the U.S. Trustee or as determined by this Court;

B.    unpaid postpetition fees and expenses of professionals of the Debtors and professionals of a Statutory Committee (if any), which are retained by an order of the Court pursuant to Bankruptcy Code sections 327, 328, 363, or 1103(a) (the "Professionals"), but only to the extent such fees and expenses are (i) incurred prior to the giving of a notice of the occurrence of the Termination Date by the DIP Agent to Ryckman and the Statutory Committee (if any), (ii) within the total cumulative amounts set forth in the Initial Budget and the Updated Budgets, (iii) paid in accordance with compensation procedures approved by the bankruptcy court, and (iv) not otherwise paid from retainers, or any professional expense escrow account established by Ryckman; provided, however, that in no event shall the Carve-Out for the items set forth above exceed the amounts set forth for such items in the Initial Budget and the Updated Budgets.  Any amounts paid from the DIP Collateral or the proceeds thereof, or funded by the DIP Agent or the Bridge Lender with respect to the Carve-Out prior to the entry of the Final Order shall be Bridge Facility Advances and such obligations shall be secured by the DIP Lien.  Further, the payment of the fees or costs of any Professional and/or Statutory Committee (if any) shall be subject to Court approval, and the DIP Agent and the Bridge Lender reserve the right to object to any Professional's application for payment.

14.     Neither the payment of any Professional fees, nor the Carve-Out shall include payment for any fees and expenses, if any, of the Professionals incurred directly or indirectly, in respect of, arising from or relating to:

A.     the initiation, joinder, or prosecution of any action contesting the indebtedness owed to the DIP Agent, the Bridge Lender, the Prepetition Lenders, or the validity of any liens granted to any of such parties, provided, however, that a Statutory Committee (if any) and its professionals shall be allowed to use the Committee Budget to investigate the validity of the Prepetition Liens;

B.     preventing, hindering, or otherwise delaying, whether directly or indirectly, the exercise by DIP Agent of any of its rights and remedies under this Interim Order, the Final Order, or the Bridge Financing Term Sheet;

C.     the commencement or prosecution of any action or proceeding of any claims, causes of action, or defenses against the DIP Agent or the Bridge Lender, Prepetition Lenders, or any of their respective officers, directors, employees, agents, attorneys, affiliates, successors, or assigns, including, without limitation, any attempt to recover or avoid any claim or interest from the DIP Agent, the Bridge Lender, or the Prepetition Lenders, or any of them, under Chapter 5 of the Bankruptcy Code;

D.     any request to borrow money other than pursuant to the terms of the Interim Order, the Final Order, or the Bridge Financing Term Sheet;

E.     with respect to the Debtors, any of the Debtors' Professionals, or any of their successors or assigns (including, without limitation, any trustee, responsible officer, examiner, estate administrator, or representative, or similar person appointed in a case for any Debtor under any chapter of the Bankruptcy Code) performing or commencing any

15

investigation or litigation (whether threatened or pending) by the Debtors with respect to any matter to be released, waived, or specified as not subject to challenge by the Debtors pursuant to this Order or the Final Order (including, without limitation Paragraph 25 herein).

15.    Subject to the entry of the Final Order, effective as of the time of commencement of the Debtors' bankruptcy cases on the Petition Date:

A.    each Debtor waives irrevocably all claims and rights, if any, it or its estate might otherwise assert against the Prepetition Collateral or the DIP Collateral pursuant to Bankruptcy Code sections 506(c), 105(a), or any other applicable law;

B.    no entity in the course of the Debtors' bankruptcy cases shall be permitted to recover from the DIP Collateral (whether directly or through the grant of derivative or equitable standing in the name of the any Debtor or such Debtor's estate) any cost or expense of preservation or disposition of the Prepetition Collateral or the DIP Collateral, including, without limitation, expenses and charges as provided in Bankruptcy Code sections 506(c), 105(a), or any other applicable law;

C.    no entity shall be permitted to recover from the DIP Collateral or the Prepetition Collateral, or assert against the Bridge Lender or any Prepetition Lender, any claim with respect to any unpaid administrative expense of the Debtors' bankruptcy cases, whether or not the Debtors' payment of such administrative claim was contemplated by or included in the Initial Budget or the Updated Budget, as applicable; and

D.    the Prepetition Lenders and the Bridge Lender shall not be subject to the "equities of the case" exception of Bankruptcy Code section 552(b), or to the equitable

doctrines of "marshaling" or any similar claim or doctrine, with respect to any DIP Collateral or the Prepetition Collateral.

16.     So long as the Bridge Facility obligations remain outstanding, unless consented to in writing by the DIP Agent, no Debtor shall seek entry of any further orders in its Chapter 11 Case which authorize (a) under Bankruptcy Code section 363, the use of Cash Collateral; (b) the obtaining of credit or the incurring of indebtedness pursuant to Bankruptcy Code sections 364(c) or 364(d) that does not repay the Bridge Facility in full, in cash, (c) the return of goods pursuant to Bankruptcy Code section 546(h) to any creditor of the Debtors or to consent to any creditor taking any setoff against any of such creditor's prepetition indebtedness based upon any such return pursuant to Bankruptcy Code section 553 or otherwise, or (d) any other grant of rights against the Debtors and/or their respective estates that is secured by a Lien in the DIP Collateral or is entitled to superpriority administrative status that does not repay the Bridge Facility in full, in cash.

17.     Upon the occurrence of: (i) an Event of Default (as such term is defined in the Bridge Financing Term Sheet); (ii) any Debtor's failure to comply with the terms of this Order or the Final Order (including, without limitation, its failure to comply with the Initial Budget or the Updated Budget, as applicable); or (iii) Ryckman's failure to comply with any of the Milestones set forth in the Bridge Financing Term Sheet, and the giving of written notice thereof by the DIP Agent to counsel to the Debtors, the Statutory Committee (if any) and the U.S. Trustee (which notice may be given by any manner of electronic transmission, the automatic stay being deemed lifted for such purpose) (the "Default Notice"), then (1) the DIP Agent shall be fully authorized, in its sole discretion to cease making Bridge Facility advances to Ryckman, and (2) after the Remedy Notice Period, absent a Restraint on Remedies (each as defined below), (a) the DIP

Agent shall be fully authorized, in its sole discretion to terminate Ryckman's use of the DIP Collateral (including, without limitation, Cash Collateral) pursuant to this Order and the Initial Budget or Updated Budget, as applicable, (b) the DIP Agent shall be fully authorized, in its sole discretion to immediately terminate the Bridge Facility and demand repayment of the Bridge Facility obligations then outstanding, and/or (c) the DIP Agent shall be fully authorized, in its sole discretion to exercise any other remedy set forth in the Bridge Financing Term Sheet.

18.     Further, upon the occurrence of an Event of Default and transmission of a Default Notice:

A.      the DIP Agent shall have the right, free of the restrictions of Bankruptcy Code section 362 or under any other section of the Bankruptcy Code or applicable law or rule (including, without limitation, Bankruptcy Rule 4001(a)), to take immediate reasonable action to protect the DIP Collateral from harm, theft, and/or dissipation;

B.      with respect to an Event of Default as to which a Default Notice has been given, the Debtors, the Statutory Committee (if any), and the U.S. Trustee shall have five (5) business days from the date of the Default Notice (the "Remedy Notice Period") to obtain an order of this Court on notice to the DIP Agent (a) enjoining or restraining the Bridge Lender and/or the DIP Agent from taking action or exercising rights and remedies (other than as set forth in clause (1) of Paragraph 17 herein, which remedy may be exercised immediately upon the satisfaction of the conditions set forth in such paragraph) based upon the Event of Default specified in the Default Notice; or (b) challenging whether an Event of Default in the Default Notice has occurred or is continuing without cure (a "Restraint on Remedies").  During the Remedy Notice Period, the DIP Agent and the Bridge Lender shall refrain from exercising their rights and remedies (other than as

18

set forth in clause (1) of Paragraph 17 herein, which remedy may be exercised immediately upon the satisfaction of the conditions set forth in such paragraph). Immediately upon expiration of the Remedy Notice Period unless a Restraint on Remedies has timely been obtained from this Court, or with respect to and upon the Maturity Date, immediately:

> (1)    the DIP Agent shall have the right, free of the restrictions of Bankruptcy Code section 362 or under any other section of the Bankruptcy Code or Bankruptcy Rules (including, without limitation, Bankruptcy Rule 4001(a)), to exercise contractual, legal, and equitable rights and remedies as to all or such part of the DIP Collateral as it shall elect, and to apply the Proceeds (as such term is defined below) of the DIP Collateral to the repayment of the Bridge Facility obligations in accordance with the applicable waterfall (as such waterfall may be modified by agreement among ING and the Prepetition Lenders) set forth in the Prepetition Loan Documents; and

> (2)    the DIP Agent, should it so elect in its sole and absolute discretion as exercised by the filing of an appropriate statement with this Court, shall be deemed to have been granted "peaceful possession" of, and right of access to, all or any portion of the DIP Collateral, by the Debtors.

19.    The Debtors shall provide the DIP Agent with (i) all financial statements, certificates, and reports required pursuant to the Bridge Financing Term Sheet in accordance with the timeframes specified therein and (ii) such additional information as the DIP Agent shall request from the Debtors.  The DIP Agent and its representatives shall have reasonable access to each Debtor's business premises and to the DIP Collateral in order to review and evaluate the

physical condition of any of the DIP Collateral and/or to inspect the financial records and other records of the Debtors concerning the operation of the Debtors' businesses.

20.    For purposes of this Order, (a) "Proceeds" shall mean both (i) proceeds (as defined in the Uniform Commercial Code for the State of New York) and (ii) any and all payments, proceeds, or other consideration realized upon the sale, liquidation, realization, collection, or other manner of disposition of the DIP Collateral, whether in the ordinary course of any Debtor's business (including without limitation accounts, receivables, and other proceeds arising from the Debtors' sales of goods and/or performance of services) or other than in the ordinary course of any Debtor's business, and (b) "Disposition" shall mean any sale, liquidation, realization, collection, or other manner of disposition of DIP Collateral other than in the ordinary course of any Debtor's Business, including without limitation any sale authorized pursuant to Bankruptcy Code section 363.

21.    Ryckman shall maintain in full force and effect the deposit, clearing, dominion, lockbox, and similar accounts maintained by or on behalf of Ryckman pursuant to the Prepetition Loan Documents for the collection of Proceeds obtained in the ordinary course of Ryckman's business (the "Collection Accounts"), and the cash management systems, treasury management systems, and payment procedures under which such accounts and systems are administered (the "Collection Procedures").  In furtherance of the foregoing, the DIP Agent shall be deemed to have control of all of Ryckman's  bank accounts (including, without limitation, all deposit accounts and blocked accounts), and any financial institutions in which such accounts of Ryckman are located are hereby ordered and directed to act in accordance with any request of the DIP Agent concerning such accounts, including, without limitation, requests to turnover funds therein without offset or deduction of any kind.

22.    The Debtors and any successors to the Debtors, including without limitation any successor trustee or trustees, shall assign or direct to the DIP Agent any and all Proceeds realized in any Disposition of any DIP Collateral and immediately deliver any and all such Proceeds which come into their possession to the DIP Agent in the form received; provided, however, that the foregoing shall be subject in all respects to the priorities of Liens with respect to the Liens granted by or permitted under this Order.  The foregoing is without prejudice to the rights of (a) the DIP Agent, the Statutory Committee (if any), or any other party to object to any proposed Disposition or (b) the rights of third parties set forth below with respect to a Challenge Action (defined below) and the remedies that may result from a successful Challenge Action.  The DIP Agent and Prepetition Agent are hereby authorized to credit-bid all or any of the applicable obligations under the Bridge Facility and the Prepetition Loan Documents at any Disposition of any Prepetition Collateral and/or DIP Collateral, subject to the entry of the Final Order.

23.    All Proceeds retained by the DIP Agent shall be applied to the repayment of the Prepetition Obligations and Bridge Facility obligations, until such obligations are paid in full; provided, however, that the foregoing shall be subject in all respects to the priorities of Liens with respect to the Liens granted by or permitted under this Order.  Such applications of Proceeds shall be free and clear of any claim, charge, assessment, or other liability.

24.    Subject to the right to bring a Challenge Action as set forth in Paragraph 26 below, upon entry of this Order:

A.    the Stipulations shall be binding upon the Debtors and all other persons, entities, and/or parties in all circumstances;

B.    the validity, extent, priority, perfection, enforceability, and non-avoidability of the Prepetition Lenders' respective, validly perfected prepetition claims

and liens against the Debtors and the Prepetition Collateral shall not be subject to challenge by the Debtors or any other person, entity, or party; and

C.      neither the Debtors, nor any other person, entity, or party shall seek to avoid or challenge (whether pursuant to Chapter 5 of the Bankruptcy Code or otherwise) any transfer made by or on behalf of the Debtors to or for the benefit of any of the Prepetition Lenders prior to the Petition Date.

25.      In consideration of and as a condition to the Bridge Lender making the Bridge Facility Advances and providing credit and other financial accommodations to the Debtors pursuant to the terms of this Order and the Bridge Financing Term Sheet, each Debtor (each a "Releasor" and collectively, the "Releasors"), subject to Paragraph 26 herein, absolutely releases, forever discharges and acquits each of the DIP Agent, the DIP Lender, and their respective successors and assigns, affiliates, officers, directors, employees, attorneys, and other representatives (the "Releasees") of and from any and all claims, demands, causes of action, damages, choses in action, and all other claims, counterclaims, defenses, setoff rights, and other liabilities whatsoever (the "Prepetition Released Claims") of every kind, name, nature, and description, whether known or unknown, both at law and equity (including, without limitation, any "lender liability" claims) that any Releasor may now or hereafter own, hold, have, or claim against each and every of the Releasees arising at any time prior to the entry of this Order (including, without limitation, claims relating to the Debtors, the Prepetition Loan Documents, and other documents executed in connection therewith, and the obligations thereunder); provided, however, that such release shall not be effective as to the Debtors' bankruptcy estates until the expiration of the Challenge Period.  In addition, upon the indefeasible payment, in full, in cash, of all Bridge Facility obligations owed to the Bridge Lender arising under this Order and

the Bridge Financing Term Sheet, the Bridge Lender shall be released from any and all obligations, actions, duties, responsibilities, and causes of action arising or occurring in connection with or related to the Bridge Financing Term Sheet.

26.    Each Releasor hereby absolutely, unconditionally, and irrevocably covenants and agrees with each Releasee that it will not sue (at law, in equity, or in any other proceeding) any Releasee on the basis of any Prepetition Released Claims released and discharged by such Releasor pursuant to this Order.  If any Releasor violates this covenant, each Debtor agrees to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all reasonable attorneys' fees and costs incurred by any Releasee as a result of such violation.

27.    Notwithstanding any other provisions of this Order, any interested party (other than the Debtors or their Professionals) in this case (including, without limitation, the Statutory Committee (if any)) shall have until (i) in the case of a party in interest with requisite standing other than a Statutory Committee, 75 days after entry of this Interim Order, (ii) in the case of a Statutory Committee, 60 days after the filing of notice of appointment of the Statutory Committee (and subject to the Statutory Committee budget (the "Committee Budget") (the "Challenge Period"), to commence an adversary proceeding against the Prepetition Agent for the purpose (collectively, a "Challenge Action") of:

A.    challenging the validity, extent, priority, perfection, enforceability, and non-avoidability of the Prepetition Liens (as applicable) against the Debtors;

B.    seeking to avoid or challenge (whether pursuant to Chapter 5 of the Bankruptcy Code or otherwise) any transfer made by or on behalf of the Debtors to or for the benefit of the Prepetition Lenders or the Prepetition Agent (as applicable) prior to the Petition Date;

23

C.      seeking damages or equitable relief against the Prepetition Lenders or the Prepetition Agent arising from or related to their prepetition business and lending relationships with the Debtors, including without limitation equitable subordination, recharacterization, lender liability, and deepening insolvency claims and causes of action; or

D.      challenging any other matter to be waived or released pursuant to this Order (including, without limitation, pursuant to Paragraph 25).

28.      All parties in interest, including without limitation the Statutory Committee (if any), that fail to act in accordance with the time periods set forth in the preceding paragraph shall be, and hereby are, barred forever from commencing a Challenge Action or challenging in any manner Prepetition Agent's Liens and shall be bound by the waivers, Stipulations, and terms set forth in this Order (including Paragraph 25 of this Order).  Any Challenge Action filed shall prohibit application of this paragraph only to the extent of the specific matters set forth in such Challenge Action on the date of filing.

29.      The legal and equitable claims, counterclaims, defenses, and/or rights of offset and setoff of the Prepetition Lenders in response to any such Challenge Action are reserved, and the ability of a party to commence a Challenge Action shall in no event revive, renew, or reinstate any applicable statute of limitations which may have expired prior to the date of commencement of such Challenge Action.  Despite the commencement of a Challenge Action, the prepetition claims and Liens of the Prepetition Lenders shall be deemed valid, binding, properly perfected, enforceable, non-avoidable, not subject to disallowance under Bankruptcy Code section 502(d) and not subject to subordination under Bankruptcy Code section 510 until

such time as a final and non-appealable judgment and order is entered sustaining such Challenge Action in favor of the plaintiffs therein.

30.     In making decisions to advance any extensions of credit to Ryckman pursuant to the Bridge Facility or in taking any other actions reasonably related to this Order or the Bridge Financing Term Sheet (including, without limitation, the exercise of its approval rights with respect to any budget), the DIP Agent and the Bridge Lender shall have no liability to any third party and shall not be deemed to be in control of the operations of the Debtors or to be acting as a "control person," "responsible person," or other "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the Internal Revenue Code, the United States Comprehensive Environmental Response Compensation and Liability Act, as amended, or any similar Federal or state statute), and the DIP Agent's and the Bridge Lender's relationship with the Debtors shall not constitute or be deemed to constitute a joint venture or partnership of any kind between the Bridge Lender and the Debtors.

31.     This Order shall be binding upon and inure to the benefit of the DIP Agent, the Bridge Lender, the Prepetition Lenders, the Debtors, and their respective successors and assigns, including, without limitation, any trustee, responsible officer, examiner, estate administrator, or representative, or similar person appointed in a case for any Debtor under any chapter of the Bankruptcy Code.  Except as set forth herein with respect to a Challenge Action, no rights are created under this Order for the benefit of any creditor of the Debtors, any other party in interest in the Debtors' bankruptcy cases, or any other persons or entities, or any direct, indirect or incidental beneficiaries thereof.

32.     Any order dismissing any of the Chapter 11 Cases under Bankruptcy Code section 1112 or otherwise shall be deemed to provide (in accordance with Bankruptcy Code sections 105 and 349) that (a) the Bridge Lender's liens and security interests in the DIP Collateral shall continue in full force and effect notwithstanding such dismissal until the Bridge Facility obligations are indefeasibly paid and satisfied in full, in cash; and (b) this Court shall retain jurisdiction, to the extent permissible under applicable law, notwithstanding such dismissal, for the purposes of enforcing the Bridge Facility Superpriority Claim, the DIP Liens, the Adequate Protection Liens, and the Prepetition Adequate Protection Superpriority Claims.

33.     To the extent that any of the provisions of this Order shall conflict with any provisions of the Bridge Financing Term Sheet, or with any order of this Court authorizing the Debtors to continue the use of prepetition bank accounts, cash management systems, treasury management systems, or business forms, or any similar orders, this Order is deemed to control and supersede the conflicting provisions therein.

34.     The terms and conditions of this Order shall be effective and immediately enforceable upon its entry by the Clerk of the Court notwithstanding any potential application of Bankruptcy Rule 6004(h) or otherwise.   Furthermore, to the extent applicable, the notice requirements and/or stays imposed by Bankruptcy Rules 4001(a)(3), 6003(b), and 6004(a) are hereby waived for good and sufficient cause.

35.     Nothing in this Order shall preclude this Court from entering a Final Order containing provisions inconsistent with or contrary to the provisions of this Order, provided, however, that the Bridge Lender and the Prepetition Lenders shall be entitled to the benefits and protections of this Order, including (a) the adequate protection afforded to the Prepetition Lenders set forth in this Order, and (b) the protections afforded pursuant to Bankruptcy Code

section 364(e), with respect to all loans, advances, and other financial, accommodations made by them pursuant to this Order.  The DIP Lien, the priority afforded the Bridge Facility Advances, and the adequate protection afforded to the Prepetition Lenders, as set forth in this Order, shall be binding on the Debtors and any successor trustee or trustees even if this Order is reversed or modified on appeal with respect to all loans, advances, and other financial accommodations made by them pursuant to this Order.  Except as provided herein, no Proceeds, or Cash Collateral may be used by any party in interest seeking to modify any of the rights granted to DIP Agent hereunder or in the Bridge Financing Term Sheet.

36.    Ryckman and the DIP Agent may implement non-material modifications of the Bridge Financing Term Sheet without the need for notice or further approval of this Court, provided, however, that copies of such amendments will be provided to the U.S. Trustee and the Statutory Committee (if any).  Ryckman and the DIP Agent may implement material modifications of the Bridge Financing Term Sheet on at least seven (7) calendar days prior notice to the Statutory Committee (if any) and the U.S. Trustee, and any proposed material modification that is objected to within such period shall only be implemented to the extent approved by this Court.

37.    The Debtors are authorized to do and perform all acts, to make, execute, and deliver all instruments and documents, and to pay all fees and expenses that may be required or necessary for the Debtors' performance under this Order or the Bridge Financing Term Sheet, including, without limitation, (a) the execution of the Bridge Financing Term Sheet, (b) the payment of the fees and other expenses described herein or in the Bridge Financing Term Sheet as such become due, including, without limitation, agent fees, commitment fees, letter of credit fees, and facility fees.

38.    The requirements of Bankruptcy Rules 4001, 6003, and 6004, in each case to the extent applicable, are satisfied by the contents of the Motion.

39.    This Court shall retain jurisdiction to enforce the provisions of this Order, the Bridge Facility and the Bridge Financing Term Sheet, and this Court shall retain jurisdiction over all matters pertaining to the implementation, interpretation and enforcement of this Order, the Bridge Facility and the Bridge Financing Term Sheet.

40.    This Court has considered and determined the matters addressed herein pursuant to its powers under the Bankruptcy Code, including the power to authorize Ryckman to obtain credit on terms and conditions to which Ryckman and DIP Agent have agreed.  Thus, each of the terms and conditions constitutes a part of the authorization under Bankruptcy Code section 364, and is, therefore, subject to the protections contained in Bankruptcy Code section 364(e), regardless of (i) any stay, modification, amendment, vacation, or reversal of this Order or the Bridge Financing Term Sheet or any term hereunder or thereunder; (ii) the failure to obtain a final order pursuant to Bankruptcy Rule 4001(c)(2); or (iii) the dismissal or conversion of any of the Chapter 11 Cases.

41.    A final hearing with respect to the Motion is scheduled for _____ [___], 2016 at [_____].m. (ET) (the "Final Hearing") before the Honorable [_____], United States Bankruptcy Judge.  The Debtors shall promptly mail copies of this Order (which shall constitute adequate notice of the Final Hearing) to the parties having been given notice of the Interim Hearing and to any other party that has filed a Bankruptcy Rule 2002 request for service.  Any party in interest objecting to the relief sought at the Final Hearing shall file written objections, and serve them on (i) the Debtors' proposed counsel, Skadden, Arps, Slate, Meagher & Flom LLP, attn:  George Panagakis and Jessica Kumar, 155 N. Wacker Drive, Chicago, IL 60606 and attn.:  Sarah E. Pierce, 920 N. King Street, Lbby 7, Wilmington, DE 19801; (ii) the Bridge Lender's counsel, Holland & Knight LLP, attn.:  Robert Jones and Brent McIlwain, 200 Crescent Court, Suite 1600, Dallas, TX 75201 and Bayard, P.A., attn.:  Neil Glasman, 222 Delaware Avenue, Suite 900, Wilmington, DE 19899; and (iii) the U.S. Trustee, on or before [_____] a.m./p.m. (prevailing Eastern time) on [_____], 2016.

Dated:  Wilmington, Delaware
        _____, 2016


        _____
        UNITED STATES BANKRUPTCY JUDGE