**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| RYCKMAN CREEK RESOURCES, LLC, | : | Case No. 16-10292 (____) |
| et al., | : |  |
|  | : | (Joint Administration Pending) |
| Debtors.[1] | : |  |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DECLARATION OF ROBERT D. ALBERGOTTI, VICE PRESIDENT OF
RESTRUCTURING OF THE DEBTORS, IN SUPPORT OF
CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, Robert D. Albergotti, hereby declare under penalty of perjury that the following

is true to the best of my knowledge, information, and belief:

1.       I am the Vice President of Restructuring of Ryckman Creek Resources, LLC

("Ryckman") and certain of its affiliates, the debtors and debtors in possession in the above-

captioned cases (collectively, the "Debtors" or the "Company").  To enable the Debtors to

minimize the adverse effects of the Chapter 11 Cases (defined below) on their business, the

Debtors intend to request various types of relief in "first day" applications and motions

(collectively, the "First Day Pleadings").  I submit this declaration (this "Declaration") in support

of the Debtors' (a) voluntary petitions for relief under chapter 11 of title 11 of the United States

Code (the "Bankruptcy Code") and (b) the First Day Pleadings.  I am authorized to submit this

Declaration on behalf of the Debtors.

---

[1]      The Debtors and, where applicable, the last four digits of their respective taxpayer identification numbers are
as follows: Ryckman Creek Resources, LLC (4180), Ryckman Creek Resources Holding Company LLC,
Peregrine Rocky Mountains LLC, and Peregrine Midstream Partners LLC (3363).  The address of the Debtors'
corporate headquarters  is 3 Riverway, Suite 1100, Houston, TX 77056.

2.      <u>Background of Declarant</u>.  I am a director at AP Services LLC ("<u>APS</u>")[2] where I have worked with senior management teams, attorneys, creditors, and employees at all levels to identify process improvements, spot business trends, and take advantage of financial opportunities as a consultant and business unit controller.  I have assisted a number of companies with complex restructurings, predominately focused on the energy, shipping, and chemicals sectors.

3.      APS has been acting as financial advisor for the Debtors since August 2014. Prior to the Petition Date, I was appointed as Vice President of Restructuring for the Debtors.  As a result of my history with the Debtors, my review of relevant documents, and my discussions with other members of the Debtors' management teams, I am familiar with the Debtors' day-to-day operations, business affairs, and books and records.  Except as otherwise noted, I have personal knowledge of the matters set forth herein and, if called as a witness, would testify competently thereto.  Except as otherwise stated, all facts set forth in this Declaration are based on my personal knowledge, my discussions with other members of the Debtors' senior management, my review of relevant documents, or my opinion, based on my experience and knowledge of the Debtors' operations and financial conditions.  In making this Declaration, I have relied in part on information and materials that the Debtors' personnel and advisors have gathered, prepared, verified, and provided to me, in each case under my ultimate supervision, at my direction, and/or for my benefit in preparing this Declaration.

4.      This Declaration is divided into two parts.  Part I provides background information about the Debtors, their business operations, their corporate and capital structures,

---

[2]    APS is a subsidiary of AlixPartners, LLP that provides interim management services to a variety of companies in and out of chapter 11 restructurings.

and the circumstances surrounding the commencement of the Chapter 11 Cases.  Part II sets forth

the relevant facts in support of each of the First Day Pleadings.

**PART I**

**BACKGROUND**

**I.      THE DEBTORS' BUSINESS AND OPERATIONS**

**A.      Chapter 11 Filings**

5.      On February 2, 2016 (the "Petition Date"), the Debtors each commenced a case

by filing a petition for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").

The Debtors have requested that the Chapter 11 Cases be jointly administered.

6.      The Debtors continue to operate their business and manage their properties as

debtors and debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

7.      To date, no creditors' committee has been appointed in the Chapter 11 Cases by

the Office of the United States Trustee for the District of Delaware (the "United States Trustee").

No trustee or examiner has been appointed in the Chapter 11 Cases.

**B.      The Debtors' Business**

8.      The Company was formed on September 8, 2009 to engage in the acquisition,

development, marketing, and operation of an underground natural gas storage facility (the

"Ryckman Creek Facility").

9.      The Ryckman Creek Facility is a depleted crude oil and natural gas reservoir

located approximately 25 miles southwest of the Opal Hub in Uinta County, Wyoming.[3]  The

Company began development of the reservoir into a natural gas storage facility in 2011.

---

[3]      The Ryckman Creek Facility includes the former Canyon Creek Compression Facility purchased by the
Debtors from Kinder Morgan.

Currently, the Ryckman Creek Facility has approximately 42 billion cubic feet (bcf) of working natural gas storage capacity and is permitted for 53 bcf of storage capacity.

10.    The Ryckman Creek Facility interconnects with five major interstate gas pipelines—the Questar, Ruby, Kern River, Northwest, and Overthrust—and is the only available gas storage facility on two of the pipelines, the Ruby and Kern River.  In addition, the Debtors have the ability to act as a receipt and delivery point for an additional four major pipelines— Cheyenne Plains, Colorado Interstate Gas, Wyoming Interstate Company, and Rocky Mountain Express.  The Ryckman Creek Facility's favorable location and direct connections to key pipelines provides multiple outlets for gas and enhanced optionality to the Debtors' customers. In particular, it allows for distribution to several key consumer markets, including California, Nevada, the northern Rockies, the Pacific Northwest, and the Midwest.

11.    The Ryckman Creek Facility is repurposed from a partially-depleted oil and gas reservoir,[4] which offers several advantages – the underground formation is geologically capable of holding natural gas, and the extraction and distribution equipment previously used in the extraction of oil or gas may be used as part of the storage facility's operations.

12.    The Debtors' business is comprised of three primary components – storage of customer natural gas, proprietary trading of inventory gas, and production of liquid hydrocarbons residing in the reservoir.

13.    <u>Natural Gas Storage</u>.  Once produced and transported, natural gas is not always needed immediately, due in part to seasonal fluctuations in demand.  Storage of natural gas ensures that excess supply can be stored when demand is lower – generally, in the summer months – and is available when demand is higher – generally, in the winter months.  The storage

---

[4]    The reservoir was originally discovered by Amoco in 1976 and developed by BP/Amoco with 36 wells.

of natural gas also serves as insurance against any unforeseen events, such as accidents or natural disasters, that may affect the production or delivery of natural gas.  In addition, natural gas storage facilities provide commercial and economic benefits to users of such storage, as gas can be stored when prices are low and can be withdrawn and sold when prices are high.  Accordingly, the Company has entered into and will continue to enter into, various contracts with customers – primarily exploration and production companies, natural gas utility operators, and various financial institutions engaged in the trading of commodities.  Under these contracts, customers may inject natural gas in the Ryckman Creek Facility when supply exceeds their needs or when customers otherwise wish to maintain a reserve of natural gas and withdraw such gas on demand or as otherwise specified in the contract.  Natural gas storage is the Company's largest business segment, currently representing nearly all of the Debtors' projected storage volumes and revenues.

14.    <u>Proprietary Trading</u>.  To enable the Company to capitalize on market fluctuations in the price of natural gas, as well as satisfy customer demand, and pipeline quality specifications, the Company intends to purchase natural gas from gas producers and store such gas for later sale to third parties.  Currently, the Debtors own approximately 4.2 Bcf of natural gas that is used as pad gas.[5]  The Debtors, however, believe that as additional customers engage in storage operations at the Ryckman Creek Facility, the Debtors will be able to trade their 4.2 Bcf of natural gas as propriety gas if and when market conditions prove favorable.

---

[5]    Pad gas, also known as permanent gas, refers to gas used to fill empty space in the reservoir to ensure that there is an adequate level of gas to maintain the latent pressure for the operability of the reservoir.

15.     Liquid Hydrocarbon Production.  In addition to storage of natural gas and proprietary trading, a projected small part of the Company's business will involve the production of liquid hydrocarbons from the depleted reservoir.

## II.     THE DEBTORS' CORPORATE AND CAPITAL STRUCTURE

### A.     Corporate Structure

16.     A corporate organization chart depicting the ownership structure of the Debtors and their Non-Debtor Affiliate is attached hereto as Exhibit A.

17.     Ryckman, a Delaware limited liability company, owns the Ryckman Creek Facility.  Ryckman Creek Holding Company LLC ("Holdings"), also a Delaware limited liability company, is the holding company for Ryckman and owns 90,000 Class A units of Ryckman.  Bear River Acquisition Company Inc. ("Bear River") owns 10,000 Class A units of Ryckman as well as approximately 31,879 Preferred Units (defined below) of Ryckman.  Ryckman also issued 10,000 Class B units, which are held by various individuals and entities associated with Nielson Energy Group, LLC (the "Nielson Equity Holders").[6]  Entities in the ownership structure above Holdings are, respectively, Debtors Peregrine Rocky Mountains LLC and Peregrine Midstream Partners LLC ("Peregrine Midstream"), and non-Debtor Bear River.[7]

---

[6]     Specifically, the Nielson Equity Holders are comprised of Sage Creek Wyoming Investments, LLC, a Colorado limited liability company, James E. Nielson, as Trustee of the James E. Nielson Revocable Trust, a trust created under the laws of the State of Wyoming by that certain James E. Nielson Revocable Trust dated October 19, 2007, Jay E. Nielson, as Trustee of the James E. Nielson Marital Trust, a trust created under the laws of the State of Wyoming by that certain James E. Nielson Marital Trust dated February 4, 2008, Jay E. Nielson, an individual, John W. Nielson, an individual, Thomas E. Fitzsimmons and Doneen K. Fitzsimmons, as Co-Trustees of The Fitzsimmons Family Trust, a trust created under the laws of the State of Wyoming by that certain Amended Declaration of Trust, as amended July 1, 2011, and Richard Stader, an individual.

[7]     Peregrine Rocky Mountains LLC is wholly owned by Peregrine Midstream.  Bear River is the majority owner of Peregrine Midstream.

18.     The Debtors have approximately 35 employees.  Of those, 30 are employed by Ryckman and the other five are employed by Peregrine Midstream but also provide services to Ryckman pursuant to a services agreement.

**B.      Capital Structure**

19.     The Company's original capital structure at formation and for much of the construction phase of the project was fairly straightforward, consisting of $120,000,000 in term loan debt, a $40,000,000 revolving credit facility, $50,000,000 in subordinated debt, and equity.[8] This capital structure was anticipated to be sufficient to bring the project into operation. However, as a result of various construction setbacks and other issues, as described in more detail below, that increased the cost of the project, Ryckman worked with its existing lenders and equity sponsor to obtain additional liquidity.  The layered capital structure described below is the result of this additional funding.

20.     As of the Petition Date, Ryckman had approximately $333,000,000 of prepetition bank debt which comprised of the following principal amounts plus accrued interest:[9]

- Tranche A Debt:  $55,000,000 in principal amount of Tranche A debt, which is subdivided into two tranches, the Initial Tranche A Loans (defined below) in the principal amount of $50,000,000 and the Secondary Tranche A Loans (defined below) in the principal amount of $5,000,000;

- Tranche B Debt: $95,000,000 in principal amount of Tranche B debt, which is subdivided into three tranches, the Initial Tranche B Loans (defined below) in the principal amount of $55,000,000, the Secondary Tranche B Loans (defined below) in the principal amount of $15,000,000, and the Tertiary Tranche B Loans (defined below) in the amount of $25,000,000; and

---

[8]   The capital structure also included an incremental facility and an inventory management facility.

[9]   Ryckman is the only borrower under the Second Amended and Restated Credit Agreement and the Amended and Restated Credit Agreement.

- Term Loan Debt: $160,000,000 in principal amount of term loan debt.[10]

21.     Second Amended and Restated Credit Agreement.  Ryckman is a borrower under that certain Second Amended and Restated Credit Agreement, dated as of October 31, 2014 (as the same has been amended, supplemented, modified, extended, renewed, restated and/or replaced at any time prior to the Petition Date,  the "Second Amended and Restated Credit Facility"), with ING Capital, LLC ("ING"), as administrative agent and as collateral agent for the secured parties, the Bank of New York Mellon ("BONY"), as depository, and the tranche A lenders (the "Tranche A Lenders"), and Bear River, as the tranche B lender (the "Tranche B Lender" and together with the Tranche A Lenders, the "Completion Loan Lenders").

22.     The Second Amended and Restated Credit Facility is secured by (i) liens on substantially all of the assets of Ryckman, (ii) pledges of the Class A units of Ryckman by Holdings and Bear River, and (iii) pledges of the Class B units of Ryckman by the Nielson Equity Holders.

23.     Tranche A Completion Loan Commitment.  Under the Second Amended and Restated Credit Facility, the Tranche A Lenders committed to advance term loans in the aggregate principal amount of $55,000,000 to finance project costs.  The first $50,000,000 of the Tranche A Loans (the "Initial Tranche A Loans") and the remaining $5,000,000 in Tranche A Loans (the "Secondary Tranche A Loans" and together with the Initial Tranche A Loans, the "Tranche A Loans") are fully funded.  The Tranche A Loans mature on December 31, 2018.

24.     Tranche B Completion Loan Commitment.  Bear River initially committed to advance term loans to finance project costs in the aggregate principal amount of $55,000,000

---

[10]    In addition, there is an approximate $1,200,000 outstanding mark to market and settlement liability related to the Ryckman's interest rate swaps with two Prepetition Lenders.

(comprised of $50,000,000 of Initial Tranche B Loans and $5,000,000 of Secondary Tranche B Loans).  Subsequently, pursuant to various amendments to the Second Amended and Restated Credit Agreement, the Tranche B Lenders increased the Secondary Tranche B Loans by an additional $15,000,000 so that the aggregate Secondary Tranche B Loan commitment was $20,000,000 and the aggregate Tranche B Loan commitment was $70,000,000.  Finally, on October 13, 2015, Ryckman, the Completion Loan Lenders, ING, and the Depository entered into the seventh amendment to the Second Amended and Restated Credit Agreement (the "Seventh Amendment").  Under the Seventh Amendment, Bear River upsized its commitment by another $25,000,000 to $95,000,000 in the aggregate.  The first $55,000,000 of the Tranche B Loans (the "Initial Tranche B Loans"), the next $15,000,000 in Tranche B Loans (the "Secondary Tranche B Loans"), and the final $25,000,000 in Tranche B Loans (the "Tertiary Tranche B Loans" and together with the Initial Tranche B Loans and the Secondary Tranche B Loans, the "Tranche B Loans") are all fully funded.  The Tranche B Loans mature on December 31, 2018; provided, however, under certain circumstances set forth in the Agreement Among Lenders, the maturity date of the Tranche B Principal Debt (as defined in the Second Amended And Restated Credit Agreement) may be extended.

25.    Term Loan Commitment.  Under the Second Amended and Restated Credit Agreement, certain loans made under the prior Amended and Restated Credit Agreement,[11] dated as of May 15, 2014, with ING as administrative agent and BONY as depository and the lenders party thereto (the "Term Loan Lenders" and, together with the Completion Loan Lenders, the

---

[11]    The Amended and Restated Credit Facility is secured by the same collateral as the Second Amended and Restated Credit Agreement.

"Prepetition Lenders" ), were restructured.[12]  As a result of the restructuring, as of the Petition

Date, term loans in the aggregate principal amount of approximately $160,000,000 (the "Term

Loans") remain outstanding.[13]  The Term Loans mature on December 31, 2018.

26.    _Priority of Payment of Obligations_.  The Lenders are party to that certain

Agreement Among Lenders (as amended, restated, or supplemented from time to time, the

"Agreement Among Lenders").  In addition, Ryckman, ING, and BONY are party to a certain

Second Amended and Restated Disbursement Agreement (as amended, restated, or supplemented

from time to time, the "Disbursement Agreement").  The Agreement Among Lenders and the

Disbursement Agreement set forth the priority of payment between and among the Completion

Loan Lenders and the Term Loan Lenders.  In general, from and after a Cessation Event (as

defined in the Disbursement Agreement)[14]:

- Payment of the principal and interest on the Tertiary Tranche B Loans and the Secondary

  Tranche A Loans is pari passu and senior in right of payment to the other outstanding

  indebtedness (collectively, the "First Priority Debt").

- The principal and interest on the Initial Tranche A Loans, the principal and interest on the

  Secondary Tranche B Loans, and the principal on the Initial Tranche B Loans are pari

  passu and next in priority (collectively, the "Second Priority Debt").

---

[12]    Under the Second Amended and Restated Credit Agreement, certain Inventory Loan Commitments (as defined in the Second Amended and Restated Credit Agreement) were terminated and none remain outstanding.  In addition, certain Incremental Loan Commitments (as defined in the Second Amended and Restated Credit Agreement) were terminated and the outstanding Incremental Loans were deemed to have been repaid to ING.  Finally, $40,000,000 outstanding under a revolving facility was converted to term loans.

[13]    This amount is comprised of $120,000,000 in term loans outstanding under the Amended and Restated Credit Agreement and the  $40,000,000  in term loans converted from the revolving facility under the Amended and Restated Credit Agreement and combined with the term loans under the Second Amended and Restated Credit Agreement.  In addition, approximately $1,200,000 remains outstanding  as a liability under certain hedging agreements.

[14]    A Cessation Event includes a voluntary or involuntary filing for bankruptcy by Ryckman.

- Finally, the Term Loan principal and interest is <u>pari passu</u> with the interest on the Initial Tranche B Loans and junior to the First Priority Debt and the Second Priority Debt (collectively, the "<u>Third Priority Debt</u>").

27.     <u>Equity</u>.  Under the Second Amended and Restated Credit Agreement, all principal and interest under that certain Subordinated Advanced Note and Unit Purchase Agreement, dated as of June 2, 2014 with Bear River, pursuant to which Bear River had advanced $30,000,000 in subordinated debt was exchanged for preferred member interests in Ryckman (the "<u>Preferred Units</u>").  As a result, Bear River holds 34,879.46 Preferred Units in Ryckman.  In addition, as set forth above, Holdings holds 90,000 Class A units and Bear River holds 10,000 Class A Units of Ryckman .  Individual owners of the Nielson Energy group hold all 10,000 of Ryckman's Class B units.  Peregrine Rocky Mountains LLC holds all 750,000 Class A Units of Holdings. Peregrine Midstream wholly owns Peregrine Rocky Mountains LLC.  Bear River is the majority owner of Peregrine Midstream.

## III.    EVENTS LEADING TO THE CHAPTER 11 FILINGS

28.     <u>Construction Issues/NRU Failure</u>.  Construction on the Ryckman Creek Facility began in the summer of 2011 under the direction of Company management and a third-party general contractor, Troy Construction, L.L.C. ("<u>Troy</u>").  The Ryckman Creek Facility began commercial operations in late 2012 and received injections of customer gas and gas purchased by the Company.

29.     During limited commercial operations in April 2013, the nitrogen removal unit ("<u>NRU</u>"), a key piece of equipment at the Ryckman Creek Facility, failed and ignited a fire.  As a result, the Ryckman Creek Facility suffered substantial damage that required significant repairs and replacement of not only the NRU but other key equipment as well.  These required repairs

and replacements led to delays in restarting commercial operations, leading to significant

incremental costs to the original construction costs.[15]

30.    Hydrogen Sulfide Gas.  In addition to the fire and damage associated with the

NRU failure, in early 2013, Ryckman Creek realized that the reservoir contained elevated levels

of hydrogen sulfide gas ("H2S"), a corrosive gas that, if present in natural gas above certain

levels, would render the natural gas unacceptable to owners of downstream pipelines and end

users.  Therefore, H2S must be removed prior to distribution to the natural gas distribution

network.  The Company and its engineers designed, developed, and installed an H2S Scavenging

System to remove the H2S.  Design and implementation of this fix, however, was expensive and

led to further cost overruns and delays at the Ryckman Creek Facility.

31.    Increased Debt.  During the spring of 2014, Ryckman Creek engaged both ING

and Bear River in discussions about amending the existing credit agreement dated November

2011 to allow for additional indebtedness to be incurred by Ryckman Creek to fund completion

of the original construction projects, the rebuilt NRU, and equipment to address the H2S issues

in the reservoir.  Consequently, Ryckman, ING, and Bear River entered into an Amended and

Restated Credit Facility.

32.    During an inspection and audit of the safety and security of the Ryckman Creek

Facility in May 2014, it was determined that significant settlement of the soils at the Ryckman

Creek Facility had occurred.  The Company determined that remediation of the site would cost

approximately $50,000,000, and at that time the remaining work to finish the project was

estimated at $48,000,000.  Therefore, Ryckman once again engaged in discussions with Bear

---

[15]    Before the Debtors operated the Ryckman Creek Facility, other companies used nitrogen as the inert gas to
pressurize the reservoir to enhance oil recovery operations.  As a result, a substantial amount of nitrogen exists
in the reservoir that must be removed prior to nominating gas to various pipelines used by the Debtors'
customers to transport natural gas.

River and ING.  During the course of September and October of 2014, Ryckman, Bear River, and ING engaged in extensive negotiations to reach a consensual, out of court transaction that culminated in the closing of the Second Amended and Restated Credit Facility, which provided an additional $110,000,000 of funding.  Following the original cost estimates from the Debtors' general contractor who replaced Troy, however, it quickly became apparent that the scope of the repairs was significantly underestimated.  Consequently, the Tranche B Lender upsized the amount of its commitment first from $55,000,000 to $65,000,000, then to $70,000,000, and finally to $95,000,000 in the aggregate.

33.     Troy Arbitration.  On August 28, 2013, Troy initiated binding arbitration seeking recovery of contract balances of approximately $31,000,000 allegedly owed by Ryckman Creek under the parties' Cost Reimbursable Plus Fixed Fee Engineering, Procurement and Construction Contract (the "EPC Contract") and Master Services Agreement (the "MSA").  On September 18, 2013, Ryckman Creek filed an answering statement and counterclaim denying Troy's entitlement to damages and seeking an award of not less than $75,000 in damages.  Subsequently, Ryckman Creek filed amended answering statements and counterclaims, increasing the amount of its claim for damages to approximately $44,000,000 for damages allegedly resulting from Troy's allegedly defective performance.  On October 26, 2015, the arbitration panel issued its final award, which granted Troy an award of $19,799,129.

34.     Completion of the Ryckman Creek Facility.  Despite these setbacks and the related liquidity issues, the Company was able to complete construction of the Ryckman Creek Facility sufficient to commence initial storage services contemplated under the Firm Storage Service Precedent Agreement in December 2015.  Currently, the Ryckman Creek Facility holds 13.1 bcf of customer gas as well as 4.2 bcf of gas owned by the Company.  In addition, the

Company anticipates installation of the remaining components of the facility in the next 60-90 days, bringing to a close the long period of construction.  Unfortunately, despite becoming commercially operational and the liquidity provided by the additional financing, the cost overruns and delays have left the Company with insufficient funds to continue to maintain and operate the facility.

35.    Accordingly, the Company explored various options to obtain the necessary liquidity and engaged in negotiations with the Tranche A Lenders and the Tranche B Lender, but ultimately determined that no feasible out-of-court alternative existed.

36.    <u>Debtor-in-Possession Financing</u>. Recognizing the Debtors' immediate need for capital and that a chapter 11 filing might be required, the Debtors and their advisors initiated a marketing process to obtain debtor-in-possession financing ("<u>DIP Financing</u>").  In connection therewith, the Debtors' advisors prepared a presentation describing the Debtors' capital structure, asset base, and financing needs.  Simultaneously, the Debtors' advisors began identifying potential financing sources, with a focus on institutions with the ability to provide financing on an expedited bases.  In total, the Debtors' advisors contacted 25 potential third-party lending sources.

37.    Of the 25 contacted, seven of the third-party institutions accepted the Debtors' invitation to receive due diligence materials and entered into nondisclosure agreements to allow for due diligence and other exchanges of information.  The Debtors' advisors held follow-up diligence calls with a number of these institutions.  Ultimately, however, despite diligent efforts, the Debtors did not receive any proposals from third-parties.  Instead, only ING was willing to provide the Debtors with any postpetition financing, in the form of the $3,000,000 in bridge financing.  ING further proposed the terms of additional financing in the aggregate amount of

$30,000,000, which the Debtors, ING, and the Prepetition Lenders will continue to negotiate and finalize postpetition.

38.    The Prepetition Lenders have been supportive of the Company and cooperative in their restructuring efforts throughout its prior difficulties.  Currently, the Company and the Prepetition Lenders are making substantial progress toward agreement on the terms of a plan of reorganization that they hope will result in a deleveraged balance sheet and sufficient liquidity to operate their business as a reorganized company, and expect to have a plan support agreement signed while the bridge financing is still outstanding.  Through the bridge financing, ING will provide the liquidity to support the Debtors' operational needs for the next 30 to 45 days while these negotiations are ongoing.  This proposed structure balances the Prepetition Lenders' concerns with providing a full $30,000,000 of funding before the Debtors have a clear path to exit while providing the Debtors with liquidity to fund the Chapter 11 Cases during the interim period.

39.    With bridge financing in place to launch the Debtors on the path to a comprehensive restructuring, on February 2, 2016, the Debtors commenced the Chapter 11 Cases.

## PART II

## FIRST DAY PLEADINGS

40.    In furtherance of the Company's restructuring efforts, the Debtors intend to file the First Day Pleadings,[16] each as listed on the attached Exhibit B, concurrently with this Declaration and respectfully request that this Court enter the proposed orders granting such First Day Pleadings.  I have reviewed each of the First Day Pleadings and proposed orders (including the exhibits thereto) and the facts set forth therein are true and correct to the best of my

---

[16]    Any term not defined herein has the meaning ascribed to it in the specific First Day Pleading being described.

knowledge, information, and belief.  Moreover, I believe that the relief sought in each of the First

Day Pleadings (a) is vital to enable the Debtors to make the transition to, and operate in, chapter

11 with minimum interruption or disruption to their business or loss of productivity or value and

(b) constitutes a critical element in maximizing value during the Chapter 11 Cases.

**A.      Administrative Pleadings (Items 1 through 4)**

41.      The Debtors have filed four "administrative" pleadings that seek to (1) jointly

administer the Chapter 11 Cases for procedural purposes only, (2) extend the time for the

Debtors to file their schedules and statements, (3) authorize the Debtors to file a consolidated list

of creditors, and (4) authorize the Debtors to retain Kurtzman Carson Consultants LLC ("KCC")

as noticing and claims agent.  The Debtors' attorneys have explained to me the customary

practices with regard to the requested relief in chapter 11 business reorganization cases and the

rationale for these pleadings.

Joint Administration (Item 1)

42.      The Debtors are requesting that the Chapter 11 Cases be jointly administered only

for procedural purposes.  As set forth above, each of the Debtors are affiliated with one another.

I believe that joint administration of these cases will avoid the unnecessary time and expense of

duplicative motions, applications, orders, and other pleadings, and related notices, that otherwise

would need to be filed in all of the cases absent joint administration.  Moreover, joint

administration will relieve this Court of the burden of entering duplicative orders and

maintaining duplicative files, and will ease the burden on the office of the United States Trustee

in supervising these cases.  Accordingly, I believe that joint administration will save

considerable time and expense for the Debtors, the Clerk of the Court, the U.S. Trustee, and

other parties in interest, which will, in turn, result in substantial savings for the Debtors' estates.

<u>Motion to File Consolidated List of Creditors (Item 2)</u>

43.    The Debtors seek entry of any order (a) authorizing the Debtors to file a consolidated list of creditors in lieu of submitting separate mailing matrices for each Debtor; (b) authorizing the Debtors to redact certain personal identification information for individual creditors; and (c) granting related relief.

44.    I believe that permitting the Debtors to maintain a single consolidated list of creditors, in lieu of filing a separate creditor matrix for each Debtor, is warranted.  Requiring the Debtors to segregate and convert their computerized records to a Debtor-specific creditor matrix format would be an unnecessarily burdensome task and result in duplicate mailings.  Moreover, I believe that cause exists to authorize them to redact address information of individual creditors, because such information could be used to perpetrate identity theft.

<u>Extension of Time to File Schedules and Statements (Item 3)</u>

45.    It is my understanding that the Debtors are required to file certain schedules of assets and liabilities and statements of financial affairs  (the "<u>Schedules and Statements</u>")  30 days after the Petition Date.  I further understand that the Debtors are requesting that this Court extend the time by which the Debtors must file their Schedules and Statements by 30 days, to 60 days after the Petition Date.

46.    I have worked closely with the Debtors management and employees and I believe that, given the burdens already imposed on the Debtors' management by the commencement of the Chapter 11 Cases, the limited number of employees available to collect the information, the competing demands upon such employees, and the time and attention the Debtors must devote to the chapter 11 process, the Debtors may be unable to complete the Schedules and Statements by the current 30-day deadline.  In addition, I believe that the requested extension will enhance the

accuracy of the Schedules and Statements and avoid the necessity of substantial subsequent amendments.

47.     Accordingly, the I believe that cause exists to extend the current deadline for an additional 30 days, until 60 days after the Petition Date.

Application to Retain KCC as Claims and Noticing Agent (Item 4)

48.     The Debtors seek authority to retain KCC as claim and noticing agent in the Chapter 11 Cases.  I understand that requesting such appointment is required by the rules of this Court given that the Debtors have more than 200 creditors and/or parties in interest listed on their creditor matrix.  I believe that KCC's retention is the most effective and efficient manner of noticing these creditors and parties in interest of the filing of the Chapter 11 Cases and other developments in the Chapter 11 Cases.  In addition, KCC will transmit, receive, docket, and maintain proofs of claim filed in connection with the Chapter 11 Cases.  Accordingly, I believe that retention of KCC, an independent third party with significant experience in this role, to act as an agent of this Court, is in the best interests of the Debtors and their estates and their creditors.[17]

**B.      Operational Pleadings (Items 5 through 11)**

Motion to Continue Cash Management System (Item 5)

49.     The Debtors have filed a motion to continue their ordinary course banking practices.  I understand that the Debtors maintain a relatively simple cash management system (the "Cash Management System") maintained in financially stable FDIC-insured banks, that facilitate the efficient flow and management of funds involved in the Debtors' operations.  In particular, prior to the commencement of the Chapter 11 Cases, the Debtors maintained three

---

[17]    The Debtors also intend to file an application to retain KCC to perform certain administrative services under Bankruptcy Code section 327.

cash accounts out of which they managed cash receipts and disbursements (the "Cash Accounts"), 13 zero-balance accounts (the "Zero-Balance Accounts") required under the Second Amended and Restated Credit Agreement, and four restricted cash accounts holding certificates of deposit securing various bonds required by the State of Wyoming and other regulatory agencies (the "Restricted Cash Accounts").   Two of the Cash Accounts are maintained at JPMorgan Chase Bank, N.A. The other Cash Account and the Zero-Balance Accounts are maintained at is at The Bank of New York Mellon Corporation.  The Restricted Cash Accounts are maintained at First Interstate Bank.

50.     I believe that the Cash Management System is essential to enable the Debtors to control and monitor funds, ensure cash availability and liquidity, comply with the requirements of their financing arrangements, and reduce administrative expenses by facilitating the movement of funds and enhancing the development of accurate account balance information.

51.     Business Forms.  In the ordinary course of business, the Debtors use checks, business letterhead, purchase orders, invoices, envelopes, promotional materials, and other business forms and correspondence (collectively, the "Business Forms").  Because the Business Forms were used prepetition, they do not reference the Debtors' current status as debtors in possession.  Requiring the Debtors to modify the Business Forms would unnecessarily distract the Debtors from their restructuring efforts and impose needless expenses on the estates.

52.     Intercompany Transactions.  In the ordinary course of business, the Debtors engage in various transactions relating to the business relationships between and among themselves (the "Intercompany Transactions").  The Intercompany Transactions include payments and services under a management services agreement between Ryckman and Peregrine

Midstream, by which Peregrine Midstream provides certain management and administrative services to support the Debtors' operations.

53.    I understand that the Intercompany Transactions are generally intended to reduce administrative costs and ensure the orderly and efficient operation of the Debtors' business. Accordingly, I strongly believe that the failure to continue the Intercompany Transactions in the ordinary course of business would unnecessarily and severely hinder the Debtors' operations.  In particular, absent Peregrine Midstream's ability to continue to perform under the Management Services Agreement, Ryckman would potentially lose key personnel, office space, and support services.  Avoiding such hindrances by continuing the Intercompany Transactions is therefore in the best interests of the estates.

54.    Accordingly, the Debtors are requesting authorization to continue to maintain existing bank accounts and the existing Cash Management System and to pay related prepetition obligations.  The Debtors are also seeking authorization to continue using existing Business Forms.  Finally, the Debtors seek authorization for the continuation of Intercompany Transactions and granting of administrative expense priority status to postpetition Intercompany Claims.  I believe such relief is necessary to the successful operations and, thus, restructuring efforts, of the Debtors postpetition.

Waiver of Investment and Deposit Requirements (Item 6)

55.    I am advised by counsel that Bankruptcy Code section 345 establishes certain investment and deposit restrictions.  I believe that the Debtors' use of their bank accounts substantially conforms with the approved investment and deposit practices identified in Bankruptcy Code section 345, and that all money deposits are safe and prudent and yield, under the circumstances, the maximum reasonable net return on such money.  This includes certain of

the Debtors' funds that are required to be held in certificates of deposit due to applicable state law.

56.     Nonetheless, out of an abundance of caution, to the extent that such deposits do not conform to the approved practices identified in Bankruptcy Code section 345, the Debtors seek to have such requirements waived so as to allow the Debtors' banks to accept and hold such funds in accordance with the Debtors' prepetition practices. In my opinion, a waiver of the section 345 requirements is in the best interests of the estates, all creditors and other parties in interest.

<u>Payment of Employee and Payroll Obligations (Item 7)</u>

57.     I believe that in order to minimize the personal hardship that the Debtors' employees will suffer if prepetition obligations are not honored, as well as the harm which would result to the Debtors if employee morale is not maintained, it is of critical importance that the Debtors pay prepetition wages, compensation, and amounts associated with employee benefit programs and continue such programs in the ordinary course.

58.     The Debtors have 35 employees (the "<u>Employees</u>"), 30 of which are employed by Rickman. Six are employed at the Debtors' Houston headquarters; 23 work at the Ryckman Creek Facility in Wyoming, and one is considered to be employed in Michigan. Twenty of these Employees are hourly, one of whom works part time. Ten Employees are full-time and salaried. The remaining five Employees are holders of member interests in Peregrine Midstream who also serve as Employees of Peregrine Midstream.

59.     I believe that substantially all of the Debtors' Employees are owed less than the priority cap established under the Bankruptcy Code, and I understand, may therefore have claims with respect to their accrued but unpaid prepetition wages or salaries that I am told are granted priority over certain other claims under the Bankruptcy Code.

60.    <u>Wages and Salaries</u>. The Debtors estimate that, as of the Petition Date, approximately $172,365 in wages, salaries, and related payroll taxes are accrued and unpaid, but no Employee has accrued but unpaid compensation in excess of the priority cap established by the Bankruptcy Code.

61.    <u>Other Compensation:  Vacation, Holiday, and Sick Time, and Business Expenses</u>. The Debtors also offer their Employees other forms of compensation, including vacation time ("<u>Vacation Time</u>"), paid holidays, sick time, severance payments, and reimbursement of certain business expenses. The precise amount of paid Vacation Time, holiday time, and sick time depends on whether the Employee is full- or part-time and the Employee's position within the management structure.  The Debtors anticipate that their Employees will use any accrued Vacation Time, holiday time, or sick time in the ordinary course of business without resulting in any material cash flow requirements beyond the Debtors' normal payroll obligations.  The Debtors estimate that, as of the Petition Date, the Employees had accrued approximately $138,694 of unused Vacation Time.

62.    In addition, the Debtors routinely reimburse the Employees for certain expenses incurred within the scope of their employment, including expenses for travel, lodging, ground transportation, meals, supplies, and miscellaneous business expenses (collectively, the "<u>Reimbursable Expenses</u>").  The Debtors also have a corporate credit card for purposes of certain expenses. The Employees who do not have corporate credit cards and incur out-of-pocket costs are reimbursed for these expenses. As of the Petition Date, the Debtors estimate that their accrued and unpaid obligations for the Reimbursable Expenses, including amounts outstanding on the corporate credit cards, are approximately $17,700.

63.     These forms of compensation are usual, customary, and necessary if the Debtors are to retain qualified employees during the reorganization process.

64.     <u>Employee Benefit Plans</u>.  The Debtors have established plans and policies to provide their Employees with (a) health benefits, including medical, dental, and vision benefits and (b) insurance benefits, including long-term disability, life insurance, supplemental life insurance, and accidental death and dismemberment insurance (collectively, the "<u>Employee Benefits</u>").  The Debtors fund the medical and insurance benefits through Company and Employee contributions.  The Employee Benefits represent an important component of an Employee's compensation.

65.     The Debtors offer the Employees a medical insurance plan (the "<u>Medical Plan</u>") through BlueCross BlueShield of Texas.  The Medical Plan is funded through Employee contributions by participating Employees and by the Debtors.  The Debtors do not believe that there are any unpaid claims, costs, or surcharges under the Medical Plan as of the Petition Date, though some claims may have been submitted but not yet reported to the Debtors.

66.     The Debtors also offer the Employees dental benefits (the "<u>Dental Plan</u>") through Guardian Life Insurance of America.  The Dental Plan is funded through contributions by participating Employees and by the Debtors.   To the Debtors' knowledge, no unpaid claims, costs, or surcharges are outstanding under the Dental Plan as of the Petition Date.

67.     The Debtors offer eligible Employees life, accidental death and dismemberment, supplemental life, short-term disability, and long-term disability, and supplemental long-term disability insurance (collectively, the "<u>Life Insurance Plans</u>") under policies issued by Principal Financial Group.  The Debtors pay for certain of these plans, while others are optional plans purchased by eligible Employees at their own expense. The Debtors do not believe that they owe

any outstanding prepetition obligations under the Life Insurance Plans.  Out of an abundance of

caution, however, the Debtors seek authority to pay any prepetition amounts due on account of

the Life Insurance Plans in the ordinary course.

68.    <u>Workers Compensation</u>.  The Debtors also provide workers' compensation

benefits to all the Employees.  Workers' compensation benefits for the Debtors' Wyoming

Employees are provided through Wyoming's state-run workers' compensation fund.  Workers'

compensation benefits for the Debtors' Houston-based Employees are covered under the

Debtors' workers' compensation insurance program, administered by Federal Insurance.  The

Debtors are aware of no pending or asserted workers' compensation claims, have posted no

collateral in favor of Federal Insurance, have made no reserves for potential liability, and are

otherwise unaware of any outstanding prepetition workers' compensation obligations.

Nonetheless, there may be unasserted workers' compensation claims against the Debtors or other

workers' compensation obligations relating to the prepetition period.

69.    <u>Employee Withholdings</u>.  Finally, the Debtors routinely withhold from Employee

paychecks amounts that the Debtors are required to transmit to third parties.  Examples of such

withholding include Social Security, FICA, federal and state income taxes, garnishments,

charitable donations, health care payments, other insurance payments, and certain other

voluntary payroll deductions.  The Debtors  request authority to direct such withheld amounts to

the appropriate parties.

70.    <u>Continuation of Employee Programs</u>.  The Debtors seek to continue their ordinary

course Employee compensation (including, without limitation, wages, salaries, commissions, and

bonuses), paid time off, benefits (including, without limitation, insurance and retirement),

expense reimbursement, the corporate credit card, workers' compensation, and related programs

during the postpetition reorganization process. I believe the continuation of these programs is essential to the success of the Debtors' reorganization.

71.     I firmly believe that continued payment, when due, of prepetition wages and salaries, and the continuation, without interruption, of compensation and benefit plans, policies, programs, and practices described herein is necessary to ensure the ongoing services of the Debtors' Employees during the Chapter 11 Cases.

Utilities (Item 8)

72.     In connection with the operation of their business and the management of their properties, the Debtors obtain propane, electricity, telephone, internet and technology, trash pick-up, security lock, and similar utility products and services (collectively, the "Utility Services") from various utility companies (the "Utility Companies"). The Debtors have filed a motion requesting that this Court approve the Debtors' proposed form of adequate assurance of postpetition payment (the "Proposed Adequate Assurance") to the Utility Companies, as that term is used in Bankruptcy Code section 366, approving procedures for resolving any objections by the Utility Companies relating to the Proposed Adequate Assurance, and prohibiting the Utility Companies from altering, refusing, or discontinuing service to, or discriminating against, the Debtors.

73.     In particular, the Debtors have proposed for the Utility Companies the establishment of a newly-created, interest-bearing segregated account in which the Debtors will place a deposit equal to approximately two (2) weeks of Utility Services (the "Utility Deposit Account"). I believe that creation of the Utility Deposit Account and the additional procedures set forth in the motion adequately protect the rights that I have been advised are provided to the Utility Companies under the Bankruptcy Code, while also protecting the Debtors' need to continue to receive, for the benefit of their estates, the Utility Services upon which their

businesses depend.  The Debtors estimate the aggregate of all the Utility Deposits will be approximately $35,500.

74.    I believe that any interruption in Utility Services, even for a brief period of time, would disrupt the Debtors' ability to continue operations.  Such a result could potentially jeopardize the Debtors' ability to perform under their customer contracts and impair the Debtors' reorganization efforts and, ultimately, the value of the Debtors' business.  In my opinion, it is critical that Utility Services continue uninterrupted during the Chapter 11 Cases.

Tax Motion (Item 9)

75.    The Debtors, in the ordinary course of their businesses, incur certain prepetition fees and taxes, including, without limitation, payroll taxes and franchise taxes (the payroll taxes and franchises taxes, the "Taxes"), and have generally paid such tax liabilities as they become due.[18]  As of the Petition Date, the Debtors were substantially current in the payment of assessed and undisputed Taxes; however, certain Taxes attributable to the prepetition period were not yet due.  Specifically, in the aggregate, the Debtors estimate that approximately $17,000 in prepetition Taxes will become due and payable following the Petition Date.

76.    The Debtors believe that a majority of the Taxes constitute so-called trust fund obligations that are required to be collected from third parties and held in trust for payment to the taxing and regulatory authorities.  Consequently, I have been advised that the funds that would be used to pay the trust fund Taxes are not property of the Debtors' estates.

77.    Additionally, the taxing authorities may cause the Debtors to be audited if Taxes are not paid immediately.  Such audits will unnecessarily divert the Debtors' attention away from

---

[18]    However, Debtors currently owe approximately $1,400,000 on account of past due 2015 property taxes to Uinta County, Wyoming.  The Debtors are not seeking authority to pay property taxes pursuant to the Tax Motion.

the reorganization process and may cause expense and distraction in excess of the relatively minimal amount of the Taxes.  In all cases, the Debtors' failure to pay Taxes could have an adverse impact on their ability to operate in the ordinary course of business.

78.     I have also been advised that the federal government and certain states have laws providing that a company's officers, directors, or other responsible employees could, under certain circumstances, be held personally liable for the payment of certain Taxes. In such event, collection efforts by the taxing authorities would be extremely distracting for the Debtors and their directors and officers in their efforts to bring the Chapter 11 Cases to an expeditious conclusion.

Insurance (Item 10)

79.     In the ordinary course of their business, the Debtors maintain various insurance policies (the "Insurance Policies") providing coverage for, among other things, general liability, workers' compensation liability, directors and officers liability, umbrella liability, automotive liability, pollution and remediation, crime, and property.  I believe that no amounts are currently outstanding on the Insurance Policies (except, as set forth more fully below, the premium financing arrangements), but out of an abundance of caution, the Debtors are requesting authorization, but not direction, to pay any prepetition amounts that are discovered to be owing and to continue to pay the policies as they come due without further court order.

80.     The Insurance Policies are essential to the preservation of the value of the Debtors' business, property, and assets.  Not only are some of the Insurance Policies required by various regulations, laws, and contracts that govern the Debtors' commercial activities, but I am informed by counsel that failure to maintain insurance could result in conversion or dismissal of the Chapter 11 Cases or a failure to comply with applicable U.S. Trustee guidelines.

81.     Certain of the Insurance Policies are obtained via up-front payment to insurers, including the Debtors' director and officers' liability, environmental and pollution liability, and commercial crimes policies. However, it is not always economically advantageous for the Debtors to pay the premiums on all of their insurance policies on a lump-sum basis.  Accordingly, in the ordinary course of the Debtors' business, the Debtors finance the premiums on some of their policies pursuant to a premium financing agreement (the "Existing PFA") with AFCO Premium Credit LLC ("AFCO"), to whom the Debtors pay monthly installments. The next installment will be due on February 9, 2015, and will be partially attributable to the prepetition period.

82.     If the Debtors are unable to continue making payments on the Existing PFA, AFCO may be permitted to terminate certain of the Insurance Policies to recoup their losses. The Debtors would then be required to obtain replacement insurance on an expedited basis and at a cost to the estates.  If the Debtors are required to obtain replacement insurance and to pay a lump sum premium for such insurance policy in advance this payment would be likely greater than what the Debtors currently pay.  Even if the Insurance Providers were not permitted to terminate the agreements, any interruption of payment would have an adverse effect on the Debtors' ability to finance premiums for future policies.

83.     In light of the importance of maintaining insurance coverage with respect to their business activities and preserving liquidity by financing their insurance premiums, the Debtors believe it is in the best interest of their estates to receive this Court's approval to honor their obligations under the Existing PFA and, as necessary, renew or enter into new such agreements.

Critical Vendors (Item 11)

84.    With the assistance of its advisors, the Debtors conducted a review of their vendors with possible outstanding prepetition claims to determine how to minimize the disruption of the ongoing business from the commencement of the Chapter 11 Cases.

85.    The Debtors and their advisors considered numerous factors to determine which vendors are critical vendors and suppliers (the "Critical Vendors"), including whether the vendor is: (i) essential to maintenance of ongoing commercial operations, continued smooth operation of the Debtors' business, acquisition and continued compliance with necessary permits and essential computer and software equipment critical to the continued operations of the Debtors' business; (ii) replaceable without significant disruption to the Debtors' postpetition operations; and/or (iii) likely to continue doing business with the Debtors notwithstanding nonpayment of prepetition claims as the Debtors do not have executory contracts with the Critical Vendors.

86.    Following this analysis, the Debtors identified the following types of goods and service providers as critical to the Debtors' continued operation: (a) safety and regulatory, (b) engineering, (c) critical local suppliers.  I believe that most of the Critical Vendors are sole-source suppliers without whom the Debtors could not operate and who could not be replaced within a reasonable time on terms as beneficial to the Debtors as those already in place, because, in part, they have specialized knowledge.  I believe that if the Critical Vendors did not continue to supply their goods or services, it would cause future revenues of the Debtors to suffer materially.  For these reasons, the Debtors believe that failure to timely pay the Critical Vendor Claims would cause disproportionate harm and economic damage to the Debtors' business, without any corresponding benefit for other stakeholders.  Conversely, the timely payment of such claims will facilitate the Debtors' reorganization.  Accordingly, the Debtors seek authority,

but not direction, to pay the prepetition claims of the Critical Vendors to induce the continued
support of the Critical Vendors for the Debtors' reorganization.

87.    Moreover, the Debtors intend to enter into trade agreements with their Critical
Vendors where possible pursuant to which the Critical Vendors agree to provide goods and
services on beneficial trade terms.  I believe entry into the trade agreements will provide a
benefit to the Debtors in excess of the amount of the Critical Vendor Claims we seek to pay.

88.    Based on their books and records, the Debtors estimate that they have outstanding
trade payables totaling approximately $60,000,000 as of the Petition Date.  The Debtors seek
authority, in their sole discretion, to pay the Critical Vendor Claims, in the aggregate amount of
up to $500,000 on an interim basis, and in the aggregate amount of up to $4,000,000 on a final
basis.  Given the nature of the Debtors' business, the demonstrated benefits of paying the Critical
Vendor Claims, and the risks associated with non-payment, I believe that this is a reasonable and
appropriate cap on the expenditure of estate funds.

**C.    Approval of DIP Financing and Access to Cash Collateral (Item 12)**

89.    The Debtors are also requesting authorization to enter into a $3,000,000 bridge
facility (the "Bridge Facility") pursuant to the terms and conditions of the Ryckman Creek
Resources, LLC Terms and Conditions of Proposed Senior Secured, Super-Priority Debtor-in-
Possession Bridge Facility Term Sheet, attached as Exhibit A to the motion (as amended,
modified, and/or supplemented at or before the Final Hearing (defined below), the "Bridge
Financing Term Sheet") and up to $30,000,000 of secured postpetition loans (the "DIP Facility"
and together with the Bridge Facility, the "Postpetition Facilities") pursuant to the terms of a
senior secured, super-priority debtor-in-possession credit agreement (the "DIP Credit
Agreement") to be filed prior to the final hearing on the DIP Facility.  As set forth above,

following a marketing process, the Debtors determined that the proposed Postpetition Facilities represented the best available option for the Company to obtain essential post-petition financing.

90.    In connection with the proposed Postpetition Facilities, the Debtors seek, among other things: (i) authorization to continue to use Cash Collateral; (ii) authorization to obtain the Bridge Facility in an aggregate principal amount of up to $3,000,000 and the DIP Facility in an aggregate principal amount of $30,000,000 (the availability of which shall be subject to the terms and conditions to be set forth in the DIP Credit Agreement); (iii) authorization to grant to the DIP Lenders, subject to the Carve-Out (as defined in the Bridge Financing Term Sheet or the DIP Credit Agreement, as applicable), superpriority administrative expense claims with priority over all other administrative expenses pursuant to Bankruptcy Code section 364(c)(1) with respect to all the DIP Obligations; (iv) authorization to grant valid, binding, continuing, enforceable, fully-perfected first priority senior security interests to the DIP Lenders; (v) authorization to provide adequate protection to the Prepetition Lenders pursuant to Bankruptcy Code sections 361, 363(e), and 364(d); (vi) an interim hearing to be held before this Court to consider entry of an interim DIP order, which would authorize the Borrowers to obtain the Bridge Facility in an aggregate principal amount of $3,000,000 to (a) fund postpetition working capital needs of the Debtors, (b) pay interest, fees, and expenses payable under the Bridge Facility, (c) pay prepetition claim payments and adequate protection payments, if any, and (d) to pay certain other costs and expenses of administration of the Chapter 11 Cases, in each case, subject to and to the extent identified in the Initial Budget and the Updated Budget (each as defined in the Bridge Financing Term Sheet), as applicable, each as approved by the DIP Agent in its sole discretion; provided that  professional fees paid in accordance with compensation procedures approved by this Court may be paid up to the total cumulative amount shown in the

Initial Budget and any Updated Budgets, and (vi) a final hearing on the DIP Motion be held

before this Court to consider entry of a final order.

91.     I believe that the Debtors have an immediate need for adequate postpetition

financing to continue operating their business in the ordinary course and preserve the value of

their assets.  The Debtors sought and were unable to obtain adequate unsecured credit allowable

as an unsecured claim or superpriority administrative expense because nearly all of the Debtors'

assets remain subject to the prepetition liens of the Prepetition Lenders.  I believe the proposed

Postpetition Facilities reflect the most favorable terms on which lenders were willing to offer

financing, particularly after consideration of the costs associated with obtaining DIP financing on

a non-consensual priming basis.  I further believe that the proceeds from the proposed

Postpetition Facilities will allow the Debtors to continue their operations in the ordinary course,

maintain prudent cash balances, satisfy working capital requirements, fund restructuring costs,

and otherwise meet their liquidity needs throughout the Chapter 11 Cases.  Finally, I believe,

after consultation with the Debtors' advisors, that the terms of the Bridge Financing Term Sheet

are fair and reasonable.

I declare under penalty of perjury that the foregoing is true and correct.


Dated:        February 2, 2016


By:        */s/ Robert D. Albergotti*
           Name: Robert D. Albergotti
           Title: Vice President of Restructuring

# EXHIBIT A

## Corporate Organizational Chart

Exhibit A

Corporate Structure



## EXHIBIT B

### List of First Day Motions

1.    Debtors' Motion for Order (A) Directing Joint Administration of Cases Under Bankruptcy Rule 1015(b) and Local Bankruptcy Rule 1015-1 and (B) Waiving Requirements of Bankruptcy Code Section 342(c)(1) and Bankruptcy Rules 1005 and 2002(n)

2.    Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to File a Consolidated List of Creditors in lieu of Submitting a Separate Mailing Matrix for each Debtor, (II) Authorizing the Debtors to Redact Certain Personal Identification Information for Individual Creditors, and (III) Granting Related Relief

3.    Debtors' Motion for Order Under Bankruptcy Code Sections 105 and 521, Bankruptcy Rule 1007(c), and Local Bankruptcy Rule 1007-1(b) Extending Time for Debtors to File Schedules and Statements

4.    Debtors' Application for Entry of Order Under Section 156(c) of Title 28 of the United States Code, Bankruptcy Code Section 105(a), Bankruptcy Rule 2002, and Local Bankruptcy Rule 2002-1(f) Authorizing the Debtors to Employ and Retain Kurtzman Carson Consultants LLC as Claims and Noticing Agent Nunc Pro Tunc to the Petition Date

5.    Debtors' Motion for Order Under Bankruptcy Code Sections 105(a), 345(b), 363, and 503(b), Bankruptcy Rules 6003 and 6004, and Local Bankruptcy Rule 2015-2 (I) Authorizing Continued Maintenance of Prepetition Bank Accounts and Payment of Related Prepetition Obligations, (II) Authorizing Continued Use of Existing Cash Management System, (III) Authorizing Continued Use of Existing Business Forms, and (IV) Authorizing the Continuation of, and Accordance of Administrative Expense Priority Status to, Intercompany Transactions

6.    Debtors' Motion for Interim and Final Orders Under Bankruptcy Code Sections 105 and 345 and Local Bankruptcy Rule 2015-2(b) Waiving Investment and Deposit Requirements

7.    Debtors' Motion for Interim and Final Orders Pursuant to Bankruptcy Code Sections 105(a), 363, 507(a), 1107(a), and 1108 and Bankruptcy Rule 6003, Authorizing Debtors to Pay Prepetition Wages, Compensation, and Employee Benefits

8.    Debtors' Motion for Interim and Final Orders Under Bankruptcy Code Sections 105(a) and 366 (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment, (II) Establishing Procedures for Resolving Objections by Utility Companies, and (III) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service

9.      Debtors' Motion for Order Under Bankruptcy Code Sections 105(a), 507(a)(8), and 541 and Bankruptcy Rule 6003 Authorizing the Debtors to Pay Certain Prepetition Sales, Use, and Other Such Trust Fund Taxes and Related Obligations

10.     Debtors' Motion for Order Under Bankruptcy Code Sections 105(a), 363(b), 364, 1107(a), and 1108 and Bankruptcy Rules 6003 and 6004 Authorizing Payment of Critical Vendors

11.     Debtors' Motion for Order Under Bankruptcy Code Sections 105, 361, 362, 363, 364, 1107, and 1108 and Bankruptcy Rule 6003 Authorizing the Debtors to (I) Maintain Existing Insurance Policies and Pay All Insurance Obligations Arising Thereunder; (II) Renew, Revise, Extend, Supplement, Change, or Enter Into New Insurance Policies; and (III) Continue to Honor Insurance Premium Financing Obligations

12.     Debtors' Motion for Interim and Final Orders Under Bankruptcy Code Sections 105, 361, 362, 363 and 364, Bankruptcy Rules 2002 and 4001, and Local Bankruptcy Rule 4001-2 (I) Authorizing the Debtors to (A) Obtain Postpetition Financing on a Secured, Superpriority Basis and (B) Use Cash Collateral, (II) Granting Adequate Protection, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief