## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| RYCKMAN CREEK RESOURCES, LLC, | : | |
| et al.,[1] | : | Case No. 16-10292 (KJC) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | D.I. 1462 |
| | : | |

### OPINION[2]

### BY:    KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE

Contract interpretation is an all-too-familiar task in the bankruptcy litigation world, finding particular importance and often complexity in the context of post-confirmation disputes. Before the Court is JLL Consultants, Inc., in its capacity as liquidating trustee (the "Liquidating Trustee") of the Ryckman Liquidating Trust's (the "Liquidating Trust"), motion to enforce provisions of the Confirmed Plan of Reorganization (the "Plan of Reorganization" or the "Plan")[3] as to Plan Sponsor Belle Butte LLC (the "Motion to Enforce").[4] The Motion to Enforce presents two discrete questions. One, does Section 9.11(c)(ii)(A)(z) of the Amended and Restated LLC Agreement (the "LLC Agreement") create a preset, mathematically determined minimum floor price for Belle Butte's call option? Two, is Belle Butte bound by its exercise of the call option to go forward with the process in light of the dispute between the parties about how the purchase price is to be

---

[1] The Reorganized Debtors, along with the last four digits of their respective taxpayer identification numbers are as follows: Ryckman Creek Resources, LLC (4180), Ryckman Creek Resources Holding Company LLC, Peregrine Rocky Mountains LLC, and Peregrine Midstream Partners LLC (3363). The address of the Debtors' corporate headquarters is 3 Riverway, Suite 1100, Houston, TX 77056.

[2] This Opinion constitutes the findings of fact and conclusions of law required by Fed. R. Bankr. P. 7052. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157. This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(1) and (b)(2)(A), (M) & (O).

[3] See D.I. 1364 [hereinafter, the "Plan of Reorganization" or the "Plan"].

[4] See D.I. 1462.

calculated? As presented in the discussion below, the Court answers both of these questions in the affirmative, and accordingly, the Motion to Enforce will be granted.

## BACKGROUND

Ryckman Creek Resources ("Ryckman"), a natural gas storage services company, filed for bankruptcy under chapter 11 of the Bankruptcy Code on February 2, 2016. Ryckman continued as debtors-in-possession through the Court's confirmation of the Plan on December 22, 2017 (the "Confirmation Order");[5] the Plan Effective Date was December 27, 2017. As of the Effective Date, Ryckman (now known as Spire Storage West LLC) became Reorganized Ryckman[6] as defined by the Plan.

Belle Butte purchased Ryckman's businesses pursuant to the financing structure described in the Plan and the Plan Sponsorship Transaction Documents,[7] which includes the LLC Agreement.[8] Under the Plan Sponsor Agreement,[9] Belle Butte purchased 80% of the new equity created in Reorganized Ryckman in exchange for $16 million and a secured promissory note (the "Plan Sponsor Note").[10] In part, the Plan provided for the creation of the Liquidating Trust. Belle Butte had the option under Section 9.11(c) of the LLC Agreement to purchase the remaining 20% equity interests (the "Call Option") owned by the Liquidating Trust. The combined 80% and 20% equity interests are categorized throughout the documents as the "Class B Membership Interests."

---

[5] *See* D.I. 1403.
[6] "Reorganized Ryckman" is also referred to throughout as the "Company."
[7] *See* Plan of Reorganization, Art. I(B), § 1.118: "Plan Sponsorship Transaction Documents" means the Plan Sponsor Agreement, the Reorganized Ryckman LLC Agreement, the Plan Sponsor Note, and other definitive documentation governing the Plan Sponsorship Transaction, including all exhibits, appendices, schedules, and other documents and agreements related thereto or entered into in connection therewith.
[8] *See* D.I. 1462, Exhibit 1 [hereinafter, the "LLC Agreement"]. The LLC Agreement is governed by Delaware law. *See* Section 13.12 of the LLC Agreement.
[9] *See* D.I. 1364, starting at 82 of 279 [hereinafter, the "Plan Sponsor Agreement"].
[10] *See* D.I. 1462, Exhibit 2 [hereinafter, the "Plan Sponsor Note"].

2

Plan Article I(B), § 1.110 provides:

"Plan Sponsor Call Option" means the right of the Plan Sponsor pursuant to the terms of the Reorganized Ryckman LLC Agreement, to purchase all of the then-outstanding Liquidating Trust Common Units at a purchase price, as of the date of the Call Option Notice (as defined in the Reorganized Ryckman LLC Agreement) equal to the sum of (a) the greater of (i) the Fair Market Value (as defined in the Reorganized Ryckman LLC Agreement) as determined by an independent appraiser and (ii) the value of the Liquidating Trust Common Units assuming an equity value of the Reorganized Ryckman equal to $50 million plus (b) $1 million.[11]

The corresponding provision in the LLC Agreement, Section 9.11(c), provides:

The "Call Price" for the Class B Membership Interests to be purchased by the Plan Sponsor pursuant to the Call Option shall (i) be determined as of the applicable date of the Call Option Notice and (ii) equal to the sum of (A) the greater of (y) the Fair Market Value of the Class B Membership Interests as determined by the Appraiser and (z) the value of the Class B Membership Interests assuming an equity value of the Company equal to $50,000,000 plus (B) $1,000,000. The costs, fees and expenses related to such appraisal shall be paid by the Plan Sponsor and the Liquidating Trust in proportion to their respective Class B Percentage Interests.[12]

As the inverse to the Call Option, the LLC Agreement granted the Liquidating Trust put options for the same 20% equity in Reorganized Ryckman (the "Put Option"). Under the Put Option, the Liquidating Trustee could exercise its option during the interval of September 27, 2018 and October 27, 2018 for a total of $5.6 million, or during the interval of May 27, 2019 and June 26, 2019 for a total of $7.2 million.

The Plan Sponsor Note contains an acceleration clause, triggered upon exercise by Belle Butte of the Call Option, requiring immediate payment to the Liquidating Trustee of all outstanding amounts due and owing under the Plan Sponsor Note.[13]

---

[11] *See* Plan of Reorganization, at Art. I(B) § 1.110.

[12] LLC Agreement, Section 9.11(c).

[13] Plan Sponsor Note, at 8, § 7.1:
> "Final Maturity Date" means the date of the earliest to occur of (a) the Scheduled Maturity Date, (b) an Event of Default, (c) the Transfer (as defined in the LLC Agreement) of any Membership Interest (as defined in the LLC Agreement) by the Maker, or (d) the exercise by the Maker of the FMV Call Right (as defined in the LLC Agreement).

In addition to the Class B Membership Interests, under the Plan, Belle Butte was provided with what are called "Class A Membership Interests." Such interests are entitled to distributions in accordance with Section 4.1 of the LLC Agreement.

On June 7, 2018, Belle Butte sent the Liquidating Trustee a letter, pursuant to Section 9.11(c) of the LLC Agreement, exercising the Call Option (the "Call Option Notice").[14] The Call Option Notice put forth Belle Butte's intention to purchase the remaining 20% Class B Membership Interests for its total appraised price of $500,000 plus $1 million.

On June 13, 2018, the Liquidating Trustee responded in writing to Belle Butte, requiring additional documentation in support of Belle Butte's appraisal and requesting confirmation that Belle Butte intended to pay the asserted minimum floor price of $11 million set by Section 9.11(c) of the LLC Agreement (the "Liquidating Trustee Response").[15]

On June 25, 2018, the Liquidating Trustee filed the Motion to Enforce, seeking an order (i) staying the appraisal process subject to a decision regarding the language of Section 9.11(c); (ii) requiring Belle Butte to pay the minimum floor price of $11 million as required by Section 9.11(c); and (iii) requiring Belle Butte to pay the outstanding balance on the Plan Sponsor Note as accelerated by Belle Butte's exercise of the Call Option. Williams Insulation Company, a statutory lienholder on the real estate on which the business operates, filed a joinder to the Motion to Enforce on July 6, 2018. The Court held a preliminary oral argument regarding the stay of the appraisal process on July 9, 2018, and determined that a stay was appropriate under the circumstances.[16] Subsequently, Belle Butte filed its objection to the Motion to Enforce on July 30,

---

[14] *See* D.I. 1462, Exhibit 3 [hereinafter, the "Call Option Notice"].
[15] *See* D.I. 1462, Exhibit 4 [hereinafter, the "Liquidating Trustee Response"].
[16] *See* Transcript of July 9, 2018 Oral Argument, D.I. 1484.

2018 (the "Objection"). The Court held oral argument on the remaining matters in the Motion to Enforce on August 9, 2018.[17] Subsequently, the Court took the matter under advisement.

## DISCUSSION

I.    The Scope of the Court's Analysis

The threshold exercise is to determine the parameters of what can be considered in interpreting Section 9.11(c) of the LLC Agreement. Section 13.10 of the LLC Agreement (the "Integration Clause") dictates that the LLC Agreement is the entire agreement between the parties and supersedes all prior writings or agreements. In general, under the parole evidence rule, if an agreement is considered "fully integrated," evidence of prior or contemporaneous discussions, documents, or other miscellaneous materials may not be used to either contradict or supplement the terms of the agreement. Here, the Integration Clause clearly marks the LLC Agreement as fully integrated, and further, the parties have agreed to such a designation. However, the parole evidence rule does not prevent the production of evidence to assist in resolving ambiguity in an agreement or to reconcile an agreement that clearly does not reflect the intent of the parties thereto.

Specifically, the Delaware Supreme Court in *Eagle Industries, Inc. v. DeVilbiss Health Care, Inc.* explained:

> If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity. But when there is uncertainty in the meaning and application of contract language, the reviewing court must consider the evidence offered in order to arrive at a proper interpretation of contractual terms.[18]

---

[17] *See* Transcript of August 9, 2018 Oral Argument, D.I. 1501.
[18] 702 A.2d 1228, 1232 (Del. 1997) (citing *Pellaton v. Bank of New York,* 592 A.2d 473, 478 (Del. Super. 1991)).

Ambiguity does not arise merely from the presence of differing interpretations.[19] "Rather, a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings."[20] "Ambiguity does not exist where the court can determine the meaning of a contract 'without any other guide than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends.'"[21]

The parties have agreed and stipulated on numerous occasions that the LLC Agreement is unambiguous. I agree. Although the Liquidating Trustee and Belle Butte do not agree on how the Court should interpret Section 9.11(c), this alone does signify ambiguity. Therefore, because the LLC Agreement is unambiguous, I am limited to the "four corners" of the document to instruct my interpretation.[22]

But, the LLC Agreement is not the only operative document which bounds this analysis. Rather, the entirety of the Plan Sponsorship Transaction Documents constitute the closed-universe of documents to be considered. As stated above, the Plan Sponsorship Transaction Documents cover the "Plan Sponsor Agreement, the Reorganized Ryckman LLC Agreement, the Plan Sponsor Note, and other definitive documentation governing the Plan Sponsorship Transaction, including all exhibits, appendices, schedules, and other documents and agreements related thereto or entered into connection therewith."[23] Such other definitive documentation consists of the Plan itself and

---

[19] See *Rhone-Poulenc Basic Chemicals Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992) ("A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction.").
[20] *Id.* (citing *Hallowell v. State Farm Mut. Auto. Ins. Co.*, 443 A.2d 925, 926 (Del. 1982)).
[21] *Id.* (quoting *Holland v. Hannan*, 456 A.2d 807, 815 (D.C. 1983)).
[22] *In re Energy Future Holdings Corp.*, 540 B.R. 96, 103 (Bankr. D. Del. 2015) ("Where the contract is clear and unambiguous on its face, the intent of the parties must be gleaned from within the four corners of the instrument, and not from extrinsic evidence.").
[23] Plan of Reorganization, Art. I(B), § 1.118.

the associated Disclosure Statement.[24] While the parties stipulated at oral argument that these documents necessarily must be considered, Belle Butte argued for the inclusion of additional evidence. Specifically, Belle Butte argued that the Court also should consider other evidence, such as: Williams Insulation Company's ("WIC") prior objection to the Disclosure Statement, which was subsequently withdrawn; any purported conversations or speculative motives behind various other parties' actions;[25] or Belle Butte's actions regarding the Call Option. However, such evidence is extraneous to the central documents in this case, and therefore will not be considered.

Now that the parameters are set, the next step is to analyze Section 9.11(c), the operative clause at issue here.

II.    Section 9.11(c)(ii)(A)(z) of the LLC Agreement Creates a Minimum Floor Price of $11 million for the Call Option.

Section 9.11(c) of the LLC Agreement is broken into two possible purchase prices for the Class B Membership Interests owned by the Liquidating Trust, with the eventual Call Price reflecting whichever dollar figure, either under subsection (y) or (z), is greater. Subsection (y) requires a Fair Market Value appraisal, by the Appraiser, of the Class B Membership Interests. Subsection (z) requires a calculation of the value of the Class B Membership Interests with an *assumed* equity value of the Company equal to $50 million. From the outset, Fair Market Value, a term defined in Section 3.7 of the LLC Agreement and the non-defined term "value" may appear to be at odds with each other. Section 3.7 of the LLC Agreement states:

> Determination of Fair Market Value. Any determination of the Fair Value of the Company or a Subsidiary (for purposes of this Section 3.7, the "Fair Market Value") shall take into account, among other matters, lack of marketability and lack of control discounts, according to the following procedures:

---

[24] *See* D.I. 1271 [hereinafter, the "Disclosure Statement"].
[25] Such other parties include, but are not limited to, the DIP Lenders and statutory lienholders.

(c) In the event that one of the Proposed Values submitted under subparagraph (b) is more than 10% higher than the other Proposed Value, then within ten Business Days after the submission of such proposals, the Initial Class B Members shall jointly select and retain an independent regionally recognized valuation firm (the "Appraiser")

....

(h) Notwithstanding anything in this Agreement to the contrary, any determination of Fair Market Value to this Section 3.7 shall be applicable only for purposes of the specific instance for which such Fair Market Value is determined, and shall not apply to any other instance requiring a determination of Fair Market Value.[26]

The Liquidation Trustee points to this difference in terms as an indicator that subsection (z) requires a simple mathematical calculation, whereas subsection (y) requires an appraisal process as contemplated in Section 3.7. On the other hand, Belle Butte contends that both subsections require an appraisal of the Class B Membership Interests, with subsection (z) providing only a starting point for the appraisal process.

Belle Butte defends its position primarily through an exhaustive exploration of the meaning of the word, "value," in subsection (z). Belle Butte first looks to "value" under Black's Law Dictionary as, "[t]he monetary worth or price of something; the amount of goods, services, or money that something commands in exchange,"[27] and Merriam Webster's Collegiate Dictionary, "A fair return or equivalent in goods, services, or money for something exchanged," or "the monetary worth of something: marketable price."[28] Next, Belle Butte identifies the numerous other occurrences of the word "value" throughout the LLC Agreement.[29] However, and particularly noteworthy, Belle Butte cites primarily to occurrences of "value" as part of a broader, defined

---

[26] LLC Agreement, at Section 3.7.
[27] Black's Law Dictionary, at 1690 (9th ed. 2009).
[28] Merriam Webster's Collegiate Dictionary, at 1305 (10th ed. 1998).
[29] *See* D.I. 1490, at 24 n.93 (summarizing the appearance of the word "value" in 72 places in "six different contexts.").

term, *e.g.* "Fair Value of the Company," defined in Section 1; and "Fair Market Value," defined

in Section 3.7.[30] Belle Butte additionally compares the matter at hand to the Delaware Minority

Interest Appraisal Statute for the proposition that the word "value" requires an appraisal and does

not contemplate a fixed amount.[31]

     In further support, Belle Butte cites to the Third Circuit's decision in *In re Oakwood Homes*

*Corp.* for the proposition that the Bankruptcy Code distinguishes between use of the word "value"

and a fixed amount.[32] In that case, as neither the word "value" nor the word "amount" is defined

in the Bankruptcy Code,[33] the Third Circuit thoroughly investigated certain provisions of the

Bankruptcy Code:

> Most significant is how the Bankruptcy Code itself uses "amount" and "value."
> U.S. Bank argues that "as of the date of the filing of the petition" axiomatically
> requires that a present value calculation be performed on the "amount" of a claim.
> However, as JP Morgan correctly notes, where the Bankruptcy Code intends a court
> to discount something to present value, the Code clearly uses the term "value, as
> of" a certain date. *See, e.g.*, 11 U.S.C. §§ 1129 ("value, as of the effective date of
> the plan"), 1173 (same), 1225 (same), 1325 (same), 1328 (same). Many sources
> support the use of the term "value" for this purpose; none support U.S. Bank's
> contention that "amount ... as of" also implies a present value calculation.[34]

     Belle Butte's argument for transplanting such proposition from the Bankruptcy Code to the

LLC Agreement belies a significant flaw in its interpretation. Neither Section 9.11(c), nor any of

the cited, operative provisions of the LLC Agreement contain the word "amount." Here, the correct

analysis centers not between "value" and "amount," but rather between "value" and "Fair Market

Value." The same dynamic appears in Plan Art. I(B) § 1.110.

---

[30] *See id.*

[31] *See* Objection to the Motion to Enforce, D.I. 1490, at 27; *see also* 8 Del. C. § 262(a).

[32] 449 F.3d 588 (3d Cir. 2006). As a side note, and perhaps unintended in Belle Butte's argument, Belle
Butte cites to the definition of "value" in Black's Law Dictionary as "[t]he monetary worth or price of
something; the *amount* of goods, services, or money that something commands in exchange." Black's Law
Dictionary 1690 (9th ed. 2009) (emphasis added).

[33] *Id.* at 597 (citing 11 U.S.C. § 101).

[34] *Id.*

"The words of a contract are deemed to have their ordinary meaning *appropriate to the subject matter*, unless a special or unusual meaning of a particular term or usage was intended, and was so understood by the parties."[35] Words cannot be interpreted in a vacuum, but in relation to the context of their inclusion. Undefined "value" in the context of Section 9.11(c), when contrasted with the defined term "Fair Market Value," does not refer to a similar appraisal process, but rather refers to the agreed, predesignated, assumed $50,000,000 equity value of the Company. Thus, the minimum price for the 20% Class B Membership Interests upon exercise of the Call Option is $10 million, plus the additional $ 1 million.

At oral argument, counsel for Belle Butte asserted that, if in fact the parties had intended to set a floor price in Section 9.11(c), "[t]hey could have written a formula that makes that... clearer in Section 9.11(c) and it would simply be a statement as follows. 'The amount calculated by multiplying the then outstanding percentage of Class B membership interest held by the liquidating trust by an assumed equity value of the company equal to $50 million.'"[36] While such language may have been employed by the parties, it was not. It is not the court's role to redraft retroactively a disputed contract. Arms-length, heavily negotiated contracts between parties with counter-veiling interests often invariably produce disputes.[37] Simply put, it is the court's job to interpret what is written, not to "write it better."

Another major point of emphasis in Belle Butte's Objection is that the Class A Membership Interests should be considered equity, similar to that of the Class B Membership Interests. Consequently, if such interests constitute equity, Belle Butte contends that the $50,000,000

---

[35] *Lockheed Martin IR Imaging Sys., Inc. v. West*, 108 F.3d 319, 322 (Fed. Cir. 1997) (emphasis added).

[36] Transcript of July 9, 2018 Oral Argument, D.I. 1484, at 39:8–13.

[37] *See* Restatement (Second) of Contracts § 20, cmt. b (1981) ("Almost never are all the connotations of a bargain exactly identical for both parties; it is enough that there is a core of common meaning sufficient to determine their performances with reasonable certainty or to give a reasonably certain basis for an appropriate legal remedy.").

assumed equity value in Section 9.11(c)(ii)(A)(z) must be adjusted to reflect a discount for the value of the Class A Membership Interests. The Court need not look further than the Plan Sponsorship Transaction Documents themselves to inform its decision. Specifically, § 1.1 of the Plan Sponsor Agreement states:

> Section 1.1 <u>Investment</u>. On the terms and subject to the conditions set forth in this Agreement and, subject to approval by the Bankruptcy Court of the Reorganization Plan, at the Closing, the Company shall issue (a) to Plan Sponsor new common equity interest of the Company representing 80% of the outstanding equity interests in Reorganized Ryckman pursuant to the Reorganization Plan (the "<u>Acquired Equity</u>") and (b) to the Liquidating Trust new common equity interest of the Company representing 20% of the outstanding equity interests in Reorganized Ryckman pursuant to the Reorganization Plan (the "<u>LT Equity</u>").[38]

Section 3.3(b) of the Plan Sponsor Agreement states:

> (b) Upon the Closing and after giving effect to the Confirmation Order and the Reorganization Plan, the authorized equity of Reorganized Ryckman shall consist solely of the Acquired Equity, which shall constitute eighty-percent (80% of the outstanding capital equity of Reorganized Ryckman), and the LT Equity, which shall constitute twenty-percent (20% of the outstanding equity of Reorganized Ryckman). Upon the Closing (prior to the issuance of the New Equity) there shall not be outstanding any authorized equity of Reorganized Ryckman, other than the New Equity to be issued by Reorganized Ryckman to or for the benefit of Plan Sponsor upon the effectiveness of the Reorganization Plan.[39]

As evident from the language above, only the Acquired Equity and LT Equity constitute the authorized equity of the Company. At no point does the Plan Sponsor Agreement, or any of the Plan Sponsorship Transaction Documents for that matter, bestow "equity status" to the Class A Membership Interests. Rather, Class A Membership Interests are provided for differently under the LLC Agreement. Section 4.1(a) of the LLC Agreement states:

> (a) Until a Trigger Event has occurred, an amount equal to 100% of Available Cash with respect to each fiscal quarter of the Company shall be distributed to the Class A Members in proportion to their Class A Percentage Interest until the aggregate amount of such distributions equals the Trigger Threshold. For the avoidance of doubt, prior to the occurrence of a Trigger Event, the

---

[38] Plan Sponsor Agreement, at Section 1.1.
[39] *Id.* at Section 3.3(b).

Class B Members shall not be entitled to any distributions hereunder in respect of the Class B Membership Interests.[40]

After the Trigger Threshold, which is the greater of a 200% return on total invested capital or a 15% internal rate of return with respect to the Class A Membership Interests, the Class A Membership Interests evaporate and are no longer entitled to distributions. Despite Belle Butte's contention that the Class A Membership Interests share some qualities with preferred equity, the capitalization of the Company, provided for in Section 3.1(b) of the LLC Agreement and the accompanying Schedule 3.1, does not categorize the Class A Membership Interests as equity. Further, Section 9.11(c) of the LLC Agreement makes no mention of the Class A Membership Interests, referring only to the Class B Membership Interests.

At oral argument, the parties stipulated that the Fair Market Value of the Company is substantially less than the assumed equity value of $50 million:

> THE COURT: So, let me ask this. It seems apparent to me, and both parties have the opportunity to correct me if they think I'm wrong, that both parties are deeply embedded in the belief that the value is worth far less than $50 million dollars...

> MR. GORDON: Yes, and we are not disputing their $31 million-dollar valuation. We don't have our own independent appraisal, but we are not taking the position in any way shape or form that the equity value of the reorganized debtor is greater than $50 million dollars.[41]

In sum, because Section 9.11(c) sets a minimum floor price for the Call Option and because the parties have stipulated that the Fair Market Value is, without question, less than the $50 million assumed equity value, Belle Butte is required to pay $11 million for its exercise of the Call Option.

---

[40] LLC Agreement, at Section 4.1(a).
[41] *See* Transcript of August 9, 2018 Oral Argument, D.I. 1501, at 49:8–12, 18–22.

III.    Belle Butte Validly Exercised the Call Option and Cannot Subsequently Withdraw.

In the alternative, Belle Butte contends, even if Section 9.11(c)(ii)(A)(z) does set a minimum floor price for the Call Option, Belle Butte never sufficiently accepted the Liquidating Trustee's offer of the Call Option. Under Section 18 of the Restatement (Second) of Contracts, the formation of a contract requires a "[m]anifestation of mutual assent to an exchange… that each party either make a promise or begin or render a performance."[42] In terms of accepting an offer, "Delaware follows the mirror image rule, requiring the acceptance to be identical to the offer… A contract cannot be formed unless there has been a valid acceptance."[43] The Delaware District Court explained the effect of the mirror image rule as follows:

> Under the common law of Delaware, in the context of two parties exchanging documents with the intent to enter into a contract, the so-called "mirror image rule" determines whether a contract is formed by one party's confirmation or acceptance of the other party's proposal. If the second party replies to the first party's proposal with terms which vary from those in the proposal, the second party's reply is deemed to be a rejection of the first party's proposal and a simultaneous counter-offer, which the first party is free to accept or reject. Simply stated, the terms of the reply must "mirror" the terms of the initial proposal. Under the old common law mirror-image rule, an acceptance must agree to terms identical to the offer in order for the acceptance to result in a binding contract.[44]

Accordingly, for the Call Option Notice to constitute a valid acceptance of the Call Option, it must comply with the requirements of the LLC Agreement. Looking to the documents in question, Section 9.11 of the LLC Agreement states:

> (a) At any time after the Effective Date, Plan Sponsor shall have the right and option to purchase all, but not less than all, of the then-outstanding Class B Membership Interests held by the Liquidating Trust (and its permitted transferees in accordance with Article 9, including the Liquidating Trust Beneficiaries) at a purchase price equal to the Call Price (as defined below). The right of the Plan Sponsor set forth in this Section 9.11 to purchase the Class B Membership Interests of the Liquidating

---

[42] Restatement (Second) of Contracts § 18 (1981).

[43] *Johnson v. Rooney*, 2011 WL 2178693, at *2 (Del. Super Ct. May 25, 2011).

[44] *Pack & Process, Inc. v. Glob. Paper & Plastics*, 1996 WL 490264, at *7 (D. Del. Aug. 19, 1996) (citing *Falcon Tankers, Inc. v. Litton Sys., Inc.*, 355 A.2d 898, 904 (Del. Super. Ct. 1976)).

Trust (and the Class B Membership Interests of its permitted transferees) is referred to as the "*Call Option*".

(b) The Call Option shall be exercised by written notice to the Liquidating Trust signed by an officer of the Plan Sponsor on behalf of the Plan Sponsor (the "*Call Option Notice*"). The Call Option Notice shall set forth (i) the number of Class B Membership Interests desired to be purchased, which shall be all of the then-outstanding Class B Membership Interests held by the Liquidating Trust and any of its permitted transferees, (ii) the consideration to be paid for such Class B Membership Interests, including the relevant valuation of the Company determined in accordance with Section 9.11(c)....

Belle Butte was required to provide written notice of the number of Class B Membership Interests it was purchasing, the consideration for the same, and the valuation used to determine the overall appraisal figure. Belle Butte did just that and sent the Liquidating Trustee the Call Option Notice on June 7, 2018, explicitly stating that Belle Butte was exercising the Call Option to purchase the 20% Class B Membership Interests held by the Liquidating Trustee, "in accordance with Section 9.11 of the [LLC Agreement]."[45] Specifically, the Call Option Notice states that the consideration would be "for a Call Price of $1,500,000, which represents $500,000 for the [interests] plus $1,000,000 in accordance with Section 9.11(c) of the LLC Agreement."[46] The Call Option Notice further details that Belle Butte appraised the current equity valuation of the Company to be $31 million, the valuation taking into account an increase in gas storage prices, an increase in long-term contracted storage volume, capital expenditures, and performance according to an attached operating plan.

Belle Butte argues that, if the Court interprets Section 9.11(c) to impose a minimum floor price of $11 million, the Call Option Notice should be categorized as a counter-offer, as opposed to the acceptance of the Call Option. Belle Butte's argument is unavailing. This contention misapprehends the nature of the Call Option. The Call Option is itself the "offer" to Belle Butte.

---

[45] Call Option Notice, at 1.
[46] *Id.*

The Call Option Notice is the "acceptance" by Belle Butte to initiate the valuation process. That the Liquidating Trustee responded to the Call Option Notice with a different view of what the valuation should be is not the defining factor here. Rather, in its response, the Liquidating Trustee "notifie[d] Belle Butte of its intention to invoke its rights… to put forth its own Fair Market Value of the Class B Membership Interests, and, if necessary, proceed with an Appraiser…."[47]

As the Liquidating Trustee points out, the LLC Agreement does not provide a mechanism for withdrawing from the exercise of the Call Option. In an attempt to circumvent the absence of such a provision, counsel for Belle Butte, at oral argument, for the first time, asserted that the parties had not sufficiently had a "meeting of the minds," which, in theory, would nullify the parties' mutual assent to be bound by the Call Option, and consequently would void the contract.[48]

The "heart" of the Call Option is the *process* for determining the price of the 20% Class B Membership Interests.[49] The Call Option validly left open the matter of whether the Fair Market Value of the Company exceeded the assumed equity value of $50 million. Accordingly, contrary to Belle Butte's position, the necessary meeting of the minds revolved around the parties' mutual assent to the process under Section 9.11(c), not the eventual consideration.

The Liquidating Trustee Response notes Belle Butte's valuation, requests supporting documentation for the same, and then states, "Additionally please confirm that, as required under Section 9.11(c)(ii)(A)(z) of the LLC Agreement, Belle Butte intends to pay at least $10 million for the called Call B Membership Interests…."[50] The Liquidating Trustee followed up to ensure compliance with Section 9.11(c)(ii)(A)(z). Accordingly, and because the evidence at the Court's

---

[47] Liquidating Trustee Response, at 2.
[48] *See, e.g.*, Transcript of August 9, 2018 Oral Argument, D.I. 1501, at 34:10–13 ("But if you determine the price should be ten million, then we believe there was no meeting of the minds on exercise of the call option and you should simply leave the parties where they're at."); *id.* at 42:23–25.
[49] *See Cont'l Warranty, Inc. v. Warner*, 108 F. Supp. 3d 250, 253 (D. Del. 2015).
[50] Liquidating Trustee Response, at 1.

disposal does not support a finding that the parties never had a "meeting of the minds," the Court

finds that the Call Option Notice was a valid acceptance of the Call Option, binding Belle Butte to

continue its participation in the process it initiated. Moreover, to the extent that the Call Option

Notice is instead the "offer" and the Liquidating Trustee's Response is either the "acceptance" or

a "counter-offer," the Liquidating Trustee's agreement to engage in the valuation process is

sufficient "acceptance" of the Call Option Notice, even if the parties had differing views of how

to the read the key provision in the LLC Agreement.

## CONCLUSION

The parties agree that this was a heavily negotiated, arms-length transaction between two

sophisticated parties.[51] Essentially, after acquiring 80% of the Company's equity at a bankruptcy

discount, Belle Butte apparently looks now to re-trade the deal for the remaining 20%. However,

under the clear, unambiguous language of Section 9.11(c), Belle Butte is bound by the minimum

floor price of $11 million.

Accordingly, and for the foregoing reasons, the Court will sustain the Liquidating Trustee's

Motion to Enforce the Plan as to Belle Butte, and will order Belle Butte to (i) pay $11 million in

exchange for the Class B Membership Interests as required by Section 9.11(c); and (ii) pay the

outstanding balance of $10 million on the accelerated Plan Sponsor Note in accordance with

Section 7.1 of the Plan Sponsor Note.[52]

BY THE COURT:

_____
KEVIN J. CAREY
UNITED STATES BANKRUPTCY COURT

DATED:  August 29, 2018

---

[51] Transcript of August 9, 2018 Oral Argument, D.I. 1501 at 10:7–13.
[52] *See* Plan Sponsor Note, at 8, § 7.1.